**CASES ARGUED AND DETERMINED**

IN THE

# SUPREME COURT

OF THE

# STATE OF CONNECTICUT

––––––––––

ANGELA BORELLI, ADMINISTRATRIX (ESTATE
OF BRANDON GIORDANO) *v.* ANTHONY
RENALDI ET AL.
(SC 20232)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiff, the administratrix of the estate of the decedent, B, sought to
recover damages for the death of B as a result of the alleged negligence
of the defendants, the town of Seymour and three officers of the Seymour
Police Department. B was a backseat passenger in a vehicle operated
by E. E had activated underglow lights that were affixed to the undercar-
riage of the vehicle, the use of which are illegal, and an officer of the
Seymour Police Department, observing the lights, pursued E's vehicle
in an attempt to pull E over. In response to the pursuit, E operated
his vehicle at a high rate of speed, and, after the officer activated his
emergency lights and siren, he notified dispatch that he was in pursuit
of E's vehicle. Within two minutes of the start of the pursuit, E's vehicle
struck an embankment and flipped onto its roof, causing injuries to B
that ultimately resulted in his death. The plaintiff alleged, inter alia,
that the officer negligently pursued E's vehicle, the shift supervisor
negligently failed to follow department protocol and failed to order the
termination of the pursuit, and the defendant town was liable pursuant
to statute (§ 52-557n (a) (1) (A)) for the negligent acts of its employees
and was required to indemnify the defendant officers. The trial court
granted the defendants' motion for summary judgment, concluding that

––––––––––

*The listing of justices reflects their seniority status on this court as of
the date of oral argument.

1

Borelli *v.* Renaldi

they were entitled to governmental immunity and that the plaintiff's claim regarding indemnification also failed as a matter of law. In concluding that the defendants were immune from liability, the court reasoned that, although the statute (§ 14-283 (d)) governing the operation of emergency vehicles and the town pursuit policy required police officers, in determining whether to initiate a pursuit, to drive with due regard for the safety of the general public, that mandate necessarily required officers to exercise their judgment and that their duty under those provisions, therefore, was discretionary. The trial court rendered judgment for the defendants, from which the plaintiff appealed. *Held*:

1. This court having concluded that § 14-283 (d), the uniform statewide pursuit policy set forth in the applicable state regulations (§§ 14-283a-1 through 14-283a-4), and the town pursuit policy require officers to exercise judgment in determining whether to pursue a fleeing motorist, the trial court correctly concluded that the defendant officers had a discretionary, rather than a ministerial, duty under § 14-283 (d) to drive with due regard for the safety of all persons and property and, therefore, were entitled to immunity from liability for their decision to pursue E's vehicle: the phrase "due regard" in § 14-283 (d) imposes a general duty on officers to exercise their judgment and discretion in a reasonable manner, and, therefore, the duty to act with due regard is a discretionary one, and the imposition of a discretionary duty under § 14-283 (d) was further supported by prior cases of this court that have interpreted similar statutory language to create a discretionary, rather than a ministerial, duty to act; moreover, the uniform statewide pursuit policy set forth in §§ 14-283a-1 through 14-283a-4 of the state regulations reinforces the discretionary nature of the duty of officers in the context of police pursuits, as that policy requires officers to evaluate the particular circumstances presented and to weigh the risks presented by pursuing a vehicle against the risks presented by not pursuing; furthermore, the language of the town pursuit policy also reinforces the discretionary nature of the duty imposed on the defendant officers, as that language makes clear that they are required to exercise their judgment and discretion in evaluating the particular circumstances in determining whether to engage in and to continue a pursuit.

2. The trial court correctly determined that the plaintiff had failed to prove that the identifiable person-imminent harm exception to discretionary act immunity applied, as the plaintiff failed to demonstrate that B was an identifiable person or a member of a class of foreseeable victims: the record revealed that B was not legally compelled to get into E's vehicle and was a voluntary passenger, and, thus, the plaintiff failed to demonstrate that B was a member of a class of foreseeable victims; moreover, notwithstanding the plaintiff's suggestion that, because § 14-283 (d) requires officers to drive with due regard for the safety of the general public, B belonged to a class of foreseeable victims, that suggestion was inconsistent with both this court's prior interpretations

Borelli *v.* Renaldi

of the scope of the identifiable person-imminent harm exception and the public policy principles underlying the grant of governmental immunity to the discretionary acts of municipal officers; furthermore, the plaintiff's argument that B was an identifiable person implicated the same public policy principle as her argument that he was a member of a class of foreseeable victims, as, in the context of a police pursuit, there always will be at least one person whose presence the police could or should be aware of, namely, the driver of the pursued vehicle, and, if this court agreed with the plaintiff, the exception would swallow the rule.

(*Two justices concurring separately in two opinions*;
*one justice dissenting in one opinion*)

Argued April 29, 2019—officially released June 24, 2020**

*Procedural History*

Action to recover damages for, inter alia, the death of the plaintiff's decedent as a result of the alleged negligence of the named defendant et al., and for other relief, brought to the Superior Court in the judicial district of Ansonia-Milford, where the defendants filed apportionment complaints against Angela Borelli and Eric Ramirez; thereafter, the court, *Tyma, J.*, granted the defendants' motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed. *Affirmed.*

*Steven J. Errante*, with whom were *Matthew D. Popilowski* and, on the brief, *Daniel P. Scholfield* and *Marisa A. Bellair*, for the appellant (plaintiff).

*Thomas R. Gerarde*, with whom was *Kristan M. Maccini*, for the appellees (defendants).

*Opinion*

KAHN, J. This appeal requires us to consider the narrow question of whether a town and its municipal police officers are shielded by governmental and qualified immunity from liability for the decision to initiate a high-speed police pursuit that lasted less than two

** June 24, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Borelli *v.* Renaldi

minutes and ended in a fatal automobile accident. The plaintiff, Angela Borelli, administratrix of the estate of Brandon Giordano (decedent), appeals[1] from the judgment of the trial court granting summary judgment in favor of the defendants, the town of Seymour (town) and three officers of the Seymour Police Department (department), Officer Anthony Renaldi, Officer Michael Jasmin and Sergeant William King. The plaintiff claims that the trial court incorrectly concluded that (1) General Statutes § 14-283 (d)[2] imposes a discretionary rather than a ministerial duty on police officers "to drive with due regard for the safety of all persons and property" in determining whether to pursue a motorist who flees when an officer attempts to pull him or her over, and (2) the plaintiff failed to demonstrate that any issue of material fact remained regarding whether the decedent was an identifiable victim subject to imminent harm on the basis of the court's finding that there was no evidence in the record supporting that conclusion. We affirm the judgment of the trial court.

It is important at the outset to emphasize what this case is *not* about. The issue presented in this appeal is independently narrowed by the statutory language and the claims raised by the plaintiff on appeal. First, although the plaintiff's complaint reasonably may be read to have raised the issue of whether governmental immunity shields officers with respect to the *manner* of driving while pursuing a fleeing motorist, her argument on appeal focuses exclusively on whether governmental immunity applies to an officer's decision to engage in such a pursuit. Second, § 14-283 pertains solely

_____

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Although § 14-283 has been amended by the legislature since the events underlying the present case; see, e.g., Public Acts 2014, No. 14-221, § 1; these amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

Borelli *v.* Renaldi

to the operation of emergency vehicles while responding to emergency calls. See General Statutes § 14-283 (a) (''As used in this section, 'emergency vehicle' means any ambulance or vehicle operated by a member of an emergency medical service organization responding to an emergency call, any vehicle used by a fire department or by any officer of a fire department while on the way to a fire or while responding to an emergency call but not while returning from a fire or emergency call, any state or local police vehicle operated by a police officer or inspector of the Department of Motor Vehicles answering an emergency call or in the pursuit of fleeing law violators or any Department of Correction vehicle operated by a Department of Correction officer while in the course of such officer's employment and while responding to an emergency call.'') Nothing in the language of § 14-283 suggests that it pertains to the operation of emergency vehicles under routine conditions. This decision, accordingly, does not address the question of whether governmental immunity applies to routine driving of emergency response vehicles by municipal actors.

The trial court found the following facts to be undisputed. ''On the evening of March 9, 2012, [the decedent] was a backseat passenger in a Ford Mustang convertible operated by his friend, [Eric] Ramirez. Another friend, Dion Major, was a passenger in the front seat. They were headed to Major's house in Seymour at the time of the accident.

''Ramirez exited Route 8 northbound at exit 22 in Seymour, and proceeded to turn left onto Route 67 toward Oxford. At the time he was operating his vehicle on Route 67, Ramirez had activated a set of lights that were affixed to the undercarriage. The lights are commonly referred to as underglow lights, the use of which . . . are illegal in this state.

''As Ramirez proceeded on Route 67 in Seymour, his vehicle came to the attention of Renaldi, who was patrol-

Borelli *v.* Renaldi

ling the west side of Seymour.[3] Renaldi observed Rami-
rez' vehicle had illuminated underglow lights, and he
decided to pull him over. Renaldi was quickly able to
position his vehicle behind Ramirez' vehicle. Ramirez
accelerated his vehicle in response, and Renaldi sped
up his vehicle in an attempt to lessen the distance
between the two vehicles. Ramirez continued operating
his vehicle at a high rate of speed and illegally passed
a few vehicles being operated in the same direction of
travel on Route 67. At the time Ramirez illegally passed
the vehicles, if not before that time, Renaldi activated
his emergency lights and siren with the intent to stop
Ramirez' reckless driving. After he activated his lights
and sirens, Renaldi notified dispatch that he was
engaged in pursuit of Ramirez' Mustang. Renaldi pur-
sued Ramirez' vehicle into Oxford. After a few miles,
Ramirez turned off Route 67 onto Old State Road in
Oxford. Renaldi lost sight of the vehicle when it turned
onto Old State Road. While operating his vehicle on
Old State Road, Ramirez' vehicle struck an embankment
off the side of Old State Road and turned over onto its
roof. [The decedent], who was fifteen years old at the
time, was killed in the accident. Ramirez and Major sur-
vived. Renaldi located the overturned vehicle near a com-
mercial building, approximately two-tenths of one mile
from the intersection of Route 67 and Old State Road.
The entire pursuit lasted less than two minutes.'' (Foot-
note added.)

The plaintiff subsequently brought this action against
the town, Renaldi, Jasmin,[4] and King. The complaint

---

[3] Renaldi testified at his deposition that, because he was traveling in the
opposite direction at the time that he observed the Mustang's underglow
lights, he made a U-turn in order to position himself behind the Mustang.
Major recalled the start of the pursuit differently, and testified at his deposi-
tion that Renaldi's car was positioned to the side of the road, "hiding" in
between a Peak Fitness building and a gate. According to Major, the police
cruiser pulled out behind the Mustang after they passed it, and the driver
did not make a U-turn. We consider it immaterial whether Renaldi made a
U-turn or pulled out from the side of the road.

[4] There was conflicting evidence as to whether Jasmin had joined the
pursuit of the Mustang. In a statement provided to the police and attached as

Borelli *v.* Renaldi

alleged that Renaldi and Jasmin were negligent in pursuing Ramirez' vehicle, that King, who was the shift supervisor, negligently failed to follow department protocol requiring him to evaluate the initiation and continuation of the pursuit and negligently failed to order the termination of the pursuit, and that the town was liable pursuant to General Statutes § 52-557n (a) (1) (A) for the negligent acts of its agents and/or employees and also was liable to indemnify the officers pursuant to General Statutes § 7-465. The defendants moved for summary judgment as to all counts of the complaint, arguing, inter alia, that the plaintiff's claims were barred by the doctrine of governmental immunity and that no exception applied.

The trial court granted the defendants' motion, first concluding that the officers' alleged actions "inherently involve[d] the exercise of judgment and discretion." The court reasoned that, although both § 14-283 and the Seymour Police Department Pursuit Policy (town pursuit policy) require police officers, in determining whether to initiate a pursuit, to drive with due regard for the safety of the general public, that mandate necessarily requires officers to exercise their judgment. The court particularly pointed to the language of the town pursuit policy, which directs officers to consider case specific circumstances in determining whether to pur-

an exhibit to the plaintiff's objection to the defendants' motion for summary judgment, a witness stated that he saw two police cruisers pursuing the Mustang. Jasmin swore in an affidavit attached as an exhibit to the defendants' motion for summary judgment, however, that he was not engaged in the pursuit that evening and was not even aware at the time that a pursuit was taking place. The trial court acknowledged that factual dispute and observed that it was undisputed that Jasmin responded to the scene of the accident. Because the trial court concluded that there were no remaining issues of material fact as to governmental immunity, we infer that the court concluded that the factual dispute regarding Jasmin's participation in the pursuit was not material. We agree. Even if we assume without deciding that Jasmin was involved in the pursuit, that fact is immaterial to the question of whether the trial court correctly concluded that the doctrine of governmental immunity applied.

Borelli *v.* Renaldi

sue, such as the nature of the offense, traffic, weather, road conditions and time of day. See Seymour Police Department Pursuit Policy § 5.11.11 (A) through (H). The officers' actions, therefore, were entitled to governmental immunity.

The trial court next turned to the plaintiff's contention that an exception to discretionary act immunity applied because the decedent was a member of a foreseeable class of victims and/or an identifiable individual subject to imminent harm. The court found that there were no allegations or evidence presented that the decedent was a member of a foreseeable class of victims because nothing in the record suggested that the decedent was statutorily compelled or mandated to get into Ramirez' vehicle. The court also found that there was no evidence in the record that Renaldi or Jasmin had notice of the decedent's presence in the vehicle. Therefore, the court concluded, the plaintiff had not met her burden of proving that the decedent was an identifiable person subject to imminent harm. Because the court concluded that the officers and the town were entitled to governmental immunity, it also concluded that the plaintiff's claim for indemnification pursuant to § 7-465 failed as a matter of law. This appeal followed.

We begin with the applicable standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal

Borelli *v.* Renaldi

conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court.'' (Internal quotation marks omitted.) *Reclaimant Corp.* v. *Deutsch*, 332 Conn. 590, 598–99, 211 A.3d 976 (2019).

I

The plaintiff first claims that the trial court incorrectly concluded that § 14-283 (d), as well as the applicable regulations and the town pursuit policy, impose a discretionary rather than a ministerial duty on police officers ''to drive with due regard for the safety of all persons and property'' when determining whether to pursue a fleeing motorist.[5] The plaintiff claims that § 14-

---

[5] We emphasize that the question presented is limited both by the record presented and by the arguments that the plaintiff has presented on appeal. Because the facts of this case involve a police officer's response to observed illegal conduct, this appeal does not concern routine conduct during day-to-day operations but, rather, an officer's response to a violation of the law. Additionally, the plaintiff's argument on appeal narrows the issue presented. Specifically, in her brief, the plaintiff states: ''[T]he question before this court is limited to determining whether the legislature intended to create a ministerial obligation [for] officers to first account for the seriousness of the offense and the dangerousness of the pursuit *before engaging in it* when the legislature passed § 14-283.'' (Emphasis added.) She states that this requirement, ''that an officer, at the start of a pursuit, take account of the safety of others, and balance that against the seriousness of the offense,'' is one that is mandatory and not subject to the officer's discretion. If this court agrees with the plaintiff, she explains, ''it falls to the jury to determine if the pursuing officers failed to take those factors into account at all *when they first engaged in an extremely dangerous, nighttime pursuit* [for] a minor infraction.'' (Emphasis added.) Accordingly, this appeal is confined to an officer's decision to initiate a pursuit and does not concern the much broader question of whether and under what circumstances the duty to drive with due regard for the safety of others is discretionary or ministerial. See *Bieluch* v. *Bieluch*, 199 Conn. 550, 555, 509 A.2d 8 (1986) (declining to address issue not raised in party's brief).

In light of the narrow question presented in this appeal, we disagree with the dissent's assessment of the scope and effect of today's decision. The dissent implicitly acknowledges the narrow reach of our decision when it provides an assessment of what it views as the likely odds that a plaintiff will ''succeed in a negligence lawsuit brought against a municipality or

Borelli *v.* Renaldi

283 (d), the Uniform Statewide Pursuit Policy, set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies, and the town pursuit policy together impose a ministerial duty on police officers to exercise due regard for the safety of all persons and property when initiating a pursuit of a fleeing motorist. Specifically, the plaintiff contends that the applicable provisions impose a ministerial duty on officers, before engaging in a pursuit, to first weigh the seriousness of the precipitating offense and the dangerousness of the pursuit. Because we conclude that the applicable provisions require officers to exercise judgment in determining whether to pursue a fleeing motorist, we conclude that the trial court correctly determined that the duty imposed is discretionary.

The following principles of governmental immunity are pertinent to our resolution of the plaintiff's claims. "The [common-law] doctrines that determine the tort liability of municipal employees are well established. . . . Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts. . . . Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [a ministerial act] refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion. . . .

"Municipal officials are immunized from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure

municipal employee for that employee's negligence." Text accompanying footnote 4 of the dissenting opinion. In a footnote, the dissent qualifies that statement: "This assessment is not meant to include lawsuits seeking recovery for personal injury or property damage caused by the negligent operation of a motor vehicle under routine conditions." Footnote 4 of the dissenting opinion.

Borelli *v.* Renaldi

to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . . This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts. . . .

"The tort liability of a municipality has been codified in § 52-557n. Section 52-557n (a) (1) provides that [e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . . Section 52-557n (a) (2) (B) extends, however, the same discretionary act immunity that applies to municipal officials to the municipalities themselves by providing that they will not be liable for damages caused by negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Violano* v. *Fernandez*, 280 Conn. 310, 318–20, 907 A.2d 1188 (2006).

"For purposes of determining whether a duty is discretionary or ministerial, this court has recognized that '[t]here is a difference between laws that impose general duties on officials and those that mandate a particular

Borelli *v.* Renaldi

response to specific conditions.' *Bonington* v. *Westport*, 297 Conn. 297, 308, 999 A.2d 700 (2010). 'A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment [or discretion] upon the propriety of the act being done.' . . . *Blake* v. *Mason*, 82 Conn. 324, 327, 73 A. 782 (1909) . . . . In contrast, when an official has a general duty to perform a certain act, but there is no 'city charter provision, ordinance, regulation, rule, policy, or any other directive [requiring the government official to act in a] prescribed manner,' the duty is deemed discretionary." (Citations omitted; footnote omitted.) *Northrup* v. *Witkowski*, 332 Conn. 158, 169– 70, 210 A.3d 29 (2019).

"In accordance with these principles, our courts consistently have held that to demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion. . . . Because the construction of any such provision, including a municipal rule or regulation, presents a question of law for the court . . . whether the provision creates a ministerial duty gives rise to a legal issue subject to plenary review on appeal." (Citations omitted; internal quotation marks omitted.) *Ventura* v. *East Haven*, 330 Conn. 613, 631–32, 199 A.3d 1 (2019).

Because this appeal concerns the actions of police officers and the town police department, we also observe that "[i]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality." (Internal quotation marks omitted.) *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 180, 544

Borelli *v.* Renaldi

A.2d 1185 (1988). "Indeed, this court has long recognized that it is not in the public's interest to [allow] a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a [police officer's] discretionary professional duty. Such discretion is no discretion at all. . . . Thus, as a general rule, [p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer." (Citations omitted; internal quotation marks omitted.) *Ventura* v. *East Haven*, supra, 330 Conn. 630–31.

We next turn to the relevant statutory provisions and rules. Section 14-283 permits the operators of emergency vehicles to disregard certain traffic rules in light of the circumstances. The term "emergency vehicle," as used in § 14-283 (a), includes "any state or local police vehicle operated by a police officer . . . in the pursuit of fleeing law violators . . . ." Section 14-283 (b) (1) provides in relevant part that an operator of an emergency vehicle may "(B) . . . proceed past any red light or stop signal or stop sign, but only after slowing down or stopping to the extent necessary for the safe operation of such vehicle, (C) exceed the posted speed limits or other speed limits imposed by or pursuant to section 14-218a or 14-219 as long as such operator does not endanger life or property by so doing, and (D) disregard statutes, ordinances or regulations governing direction of movement or turning in specific directions." The ability to disregard traffic rules is not, however, unlimited. By its terms, § 14-283 applies to state and local police vehicles only when "operated by a police officer or inspector of the Department of Motor Vehicles answering an emergency call or in the pursuit of fleeing law violators . . . ." General Statutes § 14-283 (a). Additionally, subsection (d) of § 14-283 provides: "The provisions of this section *shall not* relieve the operator of an emergency vehicle from the duty to drive *with due regard for the safety of all persons and property*." (Emphasis added.) It is this requirement,

Borelli *v.* Renaldi

that officers drive with due regard for safety, on which the plaintiff relies in contending that the officers' duty to weigh the safety of all persons and property and the seriousness of the offense prior to initiating a pursuit was ministerial, rather than discretionary.

The phrase "due regard," however, rather than mandating a particular response to specific conditions, imposes a general duty on officers to exercise their judgment and discretion in a reasonable manner. See *Bonington* v. *Westport*, supra, 297 Conn. 308 (highlighting significance of "difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions"). Because § 14-283 (d) does not define the phrase "due regard," we are guided by General Statutes § 1-1 (a), which provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." Both the legal and common usage definitions yield the same conclusion—"due regard" directs officers to exercise their judgment prudently. Black's Law Dictionary defines the term "due" as "[j]ust, proper, regular, and reasonable," and "regard" as "[a]ttention, care, or consideration . . . ." Black's Law Dictionary (11th Ed. 2019) pp. 631, 1535. Those definitions evoke the early days of law school, when all aspiring lawyers first learn of the classic concepts of "reasonable consideration" and "due care." "Due regard" is a synonym for those phrases, which embody the duty to exercise good judgment. The technical meaning of the phrase is echoed in the common usage definition. Merriam-Webster's Dictionary defines "with due regard to" as "with the proper care or concern for." Merriam-Webster's Dictionary, available at https://www.merriam-webster.com/dictionary/with due regard to (last vis-

Borelli *v.* Renaldi

ited June 16, 2020). By its very definition, therefore, the duty to act with due regard is a *discretionary duty*.[6]

We also look to a related statute, General Statutes (Supp. 2020) § 14-283a,[7] which authorizes the adoption of "a uniform, state-wide policy for handling pursuits by police officers." General Statutes (Supp. 2020) § 14-

_____

[6] Because the requirement "to drive with due regard for the safety of all persons and property" imposes a duty to exercise discretion, § 14-283 (d) falls squarely within the general rule of § 52-557n (a) (2) that municipalities "shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Nothing in the language of § 14-283, which exclusively governs response to emergencies, supports the position that the legislature intended to impose anything other than a discretionary duty, or that it intended to delineate an exception to § 52-557n.

[7] General Statutes (Supp. 2020) § 14-283a (b) (1) provides: "The Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney, the Police Officer Standards and Training Council, the Connecticut Police Chiefs Association and the Connecticut Coalition of Police and Correctional Officers, shall adopt, in accordance with the provisions of chapter 54, a uniform, state-wide policy for handling pursuits by police officers. Such policy shall specify: (A) The conditions under which a police officer may engage in a pursuit and discontinue a pursuit, (B) alternative measures to be employed by any such police officer in order to apprehend any occupant of the fleeing motor vehicle or to impede the movement of such motor vehicle, (C) the coordination and responsibility, including control over the pursuit, of supervisory personnel and the police officer engaged in such pursuit, (D) in the case of a pursuit that may proceed and continue into another municipality, (i) the requirement to notify and the procedures to be used to notify the police department in such other municipality or, if there is no organized police department in such other municipality, the officers responsible for law enforcement in such other municipality, that there is a pursuit in progress, and (ii) the coordination and responsibility of supervisory personnel in each such municipality and the police officer engaged in such pursuit, (E) the type and amount of training in pursuits, that each police officer shall undergo, which may include training in vehicle simulators, if vehicle simulator training is determined to be necessary, and (F) that a police officer immediately notify supervisory personnel or the officer in charge after the police officer begins a pursuit. The chief of police or Commissioner of Emergency Services and Public Protection, as the case may be, shall inform each officer within such chief's or said commissioner's department and each officer responsible for law enforcement in a municipality in which there is no such department of the existence of the policy of pursuit to be employed by any such officer and shall take whatever measures that are necessary to assure that each such officer understands the pursuit policy established."

All references in this opinion to § 14-283a are to the version of that statute set forth in the 2020 Supplement to the General Statutes.

Borelli *v.* Renaldi

283a (b) (1). As we explain in detail herein, the Uniform Statewide Pursuit Policy adopted pursuant to § 14-283a contemplates that officers will exercise their judgment and discretion in giving due regard to the safety of all persons and property when determining whether to engage a pursuit.

Our conclusion that § 14-283 (d) imposes a discretionary duty on police officers to act finds further support in the decisions of this court, which have interpreted similar statutory language to create a discretionary, rather than a ministerial, duty to act. For example, in *Coley* v. *Hartford*, 312 Conn. 150, 95 A.3d 480 (2014), we considered the type of duty created by General Statutes (Rev. to 2013) § 46b-38b (d) (5) (B), which directs officers who report to the scene of a report of domestic violence, upon determining that no cause exists for arrest, to remain "at the scene for a reasonable time until, in the reasonable judgment of the officer, the likelihood of further imminent violence has been eliminated."[8] The plaintiff in *Coley* argued that, because the statute *required* that officers remain at the scene for a reasonable time and exercise reasonable judgment, they did not have discretion to do otherwise, and the question of the reasonableness of the officers' actions should go to the jury. *Coley* v. *Hartford*, supra, 163. We rejected that argument on the basis that the phrases "reasonable judgment" and "reasonable time" inherently require the exercise of judgment and discretion. (Internal quotation marks omitted.) Id., 165–66. That language, we explained, "makes the manner of performance expressly contingent upon the police officer's discretion . . . ." Id., 166. Similarly, in the present case, the requirement in § 14-283 (d) that, during a pursuit of a fleeing motorist, police officers must drive with

_____

[8] The applicable Hartford Police Department policy and procedure similarly required officers to remain at the scene "for a reasonable time until, in the reasonable judgment of the officer, the likelihood of further imminent violence has been eliminated." *Coley* v. *Hartford*, supra, 312 Conn. 153 n.2.

Borelli *v.* Renaldi

"due regard for the safety of all persons and property," directs officers to exercise their duties with discretion and judgment.

Our conclusion also finds support in the Uniform Statewide Pursuit Policy, set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies.[9] Those regulations dictate generally that "[t]he deci-

---

[9] Section 14-283a-4 of the Regulations of Connecticut State Agencies provides in relevant part: "(a) Initiation of Pursuit.

"(1) The decision to initiate a pursuit shall be based on the pursuing police officer's conclusion that the immediate danger to the police officer and the public created by the pursuit is less than the immediate or potential danger to the public should the occupants of such vehicle remain at large.

"(2) In deciding whether to initiate a pursuit, the police officer shall take the following factors into consideration:

"(A) Road, weather and environmental conditions;

"(B) Population density and vehicular and pedestrian traffic;

"(C) Whether the identity of the occupants is known and immediate apprehension is not necessary to protect the public or police officers and apprehension at a later time is feasible;

"(D) The relative performance capabilities of the pursuit vehicle and the vehicle being pursued;

"(E) The seriousness of the offense; and

"(F) The presence of other persons in the police vehicle.

"(b) Pursuit Operations.

"(1) All authorized emergency vehicle operations shall be conducted in strict conformity with Sections 14-283a-1 to 14-283a-4, inclusive, of the Regulations of Connecticut State Agencies, and section 14-283a of the Connecticut General Statutes.

"(2) Upon engaging in or entering into a pursuit, the pursuing vehicle shall activate appropriate warning equipment. An audible warning device shall be used during all such pursuits.

"(3) Upon engaging in a pursuit, the police officer shall immediately notify communications of the location, direction and speed of the pursuit, the description of the pursued vehicle and the initial purpose of the stop. The police officers shall keep communications updated on the pursuit. Communications personnel shall immediately notify any available supervisor of the agency or agencies involved in such pursuit, clear the radio channel of nonemergency traffic, and relay necessary information to other police officers of the involved police agency or agencies, and adjacent police agencies in whose direction the pursuit is proceeding.

"(4) When engaged in a pursuit, police officers shall drive with due regard for the safety of persons and property.

"(5) Unless circumstances dictate otherwise, a pursuit shall consist of no more than three police vehicles, one of which shall be designated as the primary unit. No other personnel shall join the pursuit unless instructed to participate by a supervisor.

Borelli *v.* Renaldi

sion to initiate a pursuit shall be based on the pursuing police officer's conclusion that the immediate danger to the police officer and the public created by the pursuit

"(6) The primary unit involved in the pursuit shall become secondary when the fleeing vehicle comes under police air surveillance or when another unit has been assigned primary responsibility.

"(c) Supervisory Responsibilities.

"(1) When made aware of a pursuit, the appropriate supervisor shall evaluate the situation and conditions that caused the pursuit to be initiated, the need to continue the pursuit, and shall monitor incoming information, coordinate and direct activities as needed to ensure that proper procedures are used. Such supervisor shall also have the authority to terminate the pursuit. When the agency supervisor communicates a termination directive, all agency vehicles shall disengage warning devices and cease the pursuit.

"(2) Where possible, a supervisory police officer shall respond to the location where a vehicle has been stopped following a pursuit.

"(d) Pursuit Tactics.

"(1) Police officers not engaged in the pursuit as the primary or secondary unit shall not normally follow the pursuit on parallel streets unless authorized by a supervisor or when it is possible to conduct such an operation without unreasonable hazard to other vehicular or pedestrian traffic.

"(2) When feasible, available patrol units having the most prominent markings and emergency lights shall be used to pursue, particularly as the primary unit. When a pursuit is initiated by other than a marked patrol unit, such unit shall become the secondary unit when a marked unit becomes available as the primary unit, and such unit shall disengage from the pursuit when another marked unit becomes available as the secondary unit.

* * *

"(e) Termination of the Pursuit.

"(1) The police officer serving as the primary unit engaged in the pursuit shall continually re-evaluate and assess the pursuit situation, including all of the initiating factors, and terminate the pursuit whenever he or she reasonably believes that the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension.

"(2) The pursuit may be terminated by the primary unit at any time.

"(3) A supervisor may order the termination of a pursuit at any time and *shall* order the termination of a pursuit when the potential danger to the public outweighs the need for immediate apprehension. Such decision shall be based on information known to the supervisor at the time of the pursuit.

"(4) A pursuit may be terminated if the identity of the occupants has been determined, immediate apprehension is not necessary to protect the public or police officers, and apprehension at a later time is feasible.

"(5) A pursuit may be terminated when the police officers are prevented from communicating with their supervisors, communications or other police officers. . . ." (Emphasis in original.)

Borelli *v.* Renaldi

is less than the immediate or potential danger to the public should the occupants of such vehicle remain at large.''[10] Regs., Conn. State Agencies § 14-283a-4 (a) (1). Section 14-283a-4 also incorporates the requirement that officers drive with ''due regard for the safety of persons and property.'' Id., § 14-283a-4 (b) (4). In addition to setting forth the general standard, § 14-283a-4 establishes detailed guidelines for officers to follow in exercising their discretion. For instance, subsection (a) (2) provides that, in determining whether to initiate a pursuit, officers must consider road, weather and environmental conditions; population density and vehicular and pedestrian traffic; whether the identity of the occupants is known; whether immediate apprehension is necessary to protect the public or police officers and apprehension at a later time is feasible; the relative performance capabilities of the pursuit vehicle and the vehicle being pursued; the seriousness of the offense; and the pres-

---

[10] We reiterate that this appeal is limited to whether the decision to engage in a pursuit of a fleeing motorist is a ministerial or discretionary act, and does not address the manner of driving or the conduct of the pursuit itself. See footnote 5 of this opinion. The distinction between the two—the decision whether to initiate a pursuit and the manner in which that pursuit is conducted —is illustrated in the Uniform Statewide Pursuit Policy, which treats the initiation of a pursuit under a separate subsection. See footnote 9 of this opinion. As we explain, that subsection details the various factors that officers must consider in determining whether to initiate a pursuit, including road, weather and environmental conditions. We discuss those factors in detail in the body text accompanying this footnote.

The *manner* of the pursuit is governed by subsections (b) and (d) of § 14-283a-4 of the Regulations of Connecticut State Agencies. Those subsections set forth, respectively, the rules governing pursuit operations and pursuit tactics. See footnote 9 of this opinion. A few examples illustrate the distinction further. The pursuing vehicle must ''activate appropriate warning equipment'' and use ''[a]n audible warning device'' during the pursuit. Regs., Conn. State Agencies § 14-283a-4 (b) (2). The pursuit must not consist of more than three vehicles. Id., § 14-283a-4 (b) (5). Pursuing officers ''shall not normally follow the pursuit on parallel streets unless authorized by a supervisor or when it is possible to conduct such an operation without unreasonable hazard to other vehicular or pedestrian traffic.'' Id., § 14-283a-4 (d) (1). When feasible, vehicles with the most prominent markings should be used in the pursuit. Id., § 14-283a-4 (d) (2).

Borelli *v.* Renaldi

ence of other persons in the police vehicle. Id., § 14-283a-4 (a) (2). All of these considerations highlight the discretionary nature of the duty. In each instance, an officer is required to evaluate the particular circumstances presented, and then weigh the risks presented by pursuing the vehicle against the risks presented by not pursuing.

We acknowledge that the Uniform Statewide Pursuit Policy provides detailed rules governing the conduct of the pursuit. Regs., Conn. State Agencies §§ 14-283a-1 through 14-283a-4; see footnote 9 of this opinion. Those rules, however, do not constrain the officer's discretionary determination of the decision at issue in this appeal —the determination of *whether* to pursue. Many of the rules govern the actual conduct of the pursuit itself. For example, § 14-283a-4 (b) (2) of the Regulations of Connecticut State Agencies requires that a pursuing officer "activate appropriate warning equipment." Additionally, the pursuing officer must notify dispatch immediately of the pursuit, including the location, direction and speed of the pursuit, the description of the pursued vehicle and the initial purpose of the stop. Regs., Conn. State Agenciess § 14-283a-4 (b) (3). Even these detailed rules governing the conduct of the pursuit contemplate that officers will exercise discretion in implementing them. For example, the rule that ordinarily a pursuit cannot consist of more than three police vehicles is preceded by the qualifying phrase, "[u]nless circumstances dictate otherwise . . . ." Id., § 14-283a-4 (b) (5).

The Uniform Statewide Pursuit Policy's rules governing supervisory responsibilities are also quite detailed but similarly contemplate that supervisors will exercise judgment and discretion in carrying out their duties. For example, § 14-283a-4 (c) (1) of the regulations requires supervisors to "*evaluate* the situation and conditions that caused the pursuit to be initiated, the need to continue the pursuit, and shall monitor incoming informa-

Borelli *v.* Renaldi

tion, coordinate and direct activities *as needed* to ensure that proper procedures are used.'' (Emphasis added.) This language inherently ''makes the manner of performance expressly contingent upon the [supervisor's] discretion . . . .'' *Coley* v. *Hartford*, supra, 312 Conn. 166.[11]

The town pursuit policy further reinforces the discretionary nature of the duty imposed on officers engaged in pursuit. That policy begins by recognizing the risks presented by police pursuits as well as the public interest in allowing officers the freedom to pursue persons who have or are violating the law. See Seymour Police Department Pursuit Policy § 5.11.11. The remainder of the town pursuit policy provides guidelines to assist officers in exercising their judgment in this area that is fraught with risk on either side. Considering the gravity of the concerns at issue, the policy states: ''Police officers shall make every reasonable effort to apprehend a fleeing violator, but pursuit should not be carried to such an extent as to appreciably endanger the lives of innocent users of our streets and highways, or the officer himself.

''As a general rule, pursuit is not recommended or favored when the potential danger to the officer and the general public outweighs the potential advantage of apprehending a fleeing vehicle by such means. Stated simply, pursuit is clearly inappropriate when the pursuit itself endangers life more than the escape of the person pursued. Delay may also be the wiser choice when the person is known and he or she poses no immediate threat to the community.'' Id.

_____

[11] We observe that, pursuant to General Statutes § 4-170 of the Uniform Administrative Procedure Act, the Uniform Statewide Pursuit Policy, as set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies, is subject to the review of the standing legislative regulation review committee, comprised of members of the General Assembly, which has the authority to reject proposed regulations. That approval process ensures that the regulations are consistent with legislative intent.

Borelli *v.* Renaldi

In light of the risks presented by a pursuit, the town pursuit policy directs officers to weigh "many factors" in determining whether to initiate a pursuit. Id. In particular, some of the questions that officers "must ask themselves when deciding whether or not to pursue" include the nature of the offense, the time of day, weather and road conditions, geographical location (proximity to a school or hospital), population density, the officer's familiarity with the area, and the police cruiser's capability and reliability. Id., § 5.11.11 (A) through (H). It is significant that the policy characterizes these considerations as questions that officers must "ask themselves" and also indicates that, under some circumstances, delay may be the "wiser choice." That language makes very clear that the officers are required to exercise their judgment and discretion in evaluating the particular circumstances when determining whether to engage in a pursuit.

The town pursuit policy also directs officers to exercise their discretion in determining whether to continue a pursuit, providing that, once a pursuit has been initiated, "a continuing reconsideration of the above factors should be made by the officer. Once made, the decision to pursue is not irrevocable, and it is the intelligent officer who knows when to discontinue the chase. The experience and common sense of each officer and his knowledge of the area should also guide him in his decision." Id., § 5.11.11. The policy further explains that a continuing pursuit is "authorized when the pursuing officer has reasonable grounds to believe that an individual clearly exhibits an intent to avoid arrest by using his motor vehicle to flee. It is important that an officer weigh the seriousness of the offense which has been committed against the hazards present to the health and welfare of citizens that might be affected by the chase. If the pursuit is initiated, a continuous balancing of the seriousness versus public safety is mandatory." Id., § 5.11.12 (B).

Borelli *v.* Renaldi

This language clearly directs a municipal actor to exercise judgment and discretion. The town pursuit policy instructs officers to use common sense and rely on their experience, to be guided by reasonable grounds to determine if the individual intends to avoid arrest, to "weigh" the seriousness of the offense against the risks presented by the chase, to continually "balance" those concerns, and to act as an "intelligent officer . . . ." Id., §§ 5.11.11 and 5.11.12 (B). Just as with the statutory and policy language at issue in *Coley* v. *Hartford,* supra, 312 Conn. 166, all of these policy provisions make the manner of performance contingent upon the police officer's discretion. We therefore conclude that § 14-283, read together with the Uniform Statewide Pursuit Policy, set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies, and the town's pursuit policy, imposes a discretionary rather than a ministerial duty upon police officers "to drive with due regard for the safety of all persons and property" when deciding whether to initiate the pursuit of a fleeing motorist.

We find unpersuasive the plaintiff's claim that § 14-283, the Uniform Statewide Pursuit Policy, set forth in §§ 14-283a-1 through 14-283a-4 of the Regulations of Connecticut State Agencies, and the town pursuit policy create a ministerial duty to *act,* while affording officers discretion as to *how* to act. Specifically, the plaintiff suggests that, because the statutory language mandates that police officers drive with due regard for safety, there is no discretion to drive without such regard. The plaintiff's claim essentially is that the duty imposed on police officers to drive with due regard for safety is not an optional one. Therefore, the plaintiff contends, the duty is a ministerial one. The plaintiff's argument misconstrues the nature of the distinction we have drawn between discretionary and ministerial duties. We have explained that "mandatory language does not necessarily render a duty ministerial as opposed to discretionary

Borelli *v.* Renaldi

. . . .'' *Coley* v. *Hartford*, supra, 312 Conn. 169. The core distinction between the two types of duty lies not in whether the duty is mandatory, but in whether the performance of that duty will inherently require the municipal actor to exercise judgment. As we explained, § 14-283 imposes a duty on officers to exercise their judgment in determining whether to initiate, how to conduct, and whether to continue the pursuit of a fleeing motorist. The mere fact that officers are *required* to exercise *good* judgment in making those decisions does not change the discretionary nature of their duties.

We are similarly unpersuaded by the plaintiff's reliance on dictum from this court's decision in *Tetro* v. *Stratford*, 189 Conn. 601, 458 A.2d 5 (1983), which, like the present case, arose from a police pursuit, for the proposition that § 14-283 imposes a ministerial duty on officers to drive with due regard for safety when deciding whether to initiate a pursuit. For two reasons, *Tetro* is inapplicable to the present case.

First, *Tetro* presented a different question than the one at issue in this appeal. The municipal defendants in *Tetro* did not assert governmental immunity and did not even directly challenge on appeal the jury's finding that they were negligent. Id., 604. *Tetro* concerned issues of proximate cause, sufficiency of the evidence as to proximate cause, and the applicability of § 14-283 to accidents that do not directly involve an emergency vehicle. Id. The defendants argued before this court that there was insufficient evidence to establish a causal link between their acts or omissions and the plaintiff's injuries because the pursuing police cruiser was not involved in the accident that caused those injuries. Id. Instead, the plaintiff was injured when the car of the fleeing motorist collided with the plaintiff's vehicle. Id., 603. The defendants argued that, because the statutory mandate was that officers *drive the emergency vehicle* with ''due regard for the safety of all persons and prop-

Borelli *v.* Renaldi

erty,'' liability pursuant to § 14-283 was limited to injuries resulting from accidents that involved the emergency vehicle itself. Id., 609. This court rejected that argument, explaining, ''[w]e see no reason to read the words 'safety of all persons and property' so restrictively. . . . We . . . conclude that § 14-283 provides no special zone of limited liability once the defendants' negligence has been established.'' (Citations omitted; footnote omitted.) Id., 609–10. We merely rejected the defendants' suggested, narrow interpretation of the words ''due regard for the safety of all persons and property'' in § 14-283. Id.

We also rejected the defendants' claim that ''public policy requires a limitation of the liability of pursuing police vehicles to accidents involving the police car itself.'' Id., 610. That claim, we reasoned, assumed that the jury's verdict in favor of the plaintiff was solely predicated on the theory that the defendants had negligently failed to abandon or terminate the pursuit. Id. Because the jury returned a general verdict, however, we had to presume that it also had found for the plaintiff on his claim that the defendants were negligent in the *manner of pursuit*, as to which the defendants had not challenged the sufficiency of the evidence on appeal. Id. Therefore, we concluded that the verdict must stand, regardless of whether the defendants would prevail on their public policy argument. Id., 610–11.

In closing, we observed in dictum that, ''[a]s a general proposition, our common law and our statutes do not confer upon police officers, whose conduct is negligent, *blanket* immunity from liability to an innocent bystander by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior.'' (Emphasis added.) Id., 611. Our rejection of the defendants' claim that they were not liable for an accident that did not directly involve the emergency vehicle has no bearing on the question of whether the duty imposed on officers by § 14-283 is discretionary

Borelli *v.* Renaldi

or ministerial. That question was simply not before us in *Tetro*.

Second, *Tetro* was decided in 1983—thirty-seven years ago, and prior to the codification of the common law in § 52-557n. We have since interpreted and applied § 52-557n in dozens of cases.[12] See, e.g., *Northrup* v. *Witkowski*, supra, 332 Conn. 166–77; *Considine* v. *Waterbury*, 279 Conn. 830, 836–44, 905 A.2d 70 (2006); *Spears* v. *Garcia*, 263 Conn. 22, 29–34, 818 A.2d 37 (2003). In the more recent decisions interpreting § 52-557n, we have recognized that our interpretation of the distinction between ministerial and discretionary duties is one that has evolved over time. See, e.g., *Northrup* v. *Witkowski*, supra, 166 (overruling *Spitzer* v. *Waterbury*, 113 Conn. 84, 154 A. 157 (1931), in light of "more modern case law and statutes governing the distinction between ministerial and discretionary duties"). In summary, we do not find *Tetro* to be either relevant or helpful. It addressed a different question than that presented in this case, was decided almost forty years ago, prior to the evolution of our law, and the language that the plaintiff points to is dictum.

II

We next turn to the plaintiff's claim that the trial court incorrectly concluded that, because the plaintiff

_____

[12] To the extent that the dissent contends that our statutory interpretations of § 52-557n have strayed from the intent of the legislature when it codified the common law through § 52-557n in 1986, we disagree. If this court's interpretation of § 52-557n were contrary to the intent of the legislature, surely, at some point in the almost forty years that have passed since the passage of § 52-557n, the legislature would have weighed in on the issue. As we have explained, "[t]ime and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) *Spiotti* v. *Wolcott*, 326 Conn. 190, 202, 163 A.3d 46 (2017).

Borelli *v.* Renaldi

had failed to demonstrate that the decedent was either a member of a foreseeable class of identifiable victims or an identifiable individual, the identifiable person-imminent harm exception to governmental immunity did not apply in the present case. Implicitly arguing that the decedent was a member of a foreseeable class of identifiable victims, the plaintiff claims that the language of § 14-283 (d), which requires officers to ''drive with due regard for the safety of *all persons* and property''; (emphasis added); made the decedent an identifiable person. That is, under the plain language of the statute, the plaintiff contends, all persons involved in the pursuit are identifiable. To the extent that the plaintiff's argument, relying on the language of § 14-283 (d), may be construed to claim that the decedent was a member of a foreseeable class of identifiable victims,[13] the defendants respond that, because the decedent was not legally compelled to be in the vehicle, he did not belong to any such class.

As to the decedent's status as an identifiable individual, the plaintiff challenges the trial court's finding that no evidence had been presented to demonstrate that Renaldi was aware that passengers were in the vehicle. Even if the trial court's finding was correct, the plaintiff contends, pursuant to this court's decision in *Sestito* v. *Groton*, 178 Conn. 520, 423 A.2d 165 (1979), evidence that Renaldi had specific knowledge of the presence of passengers in the vehicle was not necessary in order

---

[13] The plaintiff argues that, because she has never claimed that the decedent was a member of a foreseeable class of identifiable victims, the defendants' arguments that he was not a member of a foreseeable class are irrelevant. Our review of the record, however, reveals that the plaintiff did make this argument before the trial court, which concluded that the decedent was not a member of a foreseeable class of identifiable victims. Moreover, as we explain in this opinion, by contending that the decedent was identifiable because he was included in the statutory language of ''all persons'' in § 14-283 (d), the plaintiff implicitly argues that the decedent was a member of a foreseeable class of identifiable victims.

Borelli *v.* Renaldi

for the court to conclude that the decedent was an identifiable individual. The defendants respond that this court's decision in *Sestito* has been limited to its facts. They also dispute the plaintiff's challenge to the trial court's factual finding that there was no evidence in the record to support the conclusion that the decedent was an identifiable individual. We conclude that the trial court correctly determined that the plaintiff failed to demonstrate that the decedent was either a member of a class of foreseeable victims or an identifiable individual.

This court has recognized three exceptions to governmental immunity, each of which, when proven, demonstrates that, "despite the discretionary nature of the officer's acts or omissions, the officer's duty to act was clear and unequivocal so as to warrant imposing liability on the municipality." *Edgerton* v. *Clinton*, 311 Conn. 217, 230 n.13, 86 A.3d 437 (2014). In the present case, only the identifiable victim-imminent harm exception to governmental immunity is at issue.[14] We have explained that this exception, which "has received very limited recognition in this state"; (internal quotation marks omitted) *Grady* v. *Somers*, 294 Conn. 324, 350, 984 A.2d 684 (2009); "has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. . . . All three must be proven in order for the exception to apply." (Citation omitted; internal quotation marks omitted.) *Edgerton* v. *Clinton*, supra, 230–31. We have stated that this court has "construed this exception to apply not only to identifiable individuals but also to narrowly defined identified classes of foreseeable victims." (Internal quotation

[14] The other two exceptions are: "where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; and . . . where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." (Internal quotation marks omitted.) *Grady* v. *Somers*, 294 Conn. 324, 338 n.14, 984 A.2d 684 (2009).

Borelli *v.* Renaldi

marks omitted.) *Durrant* v. *Board of Education*, 284 Conn. 91, 100, 931 A.2d 859 (2007).

The trial court rested its conclusion that the exception did not apply on the second of the three requirements, determining that there was no evidence in the record that the decedent was either a member of a foreseeable class or an identifiable individual. In arguing that the decedent was an identifiable victim, the plaintiff challenges both of those determinations by the trial court. We first consider the plaintiff's claim that the decedent was a member of a foreseeable class—a claim that cannot be squared with our case law. We repeatedly have emphasized "the narrowness of the class of persons who may be identified as foreseeable victims . . . [observing that] [t]he only identifiable class of foreseeable victims that we have recognized for these purposes is that of schoolchildren attending public schools during school hours because: they were intended to be the beneficiaries of particular duties of care imposed by law on school officials; they were legally required to attend school rather than being there voluntarily; their parents were thus statutorily required to relinquish their custody to those officials during those hours; and, as a matter of policy, they traditionally require special consideration in the face of dangerous conditions." (Citation omitted; internal quotation marks omitted.) *Grady* v. *Somers*, supra, 294 Conn. 351–52. As the trial court correctly observed in its memorandum of decision, the record in the present case revealed that the decedent was not legally compelled to get into the Mustang and was a voluntary passenger in the vehicle. The trial court correctly concluded that the plaintiff failed to demonstrate that the decedent was a member of a foreseeable class of identifiable victims.

The plaintiff's suggestion to the contrary—namely, that, because § 14-283 (d) requires officers to "drive with due regard for the safety of *all persons* and prop-

Borelli *v.* Renaldi

erty''; (emphasis added); the decedent belonged to a foreseeable class of identifiable persons—would be inconsistent with both this court's prior interpretations of the scope of the identifiable person-imminent harm exception and the public policy principles underlying governmental immunity. As we have explained, ''[o]ur decisions underscore . . . that whether the plaintiff was compelled to be at the location where the injury occurred remains a paramount consideration in determining whether the plaintiff was . . . [a] member of a foreseeable class of victims.'' (Internal quotation marks omitted.) *Strycharz* v. *Cady*, 323 Conn. 548, 575–76, 148 A.3d 1011 (2016). We have thus far found this condition to be satisfied only in the case of schoolchildren attending a public school during school hours.

As a matter of public policy, moreover, the plaintiff's argument must be rejected. There is no question that the officers owed a duty to drive with due regard for the safety of all persons and property. The mere fact that the officers owed a duty to a group of persons that included the decedent, however, did not make the decedent a member of a foreseeable class of victims. As we explained in part I of this opinion, because the duty imposed by § 14-283 (d) requires the exercise of judgment and discretion, governmental immunity applies. Under the plaintiff's theory, however, every person who is injured as a result of a police pursuit is a member of a foreseeable class of identifiable victims. If we were to agree with the plaintiff, the identifiable victim-imminent harm exception would apply to *every police pursuit*, and the exception would swallow the rule. That conclusion would run contrary to the public policy principles underlying the grant of governmental immunity to the discretionary acts of municipal officers. As we explained in part I of this opinion, discretionary act immunity ''reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to

Borelli *v.* Renaldi

exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.'' (Internal quotation marks omitted.) *Violano* v. *Fernandes*, supra, 280 Conn. 319. If we were to accede to the plaintiff's argument, police officers would not have the discretion to determine whether, in their judgment, after considering the particular circumstances presented, a pursuit is warranted.

We next address the plaintiff's claim that the decedent was an identifiable individual. We previously have stated that ''[a]n individual may be 'identifiable' for purposes of the exception to qualified governmental immunity if the harm occurs within a limited temporal and geographical zone, involving a temporary condition. *Purzycki* v. *Fairfield*, [244 Conn. 101, 110, 708 A.2d 937 (1998), overruled in part on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 323, 101 A.3d 249 (2014)]; see *Tryon* v. *North Branford*, 58 Conn. App. 702, 710, 755 A.2d 317 (2000) (because harm occurred within framework limited in duration, place and condition, plaintiff was 'identifiable person' within meaning of exception). For the harm to be deemed imminent, the potential for harm must be sufficiently immediate. In fact, the criteria of identifiable person and imminent harm must be evaluated with reference to each other. An allegedly identifiable person must be identifiable as a potential victim of a specific imminent harm. Likewise, the alleged imminent harm must be imminent in terms of its impact on a specific identifiable person.'' *Cotto* v. *Board of Education*, 294 Conn. 265, 275–76, 984 A.2d 58 (2009).

The plaintiff's argument that the decedent was an identifiable individual is unavailing. The plaintiff's argument rests on her theory that Renaldi could or should have seen the decedent in the Mustang. Specifically, the plaintiff claims that Renaldi should have been aware of the decedent's presence in the Mustang because

Borelli *v.* Renaldi

Renaldi performed a U-turn after he noticed the undercarriage lights, which positioned him behind the Mustang after he made the turn. That maneuver required him to drive past the Mustang, which was a convertible with the top down, so he likely would have been able to see the passengers in the vehicle, particularly since the boys were wearing "brightly striped, pink zebra hats." The plaintiff also argues that, because driving around town in this manner was a Friday night tradition for the boys, Renaldi "would have recognized [them] immediately."

In making this argument, the plaintiff relies heavily on the sole decision in which this court has concluded that a plaintiff had demonstrated that the person who was harmed was an identifiable individual—*Sestito* v. *Groton*, supra, 178 Conn. 520. In *Sestito*, an on duty municipal police officer watched an ongoing barroom brawl involving at least seven men taking place in a bar's parking lot. Id., 522–23. Despite the officer's belief that "one member of the group might [have been] armed and a robbery suspect," and, despite his own admission that "he could have driven unimpeded into the lot," he did not intervene until after the decedent was shot and killed. Id., 523. As we have previously observed, however, "we decided *Sestito* before we adopted the three-pronged imminent harm test . . . ." *Edgerton* v. *Clinton*, supra, 311 Conn. 240. Moreover, this court has repeatedly stated that *Sestito* has been confined to its facts. See *St. Pierre* v. *Plainfield*, 326 Conn. 420, 436 n.15, 165 A.3d 148 (2017); *Edgerton* v. *Clinton*, supra, 240; *Grady* v. *Somers*, supra, 294 Conn. 353–54.

Even if we assume without deciding that the plaintiff's representation of the record is correct,[15] the plain-

---

[15] In rejecting the plaintiff's claim that the decedent was an identifiable individual, the trial court addressed the argument that the plaintiff made in support of that proposition, namely, that the decedent was an identifiable individual because Renaldi should have recognized the Mustang from a previous incident in which he had pulled that vehicle over, and that Renaldi had the opportunity to observe that there were passengers in the vehicle on the night in question. The trial court determined that there was *no*

Borelli *v.* Renaldi

tiff's argument that the decedent was an identifiable individual implicates the same public policy principle as her argument that he was a member of a foreseeable class of victims. That is, because in the context of a police pursuit, there will *always* be at least one person whose presence the police could or should be aware of—the driver of the pursued vehicle—if we agreed with the plaintiff, the exception would swallow the rule.

Accordingly, because the plaintiff failed to demonstrate that the decedent was an identifiable individual, and, because the decedent was not a member of a foreseeable class of identifiable victims, we conclude that the trial court correctly determined that the plaintiff had failed to prove that the identifiable person-imminent harm exception to discretionary act immunity applied.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and PALMER, McDONALD, D'AURIA, and MULLINS, Js., concurred.

*evidence* in the record that Renaldi knew that the decedent was a passenger in the Mustang.

Although we assume for purposes of argument that the plaintiff's representation of the record is correct, there are weaknesses in her argument. In claiming that there was evidence that Renaldi should have been aware that there were passengers in the vehicle, she points to the fact that the boys were in a Mustang convertible with its top down in the winter, that the boys wore brightly striped, pink zebra hats, and that Renaldi had stopped the Mustang on a prior occasion when the boys were in that same vehicle, wearing the hats. At his deposition, however, Renaldi testified that, when he initially noticed the Mustang, he did not even notice that it was a convertible and did not notice how many persons were inside the vehicle. Renaldi's attention initially was drawn to the undercarriage lights, which were like disco lights, shining to the back and to the front. He then focused on trying to obtain the license plate number, because it was his preferred practice to obtain the license plate number prior to stopping a vehicle. As for his prior contact with the Mustang, Renaldi testified at his deposition that he did not recall that prior contact until two weeks later, when another officer ran the license plate number and pointed out the prior contact to Renaldi. Only then did Renaldi recall that he had previously stopped the Mustang and that the boys had been driving the convertible with the top down in winter and were wearing "goofy hats." Moreover, the only evidence provided regarding the zebra hats on the night in question was that Major wore one and that Ramirez "might" have had one on. Not only was there no evidence that the decedent was wearing a zebra hat, but Major testified at his deposition that the decedent was asleep in the back seat of the Mustang.

Borelli *v.* Renaldi

ROBINSON, C. J., concurring. I agree with and join the majority opinion, in which the majority upholds the trial court's grant of summary judgment on governmental immunity grounds in favor of the defendants, the town of Seymour and three of its municipal police officers,[1] in this action claiming that two of the police officers acted negligently when they briefly pursued a Ford Mustang convertible in which Brandon Giordano, the decedent of the plaintiff, Angela Borelli, was a passenger. I write separately to explain my views about the significant issues of municipal law considered in the majority and dissenting opinions in this appeal. First, I agree with the dissent's conclusion that General Statutes § 14-283 (d),[2] which imposes on the operators of

---

[1] The individual police officers are the named defendant, Officer Anthony Renaldi, Officer Michael Jasmin, and Sergeant William King.

[2] As the majority notes, "[a]lthough § 14-283 has been amended by the legislature since the events underlying the present case . . . these amendments have no bearing on the merits of this appeal." (Citation omitted.) Footnote 2 of the majority opinion. Therefore, I also refer to the current revision of the statute in this opinion.

General Statutes § 14-283 provides in relevant part: "(a) As used in this section, 'emergency vehicle' means any ambulance or vehicle operated by a member of an emergency medical service organization responding to an emergency call, any vehicle used by a fire department or by any officer of a fire department while on the way to a fire or while responding to an emergency call but not while returning from a fire or emergency call, any state or local police vehicle operated by a police officer or inspector of the Department of Motor Vehicles answering an emergency call or in the pursuit of fleeing law violators or any Department of Correction vehicle operated by a Department of Correction officer while in the course of such officer's employment and while responding to an emergency call.

"(b) (1) The operator of any emergency vehicle may (A) park or stand such vehicle, irrespective of the provisions of this chapter, (B) except as provided in subdivision (2) of this subsection, proceed past any red light or stop signal or stop sign, but only after slowing down or stopping to the extent necessary for the safe operation of such vehicle, (C) exceed the posted speed limits or other speed limits imposed by or pursuant to section 14-218a or 14-219 as long as such operator does not endanger life or property by so doing, and (D) disregard statutes, ordinances or regulations governing direction of movement or turning in specific directions.

"(2) The operator of any emergency vehicle shall immediately bring such vehicle to a stop not less than ten feet from the front when approaching

Borelli *v.* Renaldi

emergency vehicles certain obligations, including a
"duty to drive with due regard," functions as an excep-
tion to governmental immunity for discretionary acts
pursuant to General Statutes § 52-557n (a) (2) (B).[3] I
also conclude, however, that a police officer's decision
to pursue a fleeing law violator is a discretionary act
not within the contemplation of this exception because
it does not constitute "driv[ing]" under § 14-283 (d).
Second, although the dissent's doctrinal and historical
observations about this court's limited application of
the identifiable person, imminent harm exception to
discretionary act immunity are well taken, substantial
public policy reasons support the majority's conclusion
that the decedent, who was a passenger in a vehicle
fleeing from the police during a pursuit, was not an

and not less than ten feet from the rear when overtaking or following any
registered school bus on any highway or private road or in any parking area
or on any school property when such school bus is displaying flashing red
signal lights and such operator may then proceed as long as he or she does
not endanger life or property by so doing.

"(c) The exemptions granted in this section shall apply only when an
emergency vehicle is making use of an audible warning signal device, includ-
ing but not limited to a siren, whistle or bell which meets the requirements
of subsection (f) of section 14-80, and visible flashing or revolving lights
which meet the requirements of sections 14-96p and 14-96q, and to any state
or local police vehicle properly and lawfully making use of an audible
warning signal device only.

"(d) The provisions of this section shall not relieve the operator of an
emergency vehicle from the duty to drive with due regard for the safety of
all persons and property. . . ."

[3] General Statutes § 52-557n provides in relevant part: "(a) (1) Except as
otherwise provided by law, a political subdivision of the state shall be liable
for damages to person or property caused by: (A) The negligent acts or
omissions of such political subdivision or any employee, officer or agent
thereof acting within the scope of his employment or official duties . . . .
(2) *Except as otherwise provided by law, a political subdivision of the
state shall not be liable for damages to person or property caused by*: (A)
Acts or omissions of any employee, officer or agent which constitute criminal
conduct, fraud, actual malice or wilful misconduct; or (B) *negligent acts or
omissions which require the exercise of judgment or discretion as an
official function of the authority expressly or impliedly granted by law.
. . .*" (Emphasis added.) See also General Statutes § 52-557n (b) (providing
specific immunities for certain acts).

Borelli *v.* Renaldi

identifiable person subject to imminent harm. Accordingly, I join the majority opinion affirming the judgment of the trial court.

I

I begin with whether a police officer's decision to engage in a pursuit is a discretionary act subject to governmental immunity under § 52-557n (a) (2) (B), which provides: "*Except as otherwise provided by law*, a political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Emphasis added.) This statute codifies the well established common-law principles governing governmental immunity for discretionary acts and extends those principles from municipal employees to the municipality itself. See, e.g., *Northrup* v. *Witkowski*, 332 Conn. 158, 167, 210 A.3d 29 (2019); *Edgerton* v. *Clinton*, 311 Conn. 217, 229 n.12, 86 A.3d 437 (2014). "Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts. . . . Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [m]inisterial refers to a duty [that] is to be performed in a prescribed manner without the exercise of judgment or discretion. . . .

* * *

"Municipal officials are immunized from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . Discretionary act immunity reflects a value judgment

Borelli *v.* Renaldi

that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . . This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts. . . .

"This court has identified two other policy rationales for immunizing municipalities and their officials from tort liability. The first rationale is grounded in the principle that for courts to second-guess municipal policy making by imposing tort liability would be to take the administration of municipal affairs out of the hands to which it has been entrusted by law. . . . Second, we have recognized that a civil trial may be an inappropriate forum for testing the wisdom of legislative actions. This is particularly true if there is no readily ascertainable standard by which the action of the government servant may be measured . . . . Thus, [t]he policy behind the exception is to avoid allowing tort actions to be used as a monkey wrench in the machinery of government decision making. . . .

"For purposes of determining whether a duty is discretionary or ministerial, this court has recognized that [t]here is a difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions. . . . A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment [or discretion] upon the propriety of

Borelli *v.* Renaldi

the act being done. . . . In contrast, when an official has a general duty to perform a certain act, but there is no city charter provision, ordinance, regulation, rule, policy, or any other directive [requiring the government official to act in a] prescribed manner, the duty is deemed discretionary.'' (Citations omitted; footnote omitted; internal quotation marks omitted.) *Northrup* v. *Witkowski*, supra, 332 Conn. 167–70.

As the majority aptly notes, ''[i]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality. . . . Indeed, this court has long recognized that it is not in the public's interest to [allow] a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a [police officer's] discretionary professional duty. Such discretion is no discretion at all. . . . Thus, as a general rule, [p]olice officers are protected by discretionary act immunity when they perform the typical functions of a police officer.'' (Citation omitted; internal quotation marks omitted.) Part I of the majority opinion, quoting *Ventura* v. *East Haven*, 330 Conn. 613, 630–31, 199 A.3d 1 (2019), and *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 180, 544 A.2d 1185 (1988); see, e.g., *Coley* v. *Hartford*, 312 Conn. 150, 164–65, 95 A.3d 480 (2014) (noting, with respect to officer's ''alleged failure to adhere to specific police response procedures . . . the considerable discretion inherent in law enforcement's response to an infinite array of situations implicating public safety on a daily basis''), overruled in part on other grounds by *Ventura* v. *East Haven*, 330 Conn. 613, 199 A.3d 1 (2019); *Shore* v. *Stonington*, 187 Conn. 147, 153–55, 444 A.2d 1379 (1982) (whether to detain suspected drunk driver was discretionary act).

It is well settled, however, that exceptions to discretionary act immunity under § 52-557n (a) (2) (B) may be furnished by state or federal statutory law, as well

Borelli *v.* Renaldi

as the common law. See, e.g., *Grady* v. *Somers*, 294 Conn. 324, 344–46, 984 A.2d 684 (2009) (reviewing legislative history of § 52-557n in concluding that phrase "except as provided by law" in subsection (a) (2) (B) encompasses identifiable person, imminent harm exception to discretionary act immunity at common law). Thus, whether § 14-283 and the common-law principles governing the operation of emergency vehicles furnish an exception to discretionary act immunity under § 52-557n (a) (2) (B) presents a question of statutory interpretation, under General Statutes § 1-2z, over which our review is plenary. See, e.g., *Ventura* v. *East Haven*, supra, 330 Conn. 631–32, 634; *Grady* v. *Somers*, supra, 332–33.

In my view, part II of the dissenting opinion makes compelling arguments in support of the proposition that driving is subject to a standing common-law exception to discretionary act immunity under § 52-557n (a) (2) (B). This includes driving an emergency vehicle in accordance with the privileges and responsibilities set forth by § 14-283 (d), which codifies the reasonable care standard articulated by this court in *Voltz* v. *Orange Volunteer Fire Assn., Inc.*, 118 Conn. 307, 311, 172 A. 220 (1934), and *Tefft* v. *New York, New Haven & Hartford Railroad Co.*, 116 Conn. 127, 134, 163 A. 762 (1933).[4]

___

[4] Thus, I respectfully disagree with the majority opinion to the extent it stands for the proposition that the "due regard" language in § 14-283 (d) renders the operation of an emergency vehicle inherently discretionary for purposes of immunity. Instead, I agree with the dissent that, although "the 'rules of the road' recognize and operate on the inherently discretionary nature of the activity we call driving" insofar as they "*demand* the exercise of discretion and good judgment," often in the "split-second" context, "our cases have never conferred immunity to [municipally employed] drivers in the ordinary course," "the legislature [has never] given any indication that it intend[ed] such a result by statute," and that a "rule of immunity would be exceedingly difficult to justify in this context because it would mean that our municipal employees would be free to drive negligently with impunity." (Emphasis in original.)

The breadth of this proposition was tested by a recent Appellate Court decision, which considered whether municipal police officers have a ministerial duty to obey all traffic laws in the absence of the emergency and pursuit situations set forth in § 14-283. See *Daley* v. *Kashmanian*, 193 Conn. App.

Borelli *v.* Renaldi

I part company from the dissent, however, because I conclude that the exception does not extend to the decision to engage in a pursuit[5] and, instead, agree with the majority's conclusion that the exception is limited to the manner in which the officer conducts the pursuit.[6]

171, 187–88, 219 A.3d 499 (2019), petition for cert. filed (Conn. October 23, 2019) (No. 190245), and cross petition for cert. filed (Conn. November 1, 2019) (No. 190256); see also id., 185 n.7 (discussing Superior Court split as to whether operation of motor vehicle by police officers, even in emergency mode, is ministerial or discretionary activity). In *Daley*, the Appellate Court concluded that a police detective who engaged in a surveillance operation, while driving at high speeds in a "soft" car lacking emergency lights, was engaged in discretionary activity. Id., 187–88. The plaintiff in *Daley* has sought certification to appeal to this court on this issue.

[5] I respectfully disagree with the dissent to the extent it casts the decision to pursue in this case as one occasioned by a minor traffic violation, namely, the underglow lights on the Mustang. The undisputed facts of this case indicate that, although Renaldi's attention was drawn to the Mustang because of the underglow lights, which led him to prepare to initiate a traffic stop, his decision to pursue was predicated on the fact that the driver of the Mustang, the decedent's friend Eric Ramirez, started to operate the Mustang recklessly upon spotting Renaldi's cruiser behind him, including illegally passing multiple vehicles on Route 67. In my view, ignoring this intervening act of reckless driving as giving rise to the pursuit in this case risks suggesting that a police officer should never initiate a traffic stop for a minor traffic violation because the simple fact of the stop might result in a pursuit situation.

[6] I agree with the dissent's observation that the complaint contains certain allegations that pertain to the manner of pursuit, namely, that Renaldi followed the Mustang at an unreasonably high rate of speed. That having been said, none of the arguments on appeal pertains to the operation of the police vehicle, as the plaintiff repeatedly emphasizes her reliance on what she characterizes as Renaldi's failure to engage in a thoughtful analysis before initiating the pursuit of the Mustang. As she states in her initial brief, the court is "not being called upon to dictate *how* police officers are to engage in the pursuit of a motor vehicle," but, rather, "the question before this court is limited to determining whether the legislature intended to create a ministerial obligation on officers to first account for the seriousness of the offense and the dangerousness of the pursuit before engaging in it when the legislature passed § 14-283. If this court does find such a ministerial duty, it falls to the jury to decide if that ministerial duty was violated in this case—that is to say, it falls to the jury to determine if the pursuing officers failed to take those factors into account . . . when they first engaged in an extremely dangerous nighttime pursuit [for] a minor traffic infraction. Looking to those facts, a jury could reason that, because the officers did

Borelli *v.* Renaldi

Pursuant to § 1-2z, I begin with the statutory text. First, § 14-283 (d), which prescribes the duty of care, is limited to "the duty to *drive* with due regard for the safety of all persons and property." (Emphasis added.) The ordinary meaning of the word "drive" is "to operate the mechanism and controls and direct the course of (as a vehicle) . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2011) p. 381; see, e.g., *In re Elianah T.-T.*, 326 Conn. 614, 622, 165 A.3d 1236 (2017) (noting that, pursuant to General Statutes § 1-1 (a), ordinary meaning of word is determined by reference to dictionary definitions). This limited definition does not encompass the initial decision to engage in emergency operation, as envisioned under § 14-283 (a), which defines "emergency vehicle," in relevant part, as "any state or local police vehicle operated by a police officer . . . answering an emergency call or in the pursuit of fleeing law violators . . . ." That initial decision to escalate from ordinary to emergency operation under subsection (a) of § 14-283 is what gives rise to the various operating privileges and responsibilities available under subsections (b), (c) and (d), including the right to disregard the rules of the road, such as speed limits or stopping at red lights, when using lights and sirens and driving with "due regard for the safety of all persons and property."[7] General Statutes § 14-283 (d); see *State* v. *Gurich*,

_____

engage in a dangerous nighttime pursuit on a narrow and windy road over a minor infraction, they therefore did so thoughtlessly, without regard to the strictures of § 14-283." (Emphasis in original.) Accordingly, consistent with the plaintiff's claims on appeal, I limit my analysis to the decision to engage in a pursuit.

[7] Another point counseling a narrow application of § 14-283 as an exception to governmental immunity is that the statute applies to entities beyond municipalities and their employees. For example, emergency vehicles are operated by state employees such as state troopers, who are subject to their own waiver of sovereign immunity with respect to the negligent operation of a motor vehicle; see General Statutes § 52-556; but § 14-283 also applies to employees of private entities that perform certain governmental functions, such as private ambulance companies and volunteer fire associations. See *Voltz* v. *Orange Volunteer Fire Assn., Inc.*, supra, 118 Conn. 310.

Borelli *v.* Renaldi

238 P.3d 1, 9–10 (Okla. 2010) (Reif, J., dissenting) (analyzing text of Oklahoma's uniform emergency vehicle statute and concluding that it does not govern decision to pursue). That having been said, I believe that the dissent's reading of the statute to include the decision to pursue, which is consistent with that of two of our sister states; see *Robbins* v. *Wichita*, 285 Kan. 455, 465–66, 172 P.3d 1187 (2007); *State* v. *Gurich*, supra, 7–8; is reasonable, rendering the statute ambiguous for purposes of the § 1-2z analysis. Accordingly, I turn to extratextual sources and existing case law.

I begin with this court's decision in *Tetro* v. *Stratford*, 189 Conn. 601, 458 A.2d 5 (1983), the import of which presents a point of strong disagreement between the majority and the dissent. I review *Tetro* in detail because I agree with the dissent that it would be dispositive, if it is in fact on point.[8] In *Tetro*, two Stratford police officers observed a green Chevrolet in a shopping center parking lot that they thought might have been stolen because it was occupied by several boys who "looked too young to have valid drivers' licenses," and, "[w]hen the police approached the Chevrolet to make inquiries, the boys drove off." Id., 602–603. The officers pursued the Chevrolet at high speeds through a densely populated urban area, proceeding the wrong way up a one-way street, leading to a head-on collision with the Chevrolet and the vehicle driven by the plaintiff, Joseph Tetro. Id., 603. Tetro brought an action against the two individual officers and the town of Stratford (collectively, Stratford defendants). Id., 602. This court observed that the Stratford defendants did "not directly challenge [on

---

[8] I respectfully disagree with the majority's observation that *Tetro* v. *Stratford*, supra, 189 Conn. 601, is rendered less persuasive by its age and the fact that it was decided "prior to the codification of the common law in § 52-557n" and the evolution in our case law that has taken place since 1986. The legislature's act of codifying the common law would render *Tetro* highly instructive in the application and construction of § 52-557n, to the extent that it decided anything with respect to governmental immunity.

Borelli *v.* Renaldi

appeal] the propriety of the jury's conclusion that [the officers'] conduct was negligent'' but ''claim[ed] instead that the evidence was insufficient, for three reasons, to establish the necessary causal link between their acts or omissions and the injuries sustained by [Tetro]. They argue[d] that proximate cause was lacking because of: (1) the intervening negligence of the driver of the pursued car; (2) the lack of connection between [Tetro's] injuries and the [officers'] operation of the police car; and (3) the immunity conferred, as a matter of public policy, upon emergency vehicles in pursuit of law violators. Therefore, the [Stratford] defendants maintain[ed], the court was required to resolve the issue of proximate cause in their favor as a matter of law.'' Id., 604.

The court first rejected the common-law causation arguments before concluding that § 14-283 did not supplant the common-law principles of proximate causation with respect to emergency vehicles. Id., 607–608. The court disagreed with the Stratford defendants' argument that § 14-283 ''limits [the officers'] scope of duty to incidents involving collisions with the emergency vehicle itself,'' declining to ''read the words 'safety of all persons and property' [in § 14-283 (d)] so restrictively.'' Id., 609. The court noted that ''[o]ther courts, construing similar statutory language, have explained that emergency vehicle legislation provides only limited shelter from liability for negligence. The effect of the statute is merely to displace the conclusive presumption of negligence that ordinarily arises from the violation of traffic rules. The statute does not relieve operators of emergency vehicles from their general duty to exercise due care for the safety of others.'' Id. Thus, the court concluded that ''§ 14-283 provides no special zone of limited liability once the [municipal] defendants' negligence has been established.'' Id., 610.

The Stratford defendants' third and final claim in *Tetro* was that ''public policy requires a limitation of the liabil-

Borelli *v.* Renaldi

ity of pursuing police vehicles to accidents involving the police car itself. [They] maintain[ed] that police officers should not have to abandon or terminate the pursuit of law violators just because the fleeing person may create a risk to the public.'' Id. The court followed the general verdict rule in declining to consider this argument, observing that the argument concerned "principally one aspect of the [officers'] alleged failure to exercise due care, *namely the failure to abandon or terminate pursuit*, and assume[d] a jury verdict on this basis.'' (Emphasis added.) Id. The court recognized that "[Tetro's] complaint is not so limited. The jury having returned a general verdict against the [Stratford] defendants, [the court] must presume that the jury found every issue in favor of [Tetro], including the *claim of the* [*Stratford*] *defendants' negligence in* [*the officers'*] *manner of pursuit*.'' (Emphasis added.) Id.; see id., 610–11 ("[s]ince the [Stratford] defendants do not contest the sufficiency of the evidence to support a finding on this claim of negligence, the jury's verdict must stand, *whether or not there was error with regard to the alleged failure to abandon pursuit of the Chevrolet*'' (emphasis added; footnote omitted)).

Having based its holding on the general verdict rule, however, this court went on to observe, in dictum, that Connecticut's "common law and . . . statutes do not confer upon police officers, whose conduct is negligent, *blanket immunity from liability to an innocent bystander* by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior. [The court] note[d] again the salient circumstances of [the] case: the occupants of the Chevrolet were not endangering anyone when they were first confronted by [the officers]; the [officers], in violation of announced town policy, pursued the Chevrolet at high speeds through busy city thoroughfares, into a one-way street the wrong way. In these circumstances, the trial court correctly refused to direct a verdict for the [Strat-

Borelli *v.* Renaldi

ford] defendants and left to the jury the determination of both negligence and of proximate cause as questions of fact.'' (Emphasis added.) Id., 611.

Ultimately, I agree with the majority's determination that *Tetro* provides only limited lessons with respect to the present case. First, this court relied on the general verdict rule and expressly declined to consider whether public policy precludes the imposition of liability arising from the decision whether to continue or terminate the pursuit standing by itself. See id., 610–11. Instead, the court focused on details relative to the ''manner of the pursuit''; id., 610; such as the high speeds and the officers' decision to proceed the wrong direction on a one-way street, which, along with the fact that the occupants of the Chevrolet were not suspected of any serious offenses, rendered the officers' actions in conducting the high speed pursuit that much more negligent under the due care standard of § 14-283. Id., 611. The court's reliance on the general verdict rule eschewed any consideration of the decision to initiate or continue pursuit by itself.

Second, I agree with the majority that it is speculative to rely on *Tetro* as informative with respect to the immunity question at issue in this appeal, particularly because none of the contemporary case law on that point— most notably *Shore* v. *Stonington*, supra, 187 Conn. 147, which was decided just one year before—was cited in *Tetro*.[9] Thus, I respectfully disagree with the dissent's conclusion that *Tetro* stands for the broader proposition

_____

[9] This complete omission is particularly curious, given that one year before authoring the majority opinion in *Tetro*, former Chief Justice Peters dissented in *Shore* v. *Stonington*, supra, 187 Conn. 147, a discretionary act immunity case that has become paradigmatic for its application of the identifiable person, imminent harm exception. In that dissenting opinion, Justice Peters cited an Indiana decision for the proposition that, ''[w]here a court relied on the distinction between discretionary and ministerial acts in determining the liability of a police officer, the hot pursuit of a suspect was held to be a ministerial act carrying liability for negligence and permitting a [common-law] action.'' *Shore* v. *Stonington*, supra, 160–61 (*Peters, J.*, dissenting); see

Borelli *v.* Renaldi

that, in enacting § 52-557n in 1986, the legislature must have been aware that this court "had unanimously held in 1983 that a municipality was liable under existing law for police negligence during pursuits," and, therefore, had "the legislature wanted to establish an immunity rule for emergency vehicles generally, or police pursuits in particular, it surely would have made some reference to such a scenario in the 1986 codification."[10] Having received no guidance from *Tetro*,[11] I turn to other extratextual sources to determine whether § 14-283 governs the decision to engage in a pursuit.

Beginning with the relatively sparse legislative history, I note that the legislature enacted § 14-283 (d) as part of No. 538 of the 1971 Public Acts, entitled "An Act Granting Ambulances, Police and Fire Department Vehicles the Right of Way." The legislature intended the 1971 act to amend the existing version of § 14-283 to "[outline] in somewhat greater detail the restrictions upon and the advantages to police and fire department

*Seymour National Bank* v. *State*, 384 N.E.2d 1177, 1184–85 (Ind. App. 1979) (due care language in Indiana's emergency vehicle statute created duty of care owed by state trooper to motorist), vacated, 422 N.E.2d 1223 (Ind. 1981).

[10] Finally, and as I explain further in part II of this opinion, the public policy dictum in *Tetro* does not support the plaintiff in the present case, insofar as it is limited to "liability to an *innocent bystander*" rather than an occupant of the vehicle being pursued. (Emphasis added.) *Tetro* v. *Stratford*, supra, 189 Conn. 611.

[11] As is evident from its disparate treatment by the majority and the dissent, this court's opinion in *Tetro* offers a little something for everyone. I suggest that the ambiguity of *Tetro* renders it a cautionary tale against the virtues of the pithy opinion—in the case of *Tetro*, three appellate issues resolved in ten pages of the Connecticut Reports—and unnecessary dictum. See *Tetro* v. *Stratford*, supra, 189 Conn. 602–11. Thus, I acknowledge that members of other state courts have construed *Tetro* like the dissent. See, e.g., *Estate of Cavanaugh* v. *Andrade*, 202 Wis. 2d 290, 325 and n.3, 550 N.W.2d 103 (1996) (Abrahamson, J., concurring in part and dissenting in part) (citing *Tetro* as illustrative of "a number of state supreme courts interpreting provisions substantially similar to [Wisconsin's discretionary act immunity statute that] have concluded that a law enforcement officer is not immune from liability for a discretionary decision to give or not to give chase and that the negligence standard is applicable to the officer's conduct").

Borelli *v.* Renaldi

vehicles. It does not restrict them seriously, but it does call for slowing down at red lights and observation that the way is clear and such matters of that sort. It also outlines what the public is expected to do when a vehicle with its siren going is approaching them . . . along the lines of pulling parallel to the highway in order to not obstruct the passage of the vehicle.'' 14 H.R. Proc., Pt. 9, 1971 Sess., p. 4061, remarks of Representative Frank M. Reinhold. Testimony before the Transportation Committee indicates that the bill enacted as the 1971 act was intended to conform Connecticut law to the Uniform Vehicle Code by ''clarify[ing] many of the areas [that] previously . . . were left up to chance. It will clarify the duties and rights and [responsibilities] of both the driver of the emergency vehicle as well as motorists and drivers of other vehicles.''[12] Conn. Joint Standing Committee Hearings, Transportation, Pt. 3, 1971 Sess., p. 717, remarks of Bill Adint of the Connecticut Safety Commission; see also id., pp. 716–17, remarks of Lieutenant Michael Griffin of the Traffic Division of the Connecticut State Police (''This bill . . . requires [not only] that the motoring public grant the right of way to ambulances, [and] police and fire department vehicles under certain prescribed conditions, but it also places definite responsibilities upon the operators of these emergency vehicles. This bill also brings the Connecticut law into conformance with the Uniform Vehicle Code.''); National Committee on Uniform Traffic Laws and Ordinances, Uniform Vehicle Code and Model Traffic Ordinance (1968 Rev.) § 11-106 (d), p. 135; National

---

[12] See, e.g., *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 314, 819 A.2d 260 (2003) (''[I]t is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question.'' (Internal quotation marks omitted.)).

Borelli *v.* Renaldi

Committee on Uniform Traffic Laws and Ordinances, Uniform Vehicle Code (2000 Rev.) § 11-106 (d), p. 126.[13]

Because § 14-283 is intended to conform Connecticut law to the Uniform Vehicle Code, I find it helpful to consider sister state precedent considering emergency vehicle statutes that are based on the uniform law. See, e.g., *Friezo* v. *Friezo*, 281 Conn. 166, 187–88, 914 A.2d 533 (2007). The most comprehensive and persuasive analysis that my research has revealed is Justice Reif's dissent from the Oklahoma Supreme Court's decision in *State* v. *Gurich*, supra, 238 P.3d 1, which aptly blends both textual and policy considerations in concluding that the decision to pursue is distinct from the driving of the vehicle for purposes of Oklahoma's emergency vehicle statute, which is identical to § 14-283 for all relevant purposes. See id., 8–10 (Reif, J., dissenting). Justice Reif explains that subsection (a) of that statute sets forth "public interests protected by the privilege," namely, responding to emergency calls or engaging in pursuits, meaning that "*the decision* that the driver of an emergency vehicle should act for the purpose of

---

[13] Subsection (d) of § 11-106 of the 2000 Uniform Vehicle Code provides: "The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of the driver's reckless disregard for the safety of others."

As the dissent observes, Connecticut's version of this provision does not contain the "reckless disregard" language. Some courts from states that have adopted this version of the Uniform Vehicle Code have construed this language "to require a standard of care higher than mere negligence, obligating plaintiffs to establish more consequential, material, and wanton acts to support a breach of the standard of care." *Robbins* v. *Wichita*, supra, 285 Kan. 467; see, e.g., *State* v. *Gurich*, supra, 238 P.3d 7–8 (decision to use "reckless disregard" standard of care was supported by statutory language and public policy considerations that reflect "the split-second life and death decisions involved in police pursuits"). But see *Pogoso* v. *Sarae*, 138 Haw. 518, 525–26, 382 P.3d 330 (App. 2016) (citing authorities indicating split among states on this point and adopting negligence standard of care, despite statute with "reckless disregard" language), cert. dismissed, Docket No. SCWC-12-0000402, 2017 WL 679187 (Haw. February 21, 2017).

protecting or advancing these public interests has been
made by the [l]egislature.'' (Emphasis in original.) Id.,
9 (Reif, J., dissenting). Justice Reif then posits that the
remainder of the emergency vehicle statute functions to
''balance the protection of these specific interests, with
a more general interest of public safety,'' insofar as ''the
[l]egislature made exercise of the emergency vehicle priv-
ilege subject to certain conditions [such as use of emer-
gency lights and sirens and slowing down as necessary
for safe operation]. These conditions deal with the oper-
ation of the emergency vehicle.'' Id. Justice Reif empha-
sizes that the proviso—present in our § 14-283 (d)—
that ''[t]he provisions of this section shall not relieve
the driver of an authorized emergency vehicle from
the duty *to drive* with due regard for the safety of all
persons,'' along with the Oklahoma statute's ''conse-
quences of reckless disregard'' language; (emphasis in
original; internal quotation marks omitted) id.; see foot-
note 13 of this opinion; states that it is ''simply another
condition on the exercise of the privilege. That is, a
driver of an emergency vehicle who acts (drives) with
reckless disregard loses the protection of the privilege.
Conversely, a driver who maintains control of the emer-
gency vehicle and does not harm anyone with the vehi-
cle, remains within the privilege, breaches no duty, and
commits no tort as a matter of law.'' *State* v. *Gurich*,
supra, 9 (Reif, J., dissenting). Justice Reif emphasizes
that, ''once a pursuit is commenced, [the emergency
vehicle statute] governs the action of the pursuing offi-
cer. The initiation of a pursuit and its continuation in
compliance with [the emergency vehicle statute] cre-
ates nothing more than a condition for harm *caused* by
the violator being pursued.'' (Emphasis in original.) Id.
Beyond this textual analysis, Justice Reif observed that,
''[i]n setting public policy, the [l]egislature has decided
that the public benefit to be achieved by pursuit of
violators outweighs any potential harm caused by the
violators being pursued, who are under a duty to stop

Borelli *v.* Renaldi

. . . and [who] if they attempt to allude, commit a crime
. . . .'' Id., 10 (Reif, J., dissenting).

I find similarly instructive the Wisconsin Supreme
Court's well reasoned decision in *Estate of Cavanaugh*
v. *Andrade*, 202 Wis. 2d 290, 298 n.3, 315, 550 N.W.2d
103 (1996), which considered the intersection of Wis-
consin's emergency vehicle statute and a governmental
immunity statute that, like § 52-557n (a) (2) (B), afforded
immunity to police officers for liability during the per-
formance of discretionary acts. In *Cavanaugh*, the plain-
tiff's decedent was driving a car that was struck by a
vehicle fleeing from the police at high speeds through
a residential neighborhood. Id., 295–96. The court con-
cluded that ''an officer's decision to initiate or continue
a [high speed] chase is a discretionary act entitled to
immunity.'' Id., 315. Emphasizing that the emergency
vehicle statute did not evince ''an expression of clear
legislative intent to abolish discretionary act immunity,''
the court observed that the application of discretionary
act ''immunity for an officer's decision to initiate or
continue a pursuit does not mean . . . that officers are
afforded blanket immunity from all liability by virtue
of their involvement in a pursuit,'' stating that, under
the emergency vehicle statute, ''an officer may be negli-
gent . . . for failing to physically operate his or her
vehicle with due regard for the safety of others.'' Id.,
317. The Wisconsin court distinguished ''between an
officer's discretionary decision to initiate and continue
a pursuit and the physical operation of the vehicle,''
concluding that ''the duty of due care created by the
emergency vehicle statutes applies only to the opera-
tion of the emergency vehicle itself. The statutes exempt
emergency drivers from certain operational rules of
the road, such as obedience to speed limits, parking
restrictions and stop signals. The statutes recognize the
public necessity for a fire, ambulance or police vehicle
in an emergency situation to be *driven* unhindered by

Borelli *v.* Renaldi

the traffic rules governing ordinary vehicles. . . . [The plaintiff's] real objection is to [the officer's] decision to initiate and continue police pursuit. This is not the consideration addressed by [the emergency vehicle statutes]." (Emphasis in original; internal quotation marks omitted.) Id., 317–18; see also *Legue* v. *Racine*, 357 Wis. 2d 250, 291, 849 N.W.2d 837 (2014) ("*Cavanaugh* . . . attempted to segregate an officer's decision to initiate or continue a pursuit from that officer's physical operation of the vehicle with due regard under the circumstances for the safety of all persons").

Similarly, in *Lancaster* v. *Chambers*, 883 S.W.2d 650, 652 (Tex. 1994), the Texas Supreme Court addressed claims brought by plaintiffs whose son was the passenger on a motorcycle that crashed while fleeing during a police pursuit. The Texas court concluded that the state's emergency vehicle statute did not mandate "a holding that an officer has no discretion to drive without due regard for the safety of all persons." Id., 655. The court concluded that that reading of the emergency vehicle statute would "[frustrate] official immunity's very function. If public officials perform their duties without negligence, they do not need immunity. The complex policy judgment reflected by the doctrine of official immunity, if it is to mean anything, protects officers from suit even if they acted negligently." Id. Instead, the court concluded that the "decision to pursue a particular suspect will fundamentally involve the officer's discretion, because the officer must, in the first instance, elect whether to undertake pursuit. Beyond the initial decision to engage in the chase, a high speed pursuit involves the officer's discretion on a number of levels, including, which route should be followed, at what speed, should [backup] be called for, and how closely should the fleeing vehicle be pursued. [The Texas court held] that these police [officers'] engaging in a [high speed] chase was a discretionary act." Id.; see *Pletan* v. *Gaines*, 494 N.W.2d 38, 39–41 and n.2

Borelli *v.* Renaldi

(Minn. 1992) (police officer's decision to pursue vehicle that had been involved in ''snatch and grab'' theft from clothing store and that struck child during chase was discretionary decision subject to official immunity doctrine governing ''operational'' discretion, despite state's emergency vehicle statute, because ''[t]he issue . . . is not about how a police car should be driven during a pursuit, but whether a pursuit should have been undertaken in the first place or discontinued at some point after being undertaken''); *Colby* v. *Boyden*, 241 Va. 125, 129–31, 400 S.E.2d 184 (1991) (concluding that engaging in pursuit, including operation of vehicle during pursuit that struck plaintiff's car, is discretionary function for purposes of state's governmental immunity doctrine, which required plaintiff to prove gross negligence, despite ''reasonable care'' language in state's emergency vehicle statute); see also *Pinellas Park* v. *Brown*, 604 So. 2d 1222, 1226–28 (Fla. 1992) (extending discretionary immunity to police officers' decision to engage in pursuit via ''actual execution of a [hot pursuit] policy'' but concluding that ''the method chosen for engaging in hot pursuit will remain an operational function that is not immune from liability if accomplished in a manner contrary to reason and public safety,'' such as in that case, in which twenty police vehicles engaged in high speed chase for nearly twenty-five miles in densely populated area and officers disobeyed supervisor's order to discontinue chase (emphasis omitted)); *Robinson* v. *Detroit*, 462 Mich. 439, 457, 613 N.W.2d 307 (2000) (''the decision to pursue a fleeing motorist, which is separate from the operation of the vehicle itself, is not encompassed within a narrow construction of the phrase 'operation of a motor vehicle' '' for purposes of statute providing exception to governmental immunity resulting from ''operation'' of motor vehicle); *Tice* v. *Cramer*, 133 N.J. 347, 370–72, 627 A.2d 1090 (1993) (emergency vehicle statute did not affect absolute immunity afforded police

Borelli *v.* Renaldi

officers, in absence of wilful misconduct, for actions
of fleeing or escaping offender and injuries resulting
from pursuit).

Given that they arise under similar emergency vehicle
statutes and governmental immunity schemes, I find
these sister state cases highly instructive.[14] Accordingly,

[14] I note that there is some sister state authority holding to the contrary,
namely, that the decision to engage in a pursuit is not discretionary for
purposes of governmental immunity, but I view those cases as either poorly
reasoned or distinguishable because they arise under immunity or statutory
schemes that differ materially from Connecticut law. Some cases consider
this question under a discretionary immunity scheme that is more constric-
tive than ours, insofar as they afford immunity for policymaking but not
decisions on the operational level. See *Tice* v. *Cramer*, supra, 133 N.J.
366–67; *State* v. *Gurich*, supra, 238 P.3d 3–4; *Lowrimore* v. *Dimmitt*, 310
Or. 291, 296, 797 P.2d 1027 (1990); *Day* v. *State*, 980 P.2d 1171, 1180–81
(Utah 1999); *Mason* v. *Bitton*, 85 Wn. 2d 321, 328–29, 534 P.2d 1360 (1975);
see also *Tetro* v. *Stratford*, supra, 189 Conn. 606–607 (citing *Mason* v. *Bitton*,
supra, 326, as example of court holding that application of emergency vehicle
statute is not limited to situation in which police vehicle itself is involved
in accident).

There are similarly distinguishable cases from Maryland and Tennessee
holding that there was no immunity under emergency vehicle statutes that
specifically provided that law enforcement officers could be liable for injur-
ies caused by a fleeing motorist during a pursuit when the " 'conduct of the
law enforcement personnel was negligent . . . .' " (Emphasis omitted.)
*Haynes* v. *Hamilton*, 883 S.W.2d 606, 609 (Tenn. 1994); see *Boyer* v. *State*,
323 Md. 558, 574–75, 594 A.2d 121 (1991) (statutory waiver of immunity
for negligent "operation" of emergency vehicle, with "operation" deemed
broader than "driving"); *Haynes* v. *Hamilton*, supra, 611 ("an officer's deci-
sion to commence or continue a [high speed] chase is encompassed within
the statutory term 'conduct' and may form the basis of liability in an action
brought by a third party who is injured by the fleeing suspect, if the officer's
decision was unreasonable").

This brings me, then, to the Kansas Supreme Court's decision in *Robbins*
v. *Wichita*, supra, 285 Kan. 455, relied on by the dissent, which followed
the Tennessee and Maryland courts, respectively, in *Haynes* and *Boyer*. The
Kansas court "refus[ed] to distinguish between the decision to pursue and
continue the pursuit from the method of pursuing. The language of [the
Kansas emergency vehicle statute] requires the drivers of emergency vehi-
cles to 'drive with due regard for the safety of all persons.' [The Kansas
court] believe[d] [that] the act of driving involves both the mental and
physical components." Id., 465. In so holding, the Kansas court overruled
its earlier decision in *Thornton* v. *Shore*, 233 Kan. 737, 666 P.2d 655 (1983),
on which the Wisconsin court in *Estate of Cavanaugh* v. *Andrade*, supra,
202 Wis. 2d 290, relied, and concluded that it was "unable to distinguish
between the decision to pursue and the method of pursuing. Thus, [the

Borelli *v.* Renaldi

I conclude that deciding whether to engage in a vehicular pursuit of a fleeing suspect is not "driving" within the contemplation of § 14-283 (d) and, thus, remains a decision that is unique to law enforcement and rife with the exercise of professional discretion. "The decision to engage in a car chase and to continue the chase involves the weighing of many factors. How dangerous is the fleeing suspect and how important is it that he be caught? To what extent may the chase be dangerous to other persons because of weather, time of day, road, and traffic conditions? Are there alternatives to a car chase, such as a road block up ahead? These and other questions must be considered by the police officer in deciding whether . . . to engage in a vehicular pursuit. And these questions must be resolved under emergency conditions with little time for reflection and often on the basis of incomplete and confusing information. It is difficult to think of a situation [in which] the exercise of significant, independent judgment and discretion would be more required." (Footnote omitted.) *Pletan* v. *Gaines*, supra, 494 N.W.2d 41.

Kansas court] overrule[d] that portion of the *Thornton* decision that exempts the decision to pursue and continue the pursuit from the duty found in [the emergency vehicle statute]." *Robbins* v. *Wichita*, supra, 465–66. I respectfully disagree with the reasoning in *Robbins*. First, it does not account for the distinct statutory language that formed the bases for the Tennessee and Maryland decisions in *Haynes* and *Boyer*, respectively, which considered liability for negligent "operation" or "conduct" rather than just "driving." Second, its immunity determination does not account for the complexity of the decision to pursue or continue pursuit. Accordingly, I decline to follow *Robbins*, along with the Oklahoma Supreme Court's majority opinion in *State* v. *Gurich*, supra, 238 P.3d 5–6, which follows the reasoning of *Robbins* on this point. See also *Legue* v. *Racine*, supra, 357 Wis. 2d 292–93 (The court criticized the distinction between operation and making the decision to pursue drawn in *Estate of Cavanaugh* v. *Andrade*, supra, 202 Wis. 2d 290, as suffering from "theoretical and practical difficulties . . . ." Nonetheless, the court concluded that *Cavanaugh* "retains vitality and is instructive" on the point that, under the emergency vehicle statute, "an officer must still treat all persons and vehicles with 'due regard under the circumstances,' notwithstanding the discretionary decision of the officer to engage in a [high speed] pursuit or respond to an emergency call. *Cavanaugh* instructs that the duties of the officer to operate the vehicle are not subsumed by an initial discretionary decision.").

Borelli *v.* Renaldi

I further agree with the majority's conclusion that the town and statewide pursuit policies at issue in this case, promulgated pursuant to the police pursuit statute, General Statutes § 14-283a,[15] do not change the inherently discretionary nature of the pursuit decision

---

[15] General Statutes § 14-283a recently was amended by No. 19-90, § 5, of the 2019 Public Acts, which made technical changes to the statute that are not relevant to this appeal. For purposes of clarity, I refer to the current revision of § 14-283a, which provides in relevant part: "(a) As used in this section, 'police officer' and 'law enforcement unit' have the same meanings as provided in section 7-294a, and 'pursuit' means an attempt by a police officer in an authorized emergency vehicle to apprehend any occupant of another moving motor vehicle, when the driver of the fleeing motor vehicle is attempting to avoid apprehension by maintaining or increasing the speed of such vehicle or by ignoring the police officer's attempt to stop such vehicle.

"(b) (1) The Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney, the Police Officer Standards and Training Council, the Connecticut Police Chiefs Association and the Connecticut Coalition of Police and Correctional Officers, shall adopt, in accordance with the provisions of chapter 54, a uniform, state-wide policy for handling pursuits by police officers. Such policy shall specify: (A) The conditions under which a police officer may engage in a pursuit and discontinue a pursuit, (B) alternative measures to be employed by any such police officer in order to apprehend any occupant of the fleeing motor vehicle or to impede the movement of such motor vehicle, (C) the coordination and responsibility, including control over the pursuit, of supervisory personnel and the police officer engaged in such pursuit, (D) in the case of a pursuit that may proceed and continue into another municipality, (i) the requirement to notify and the procedures to be used to notify the police department in such other municipality or, if there is no organized police department in such other municipality, the officers responsible for law enforcement in such other municipality, that there is a pursuit in progress, and (ii) the coordination and responsibility of supervisory personnel in each such municipality and the police officer engaged in such pursuit, (E) the type and amount of training in pursuits, that each police officer shall undergo, which may include training in vehicle simulators, if vehicle simulator training is determined to be necessary, and (F) that a police officer immediately notify supervisory personnel or the officer in charge after the police officer begins a pursuit. The chief of police or Commissioner of Emergency Services and Public Protection, as the case may be, shall inform each officer within such chief's or said commissioner's department and each officer responsible for law enforcement in a municipality in which there is no such department of the existence of the policy of pursuit to be employed by any such officer and shall take whatever measures that are necessary to assure that each such officer understands the pursuit policy established.

Borelli *v.* Renaldi

in this case. For example, § 14-283a-4 of the Regulations of Connecticut State Agencies,[16] governing the decision to initiate a pursuit, provides that "[t]he decision to initiate a pursuit shall be based on the pursuing police officer's conclusion that the immediate danger to the police officer and the public created by the pursuit is less than the immediate or potential danger to the public should the occupants of such vehicle remain at large." Regs., Conn. State Agencies § 14-283a-4 (a) (1). It then requires the officers to "take the following factors into consideration" in making that determination: (1) "[r]oad, weather and environmental conditions"; (2) "[p]opulation density and vehicular and pedestrian traffic"; (3) "[w]hether the identity of the occupants is known and immediate apprehension is not necessary to protect the public or police officers and apprehension at a later time is feasible"; (4) "[t]he relative performance capa-

"(2) Not later than January 1, 2021, and at least once during each five-year period thereafter, the Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney, the Police Officer Standards and Training Council, the Connecticut Police Chiefs Association and the Connecticut Coalition of Police and Correctional Officers, shall adopt regulations in accordance with the provisions of chapter 54, to update such policy adopted pursuant to subdivision (1) of this subsection.

"(c) No police officer engaged in a pursuit shall discharge any firearm into or at a fleeing motor vehicle, unless such officer has a reasonable belief that there is an imminent threat of death to such officer or another person posed by the fleeing motor vehicle or an occupant of such motor vehicle.

"(d) No police officer shall intentionally position his or her body in front of a fleeing motor vehicle, unless such action is a tactic approved by the law enforcement unit that employs such police officer.

"(e) If a pursuit enters the jurisdiction of a law enforcement unit other than that of the unit which initiated the pursuit, the law enforcement unit that initiated the pursuit shall immediately notify the law enforcement unit that has jurisdiction over such area of such pursuit.

"(f) (1) Not later than December 1, 2018, the Police Officer Standards and Training Council, established under section 7-294b, shall develop and promulgate a standardized form for (A) reporting pursuits by police officers pursuant to subdivision (2) of this subsection, and (B) submitting annual reports pursuant to subdivision (3) of this subsection. . . ."

[16] See footnote 9 of the majority opinion (complete text of relevant state regulations).

Borelli *v.* Renaldi

bilities of the pursuit vehicle and the vehicle being pursued''; (5) ''[t]he seriousness of the offense''; and (6) ''[t]he presence of other persons in the police vehicle.'' Id., § 14-283a-4 (a) (2) (A) through (F). Officers engaged in a pursuit are required to ''continually re-evaluate and assess the pursuit situation, including all of the initiating factors, and terminate the pursuit whenever he or she reasonably believes that the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension.''[17] Id., § 14-283a-4 (e) (1). I agree with the majority that the state regulations, and the very similarly worded town policy; see Seymour Police Department Pursuit Policy §§ 5.11.11 and 5.11.12; are written in a manner that we consider discretionary rather than mandatory—at least with respect to the multifactored decisions to engage in a pursuit.[18] ''It is difficult to conceive of policy language

---

[17] Under the statewide pursuit policy, a police supervisor is authorized to ''order the termination of a pursuit at any time and shall order the termination of a pursuit when the potential danger to the public outweighs the need for immediate apprehension. Such decision shall be based on information known to the supervisor at the time of the pursuit.'' (Emphasis omitted.) Regs., Conn. State Agencies § 14-283a-4 (e) (3). Similarly, a ''pursuit may be terminated'' when communications problems arise among the police units involved, or ''if the identity of the occupants has been determined, immediate apprehension is not necessary to protect the public or police officers, and apprehension at a later time is feasible.'' Id., § 14-283a-4 (e) (4) and (5).

[18] I note that there are certain portions of the town and statewide policies governing the manner of pursuit that are phrased in a manner that is susceptible to being read as imposing a ministerial duty, such as mandating the use of emergency lights and sirens during the pursuit and requiring officers to discontinue pursuit when directed by a supervisor, or precluding certain units from engaging in pursuit. See Regs., Conn. State Agencies § 14-283a-4 (b) (2) (''Upon engaging in or entering into a pursuit, the pursuing vehicle shall activate appropriate warning equipment. An audible warning device shall be used during all such pursuits.''); Seymour Police Department Pursuit Policy § 5.11.12 (B) (1) (''As soon as the operator of a pursued vehicle increases his speed or drives in such a manner as to endanger safety of others, the pursuing officer shall immediately activate both siren and emergency dome lights, and shall use both throughout the entire pursuit. The purpose of the lights and siren is primarily to warn motorists of unusual vehicular movements.''); Seymour Police Department Pursuit Policy § 5.11.12

Borelli *v.* Renaldi

that could more clearly contemplate the exercise of judgment by a municipal employee than is contemplated by the police response procedures in the present case.'' *Coley* v. *Hartford*, supra, 312 Conn. 165. ''Because the policy language makes the manner of performance expressly contingent upon the police officer's discretion, it cannot be said that the alleged acts were to be performed in a prescribed manner without the exercise of judgment . . . .'' (Internal quotation marks omitted.) Id., 166. Accordingly, I conclude that the decision to engage in pursuit in this case was discretionary for purposes of governmental immunity.

## II

''Three exceptions to discretionary act immunity are recognized,[19] but only one is relevant here: the identifi-

(C) (''[u]nits that have prisoners, witnesses, suspects, complainants, or other non-law enforcement personnel as passengers, shall not become engaged in pursuit situations''); Seymour Police Department Pursuit Policy § 5.11.12 (D) (1) (''[i]f an officer receives a communication from the dispatcher that the chase be terminated, he shall do so immediately, reporting to the dispatcher the final location and direction of travel of the pursued vehicle at the time of termination'').

I leave to another day whether these portions of the policies impose ministerial duties but recognize that the Minnesota Supreme Court has rejected the argument that ''all police conduct in emergency situations is discretionary,'' stating that ''governmental entities have the authority to eliminate by policy the discretion of their employees . . . . Moreover, the existence of such policies reveals a belief that certain situations do not justify the creation of the risk attendant to police chases.'' *Mumm* v. *Mornson*, 708 N.W.2d 475, 493 (Minn. 2006); see id., 491–92 (officers violated ministerial duty by failing to discontinue pursuit when language of department policy mandated termination of pursuit, identity of pursued party was known, and pursued party was not suspected of certain violent felonies); see also *Benedict* v. *Norfolk*, 296 Conn. 518, 520 n.4, 997 A.2d 449 (2010) (municipal acts are ''deemed ministerial [only] if a policy or rule limiting discretion in the completion of such acts exists'').

[19] ''Liability for a municipality's discretionary act is not precluded when (1) the alleged conduct involves malice, wantonness or intent to injure; (2) a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; or (3) the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . .'' (Internal quotation marks omitted.) *St. Pierre* v. *Plainfield*, 326 Conn. 420, 434 n.13, 165 A.3d 148 (2017).

Borelli *v.* Renaldi

able person, imminent harm exception. Pursuant to this
exception, liability is not precluded when the circum-
stances make it apparent to the public officer that his
or her failure to act would be likely to subject an identifi-
able person to imminent harm . . . .” (Footnote in orig-
inal; internal quotation marks omitted.) *St. Pierre* v.
*Plainfield*, 326 Conn. 420, 434–35, 165 A.3d 148 (2017).
“[T]he identifiable person, imminent harm exception to
qualified immunity for an employee’s discretionary acts
is applicable in an action brought under § 52-557n (a)
to hold a municipality directly liable for those acts. . . .
The exception requires three elements: (1) an imminent
harm; (2) an identifiable victim; and (3) a public official
to whom it is apparent that his or her conduct is likely to
subject that victim to that harm . . . . We have stated
previously that this exception to the general rule of
governmental immunity for employees engaged in dis-
cretionary activities has received very limited recogni-
tion in this state. . . . If the plaintiffs fail to establish
any one of the three prongs, this failure will be fatal to
their claim that they come within the imminent harm
exception. . . .

“An allegedly identifiable person must be identifiable
as a potential victim of a specific imminent harm. Like-
wise, the alleged imminent harm must be imminent in
terms of its impact on a specific identifiable person.”
(Citations omitted; footnote omitted; internal quotation
marks omitted.) Id., 435–36.

In a precedential vacuum,[20] the dissent’s observation
that, under the elements of the exception, no one would

[20] The dissent raises some compelling observations about what it considers
to be this court’s unduly restrictive approach to the first prong of the test,
under which “we [generally] have held that a party is an identifiable person
when he or she is compelled to be somewhere,” and “[t]he only identifiable
class of foreseeable victims that we have recognized . . . is that of school-
children attending public schools during school hours because: they were
intended to be the beneficiaries of particular duties of care imposed by law
on school officials; they [are] legally required to attend school rather than
being there voluntarily; their parents [are] thus statutorily required to relin-
quish their custody to those officials during those hours; and, as a matter

Borelli *v.* Renaldi

be more of an identifiable person subject to imminent
harm than the occupant of a car being pursued by the
police makes logical sense. Even assuming, however,
that the plaintiff satisfies all three prongs of the excep-
tion, "whether a particular plaintiff comes within a cog-
nizable class of foreseeable victims for purposes of this
exception . . . is ultimately a question of policy for
the courts, in that it is in effect a question of duty . . .
[that] involves a mixture of policy considerations and
evolving expectations of a maturing society . . . ."
(Citation omitted; internal quotation marks omitted.)
*Prescott* v. *Meriden*, 273 Conn. 759, 763–64, 873 A.2d
175 (2005); see, e.g., *Strycharz* v. *Cady*, 323 Conn. 548,
575, 148 A.3d 1011 (2016), overruled in part on other
grounds by *Ventura* v. *East Haven*, 330 Conn. 613, 199
A.3d 1 (2019); *Grady* v. *Somers*, supra, 294 Conn. 356;
*Durrant* v. *Board of Education*, 284 Conn. 91, 100–101,
931 A.2d 859 (2007). Consistent with the public policy
aspect of this inquiry, I join those courts that have held
that a police officer owes no duty of care to an occupant

of policy, they traditionally require special consideration in the face of
dangerous conditions." (Internal quotation marks omitted.) *St. Pierre* v.
*Plainfield*, supra, 326 Conn. 436; see id., 436–37 and n.15 (discussing *Sestito*
v. *Groton*, 178 Conn. 520, 423 A.2d 165 (1979), and noting that, "[o]utside
of the schoolchildren context, we have recognized an identifiable person
under this exception in only one case that has since been limited to its
facts," and, "although we have addressed claims that a plaintiff is an identifi-
able person or member of an identifiable class of foreseeable victims in a
number of cases, we have not broadened our definition").

A long line of cases illustrates how well established the compulsion aspect
is to the identifiability element of the exception. See, e.g., id., 438 (person
injured while attending aqua therapy session at municipal pool was not
subject to exception); *Grady* v. *Somers*, supra, 294 Conn. 356–57 (town
resident using transfer station was not subject to exception); *Prescott* v.
*Meriden*, supra, 273 Conn. 759, 764–66, 873 A.2d 175 (2005) (parent attending
high school football game was not subject to exception); *Durrant* v. *Board
of Education*, 284 Conn. 91, 109–110, 931 A.2d 859 (2007) (parent picking
up her child from after-school program held at public school was not subject
to exception); see also *Shore* v. *Stonington*, supra, 187 Conn. 153–54 (motor-
ist on road was not identifiable person subject to imminent harm, even
when police officer exercised discretion to let apparently drunk driver go
on his way after traffic stop).

Borelli *v.* Renaldi

of a car that he is pursuing, insofar as—in the absence
of evidence otherwise—that passenger is presumed to
be in cahoots with the person whose actions created the
dangerous situation—namely, the person who led the
officers on a chase in violation of his duty to stop pur-
suant to General Statutes § 14-223.[21] Cf. *Tetro* v. *Strat-
ford*, supra, 189 Conn. 611 (dictum precluding "blanket
immunity" for actions during pursuit limited to "liability
to an innocent bystander").

Given its use of a multifactor duty analysis akin to
Connecticut law; see, e.g., *Munn* v. *Hotchkiss School*,
326 Conn. 540, 548–50, 165 A.3d 1167 (2017); I find par-
ticularly instructive the Pennsylvania Supreme Court's
decision in *Sellers* v. *Abington*, 630 Pa. 330, 106 A.3d
679 (2014), in which the decedent was a passenger who
was ejected from a car that crashed while fleeing from
police officers, who had attempted to stop the driver for
suspected drunk driving. Id., 333–35. The court rejected
the plaintiff's argument that Pennsylvania's emergency
vehicle statute, requiring police officers engaged in pur-
suit "to drive with due regard for the safety of all per-
sons," created a statutory duty to "unknown passengers"
in a fleeing vehicle; (internal quotation marks omitted)
id., 340, 349; defining "unknown passengers" as "pas-

---

[21] General Statutes § 14-223 provides in relevant part: "(a) Whenever the
operator of any motor vehicle fails promptly to bring his motor vehicle to
a full stop upon the signal of any officer in uniform or prominently displaying
the badge of his office, or disobeys the direction of such officer with relation
to the operation of his motor vehicle, he shall be deemed to have committed
an infraction and be fined fifty dollars.

"(b) No person operating a motor vehicle, when signaled to stop by an
officer in a police vehicle using an audible signal device or flashing or
revolving lights, shall increase the speed of the motor vehicle in an attempt
to escape or elude such police officer. Any person who violates this subsec-
tion shall be guilty of a class A misdemeanor, except that, if such violation
causes the death or serious physical injury, as defined in section 53a-3, of
another person, such person shall be guilty of a class C felony, and shall
have such person's motor vehicle operator's license suspended for one year
for the first offense . . . ."

Borelli *v.* Renaldi

sengers whose presence in the vehicle *or connection to the driver* is unknown to the pursuing officer.'' (Emphasis added; internal quotation marks omitted.) Id., 336 n.5. Recognizing that ''emergency vehicle drivers still owe a [common-law] duty to the public at large, [that is] innocent bystanders,'' the court concluded that the officer had no common-law duty to the passenger, stating that it viewed ''the relationship between the officers and passengers in a fleeing vehicle, in the broader context of the relationship the officer has to the community he or she serves. . . . An officer's relationship to the community he or she serves hinges on the officer's ability to keep the members of the community safe from criminals, including dangerous drivers. Accordingly, where . . . the officer was unaware of the presence of a passenger in a fleeing vehicle, this first factor weighs against imposing a duty.'' (Citation omitted.) Id., 347–48. The court further stated that ''the social utility of a police officer's attempt to apprehend a person suspected of violating the law is beyond dispute,'' which ''is not curtailed by the addition of an unknown passenger in a fleeing vehicle.'' (Internal quotation marks omitted.) Id., 348. The Pennsylvania court emphasized: ''Imposing a duty on officers to unknown passengers in a fleeing vehicle would present an unworkable burden on officers, essentially halting police pursuits. The decision to pursue a fleeing vehicle is one that must be made in a matter of seconds. To require officers to not only establish the presence of passengers, but also discover the relationship of the passengers to the fleeing driver, would be unmanageable in the necessarily [fast paced] environment of law enforcement. Moreover, officers, fearing the risk of civil liability, would be less likely to initiate pursuit, which would likely encourage criminals to flee.'' Id.

Similarly, in *Robinson* v. *Detroit*, supra, 462 Mich. 439, the Michigan Supreme Court observed: ''Out of

Borelli *v.* Renaldi

concern for public safety, [the] police must sometimes allow fleeing suspects to get away. However, it would be absurd to conclude that the police, out of concern for the safety of a fleeing criminal suspect, must cease pursuit of the fleeing suspect or risk possible civil liability.'' (Internal quotation marks omitted.) Id., 451. The court extended this rule to passengers, holding that ''it is irrelevant whether a wrongdoer is a driver or a passenger or whether an innocent person is inside or outside the vehicle. . . . [W]hatever their location, there is a duty to innocent persons, but not to wrongdoers. In other words, the police owe a duty to innocent persons whether those persons are inside or outside the vehicle. Conversely, the police owe no duty to a wrongdoer, whether the wrongdoer is the fleeing driver or a passenger.'' Id. The court ''place[d] on the plaintiff the burden of proving that a passenger was an innocent person and that the police therefore owed the passenger a duty.'' Id., 452; see *Fisher* v. *Miami-Dade County*, 883 So. 2d 335, 336–37 (Fla. App. 2004) (no duty of care to passenger in car being pursued by police, despite officers' apparent failure to follow procedures limiting pursuits to suspected violent felons), review denied, 901 So. 2d 873 (Fla. 2005); *Fawcett* v. *Adreon*, Docket No. M2000-00940-COA-R3-CV, 2001 WL 950159, *4 (Tenn. App. August 21, 2001) (''[I]n the absence of information to the contrary, a police officer can reasonably assume that the passenger in the fleeing vehicle is engaged in a common criminal activity with the driver and would therefore be a suspected violator of the law under [Tennessee's emergency vehicle statute]. If the passenger in a fleeing vehicle is a 'suspected violator' and not a 'third party,' a municipality cannot be held liable for an injury to such a passenger resulting from a high speed police chase.''); see also *Ombres* v. *Palm Beach Gardens*, 788 Fed. Appx. 665, 666, 668–69 (11th Cir. 2019) (The court followed *Fisher* and held that the officer owed no duty of care to the decedent, a passen-

Borelli *v.* Renaldi

ger in a fleeing vehicle, because, although the evidence "did not show that [the passenger] encouraged the unlawful behavior, neither did it establish that the officer had reason to believe she was an unwilling passenger such as a kidnapping victim. Under those circumstances, Florida law treats the passenger of a fleeing car no differently than it does the driver of the car and does not impose a duty of care upon the pursuing officer."). But see *Holthusen* v. *United States*, 498 F. Supp. 2d 1236, 1243, 1244 (D. Minn. 2007) (holding that, under Minnesota law, "the officers' duty of care extends to a passenger in a vehicle being pursued" given "due regard for the safety of persons using the street" language in state's emergency vehicle statute (internal quotation marks omitted)); *Lancaster* v. *Chambers*, supra, 883 S.W.2d 653 (police officer had duty to passenger on motorcycle that he was pursuing because of "due regard for the safety of all persons" language in Texas' emergency vehicle statute (emphasis omitted; internal quotation marks omitted)). The record indicates that the circumstances of the decedent's death were undeniably tragic, with the driver of the Mustang resisting the entreaties of his front seat passenger to stop for the police. I nevertheless conclude that, in the absence of evidence that a pursuing police officer is aware of an innocent occupant of the vehicle—such as a kidnapping victim—that officer has no duty of care to the occupants of the vehicle that he is pursuing, given the state's interest in effective law enforcement and given that § 14-223, as an expression of public policy, places the responsibility to stop on the driver of the car being pursued.

I respectfully disagree with the dissent's reliance on § 14-283a, the pursuit statute; see footnote 15 of this opinion; in support of the proposition that public policy supports the imposition of a duty of care via a holding that the decedent was an identifiable person subject to imminent harm, because the "fatal accident that led to this case is precisely the type of tragedy the legislature

Borelli *v.* Renaldi

was concerned with preventing when it promulgated and amended § 14-283a,'' and, ''[i]f the young occupants of the Mustang convertible being pursued at a high rate of speed do not qualify as members of an identifiable class of likely victims, then the doctrine has become an absurdity.'' Although I agree with the dissent's observation that this ''state has a strong public policy in favor of encouraging the safe operation of motor vehicles and discouraging police officers from initiating high speed chases for minor vehicular infractions,'' I believe that it invades the purview of the legislature for this court to assert, as the dissent does, the judgment that ''[n]othing is to be gained and more lives will be lost if we grant immunity to officers who engage in such chases in a negligent manner contrary to the spirit and purpose of §§ 52-557n, 14-283, 14-283a, and our common-law history.''[22] Part III of the dissenting opinion; see *Tice* v. *Cramer*, supra, 133 N.J. 381 (observing that ''[the] difficult policy question involved in this legislative choice between aggressive law enforcement and the numerous injuries alleged to be unjustified continues to rage'' in concluding that absolute immunity was not inconsistent with legislation requiring adoption of police standards for initiation and conduct of pursuits and ''efforts by the [s]tate to minimize the frequency and dangers of unwarranted or reckless police pursuits''). To me, this spate of legislative activity, including the recent amendments to § 14-283a highlighted by the dissent, shows that the legislature is well positioned to amend our governmental immunity and motor vehicle statutes to waive immunity and to allow a private right

[22] I respectfully disagree with the dissent's assertion that my reading of the pursuit and immunity statutes amounts to ''substituting [my] own policy preferences for those policies established by the legislature,'' despite an ostensible ''deference to legislative prerogative . . . .'' In my view, the correctness of the dissent's policy analysis with respect to § 14-283a wholly depends on the validity of its conclusion that the decision to pursue is inextricable from the conduct of the pursuit for purposes of § 14-283 (d), a conclusion with which I have stated my disagreement in part I of this opinion.

Borelli *v.* Renaldi

of action should it deem that remedy necessary to vindicate the public safety interests implicated by high speed police pursuits.[23] See, e.g., *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 550, 93 A.3d 1142 (2014) ("Given the continuing vigorous legislative debate on open government matters both in 1994 and today, we deem balancing the various interests and articulating a coherent policy on this matter to be a uniquely legislative function. The General Assembly retains the prerogative to modify or clarify [General Statutes] § 1-215 as it sees fit."); *Gerardi* v. *Bridgeport*, 294 Conn. 461, 472–73, 985 A.2d 328 (2010) (comparing electronic monitoring statute, General Statutes § 31-48d, to other employment statutes in concluding that legislature did not intend to create private right of action for violation of that statute). Accordingly, I conclude that the decedent was not an identifiable person subject to imminent harm because public policy does not support extending a legal duty from the pursuing officer to him.

---

[23] For example, the legislature has specifically waived sovereign immunity with respect to the negligence of state officials and employees operating state owned and insured motor vehicles. See General Statutes § 52-556. An example of a more targeted waiver of governmental immunity in the pursuit context is Florida's pursuit statute. See Fla. Stat. Ann. § 768.28 (9) (d) (West Supp. 2020) ("The employing agency of a law enforcement officer as defined in [§] 943.10 is not liable for injury, death, or property damage effected or caused by a person fleeing from a law enforcement officer in a motor vehicle if: 1. The pursuit is conducted in a manner that does not involve conduct by the officer which is so reckless or wanting in care as to constitute disregard of human life, human rights, safety, or the property of another; 2. At the time the law enforcement officer initiates the pursuit, the officer reasonably believes that the person fleeing has committed a forcible felony as defined in [§] 776.08; and 3. The pursuit is conducted by the officer pursuant to a written policy governing high-speed pursuit adopted by the employing agency. The policy must contain specific procedures concerning the proper method to initiate and terminate high-speed pursuit. The law enforcement officer must have received instructional training from the employing agency on the written policy governing high-speed pursuit."). Similarly, the legislature might consider an amendment to the emergency vehicle statute to clarify more specifically the scope extent to which it waives governmental immunity in that area, such as by adapting the "reckless disregard" language used in other states. See footnote 13 of this opinion.

Borelli *v.* Renaldi

I concur in and join the majority's judgment affirming the judgment of the trial court.

D'AURIA, J., concurring. Although I join the majority opinion in full, I agree in part with observations Justice Ecker makes in part III of his dissenting opinion concerning the identifiable victim-imminent harm exception to governmental immunity. Specifically, I am skeptical that the doctrinal validity of this exception can be based on whether a plaintiff "was compelled to be at the location where the injury occurred . . . ." (Internal quotation marks omitted.) *Strycharz* v. *Cady*, 323 Conn. 548, 576, 148 A.3d 1011 (2016), overruled in part on other grounds by *Ventura* v. *East Haven*, 330 Conn. 613, 199 A.3d 1 (2019). The appropriate doctrinal underpinnings and limits of this exception would be useful to explore in a future case. I am satisfied, however, that the exception does not save the plaintiff's cause of action from defeat in this case.

ECKER, J., dissenting. Negligence liability for municipal employees is effectively dead. The doctrinal demise has occurred as the result of an accumulation of cuts inflicted by this court, on a case-by-case basis, over the past thirty years. In that sense, today's decision is merely one more unfortunate chapter in a story nearing its now-predictable end. But the majority's holding also does new damage. For the first time in Connecticut's history, and in direct contravention of numerous statutes reflecting our legislature's opposite policy choice, the majority extends immunity to municipal employees whose negligent operation of a motor vehicle on a public road has caused bodily injury or death. This opinion registers my objection to both the general trend and the additional step taken by the court today, which, in my view, further eviscerates a doctrine that, as codified in 1986; see Public Acts 1986, No. 86-338, § 13 (P.A. 86-

Borelli *v.* Renaldi

338), codified as amended at General Statutes § 52-557n; had routinely imposed tort liability on municipal employees for personal injuries caused by their on-the-job negligence.

In broad perspective, these recent developments in the law of municipal immunity reflect a flawed jurisprudence that unnecessarily and unjustifiably denies legal recourse to many individuals who sustain actual physical harm as a result of a municipal employee's negligent conduct. Of particular concern to me is that the nearly unlimited reach of the current, judge-made, municipal immunity doctrine is of recent vintage, which is to say that (1) the current law of municipal employee immunity[1] bears only a slight resemblance to the law that was codified by the legislature in 1986 in P.A. 86-338, and (2) the developments since the 1986 codification are not the result of legislative policymaking. The reality is that the scope of immunity for municipal employees

---

[1] Throughout this opinion, I use the terms "municipal employee immunity" and "municipal entity immunity" to highlight and maintain the important difference between the immunity of the municipal employee and the immunity of the municipality itself. I use the term "municipal immunity" when I refer to the doctrine generally, to encompass the immunity of both municipal employees and municipalities. We would benefit from greater linguistic and conceptual precision in this regard. Thus, the immunity doctrine applied to municipal employees has gone by different names in Connecticut. Usually, it is called either official immunity or qualified immunity; see, e.g., *Grady* v. *Somers*, 294 Conn. 324, 326, 984 A.2d 684 (2009) (referring to "a municipal employee's qualified immunity for discretionary acts"); though, sometimes, it is indiscriminately and inaccurately lumped together with the corporate (municipal entity) immunity under the rubric of "governmental" or "municipal" immunity. See, e.g., *Evon* v. *Andrews*, 211 Conn. 501, 507, 559 A.2d 1131 (1989) (referring to "the general rule of governmental immunity for employees engaged in discretionary activities"). Adding to the confusion, the common law historically distinguished between officials (or officers) and mere employees of a municipality for immunity purposes. See 1 E. Kinkead, Commentaries on the Law of Torts (1903) § 153, p. 348 ("we must have clearly in mind when a person is to be considered a public officer, for if he is not an official, he must be something else—as an employee—his liability depending, in such cases, upon different principles"). This officer/employee distinction evidently was abandoned in Connecticut, as elsewhere.

Borelli *v.* Renaldi

has expanded radically since 1986 without any basis in the governing statute, § 52-557n.

This opinion summarizes where we are and how we have reached this unfortunate state of affairs. Part I provides a brief historical overview of the doctrine of municipal employee immunity, both common-law and statutory, and offers a general critique of the changes we have made over the past three decades. Parts II and III examine the doctrinal expansion produced by the majority in the present case, which, in my view, warrants criticism in its own right and marks a milestone in the judicial eradication of municipal employee negligence liability.

The impact of today's decision is especially profound because it is double-fisted. One blow is dealt because the majority creates a new zone of immunity that did not exist and that was never intended by the legislature when it enacted § 52-557n in 1986, namely, immunity for injuries caused by the negligent driving of a municipal police officer during a vehicular pursuit on public roadways. Immunity for negligent driving—routine or emergency—has *never* been available to municipal employees in Connecticut. As discussed in part II of this opinion, the majority's holding actually reverses existing law and overrules established doctrine in the particular context of emergency vehicle operation. See *Tetro* v. *Stratford*, 189 Conn. 601, 609–10, 458 A.2d 5 (1983) ("[w]e . . . conclude that [General Statutes] § 14-283 [which governs the rights and duties of emergency vehicles on public roadways] provides no special zone of limited liability once the defendants' negligence has been established [in connection with a police vehicular pursuit]"); *Voltz* v. *Orange Volunteer Fire Assn.*, *Inc.*, 118 Conn. 307, 310, 172 A. 220 (1934) ("[The defendants' immunity] claim involves a misconception of the doctrine of governmental immunity . . . . The driver of a fire truck is liable to one injured by his negligent driving, though

Borelli *v.* Renaldi

the municipality employing him is exempt from liability.''). The majority's analysis also fails to come to terms with the express legislative command contained in the specific statute, § 14-283, governing the very municipal activity at issue in the present case, i.e., the operation of emergency vehicles on public roadways. Section 14-283 (d) plainly and unambiguously retains the long established negligence liability of the municipal employee in this context by providing expressly that the vehicle's emergency status ''shall not relieve the operator . . . from the duty to drive with due regard for the safety of all persons and property.'' That duty has *never* been considered ''discretionary,'' and the majority's decision to label it as such disregards the legislature's affirmation of the mandatory nature of the duty, even under emergency conditions.

Part III of this opinion addresses the second blow struck by the majority opinion, which effectively does away with the identifiable victim, imminent harm exception to municipal employee immunity in all cases outside of the public school context. The line drawn by the majority is arbitrary and bears no connection to any legitimate, or even articulable, underlying purpose. The present case presents a paradigmatic example of identifiable persons being exposed to the risk of imminent harm. In light of the legislature's codification of the doctrine in § 52-557n, we are no longer free to change or contract the scope of that doctrine when the outcome it produces is not to our liking.

I

A

I begin with the larger picture because the best way to appreciate what has gone wrong in the field of municipal employee negligence law over the past three decades is first to describe the current state of the law and then to examine how we arrived here. The standard narrative appearing in our more recent cases views the

Borelli *v.* Renaldi

current doctrine of near-total immunity as an unadulter-
ated continuation of an old and deeply rooted common-
law tradition, in which a municipality and its employees
always have been immune from liability for negligence
flowing from an employee's performance of routine, dis-
cretionary tasks.[2] The broad immunity conferred under
the common law, the story goes, ultimately was codified
by the legislature in § 52-557n. We have explained that,
since the 1986 codification, our cases have merely imple-
mented the municipal immunity doctrine as codified, with-
out material modification. In other words, we say that
our judicial decisions do not make new law but merely
reflect the legislative will, as established in 1986, which,
in turn, reflected the accumulated wisdom of long estab-
lished common-law rules.[3]

This story is substantially inaccurate. It ignores the
leading role that we have played in the expansion of

[2] See, e.g., *Northrup* v. *Witkowski*, 332 Conn. 158, 167, 210 A.3d 29 (2019)
("[t]he [common-law] doctrines that determine the tort liability of municipal
employees are well established" (internal quotation marks omitted)); *Elliott*
v. *Waterbury*, 245 Conn. 385, 411, 715 A.2d 27 (1998) ("under the common
law . . . both municipalities and their employees or agents have immunity
from negligence liability for governmental acts involving the exercise of
judgment or discretion" (footnote omitted)).

[3] This court has stated on numerous occasions that § 52-557n codified the
fundamental components of the municipal immunity doctrine, as established
under the common law. See, e.g., *Violano* v. *Fernandez*, 280 Conn. 310, 320,
907 A.2d 1188 (2006) ("[t]he tort liability of a municipality has been codified
in § 52-557n"); see also, e.g., *Durrant* v. *Board of Education*, 284 Conn. 91,
107, 931 A.2d 859 (2007) ("[s]ince the codification of the common law under
§ 52-557n [in 1986], this court has recognized that it is not free to expand
or alter the scope of governmental immunity therein"); *Considine* v. *Water-
bury*, 279 Conn. 830, 844, 905 A.2d 70 (2006) (concluding that § 52-557n (a)
(1) (B) codified "municipal common-law liability for acts performed [by the
municipality] in a proprietary capacity"). As *Considine* indicates, a more
refined characterization of the statutory codification of municipal immunity
is that subsection (a) of § 52-557n codified the existing common law of
municipal immunity, whereas subsection (b) altered the common law in a
limited set of context-specific circumstances. See *Considine* v. *Waterbury*,
supra, 838–41. None of the situations enumerated in subsection (b) of § 52-
557n involves the operation of municipal motor vehicles.

Borelli *v.* Renaldi

municipal immunity since 1986 and belies our repeated insistence that, "[s]ince the codification of the common law under § 52-557n [in 1986], this court has recognized that it is not free to expand or alter the scope of governmental immunity therein." *Durrant* v. *Board of Education*, 284 Conn. 91, 107, 931 A.2d 859 (2007); see footnote 3 of this opinion. I do not intend any criticism of our court for "activism" in this regard. I believe that, in an age of statutes, there remains a vital judicial role to fill, in case-by-case adjudication, the numerous gaps, interstices, and ambiguities that emerge as legislative designs meet the infinitely varied and unpredictable conditions of the real world. See B. Cardozo, The Nature of the Judicial Process (1921) pp. 15–17, 113–115, 129; E. Peters, "Common Law Judging in a Statutory World: An Address," 43 U. Pitt. L. Rev. 995, 1002–1005 (1982); R. Traynor, "Statutes Revolving in Common-Law Orbits," 17 Cath. U. L. Rev. 401, 401–402 (1968). Rather, I take issue with the fact that we have failed, in my view, to perform that necessary analysis in a manner consistent with the guidance provided by historical precedent, legislative intentions, and relevant public policy. I also regret that we too often attribute our holdings to the very historical and legislative sources that our analysis contravenes.

As a starting point, the public is entitled to a candid assessment of the chances that a person today will succeed in a negligence lawsuit brought against a municipality or municipal employee for that employee's negligence.[4] The odds are close to zero.[5] This is true even

___

[4] This assessment is not meant to include lawsuits seeking recovery for personal injuries or property damage caused by the negligent operation of a motor vehicle under routine conditions. See part II A of this opinion.

[5] It would risk overheating the printing press to include a complete list of such cases decided by this court and the Appellate Court since 1990. To conserve resources, I provide only a representative sampling of cases decided by this court. See, e.g., *Northrup* v. *Witkowski*, 332 Conn. 158, 188–90, 210 A.3d 29 (2019); *Ventura* v. *East Haven*, 330 Conn. 613, 640–42, 199 A.3d 1 (2019); *Martinez* v. *New Haven*, 328 Conn. 1, 11–12, 176 A.3d 531 (2018); *St. Pierre* v. *Plainfield*, 326 Conn. 420, 432–35, 165 A.3d 148

Borelli *v.* Renaldi

in cases in which the negligence is manifest, the causation is direct, and the harm to person or property is serious. I put the odds at close to zero rather than completely hopeless because a plaintiff still stands a modest chance of success if she is a child injured on school premises under certain limited conditions,[6] and, on exceedingly rare occasions, a nonstudent plaintiff may avoid the immunity bar by fitting within the narrow proprietary function exception under § 52-557n (a) (1) (B) or one of the special exceptions expressly enumerated in § 52-557n (b).[7] But, in the vast majority of cases, a negligence claim against municipal defendants is doomed from the outset under our current case law.

Indeed, it is difficult to overstate the breadth of the municipal immunity doctrine under our more recent cases. A plaintiff will lose her case under current law, even if the long-standing and on-point precedent of this court had refused to confer such immunity, and even in the absence of any indication that the legislature disapproved of that precedent.[8] In the same spirit,

---

(2017); *Strycharz* v. *Cady*, 323 Conn. 548, 575, 148 A.3d 1011 (2016), overruled in part by *Ventura* v. *East Haven*, 330 Conn. 613, 199 A.3d 1 (2019); *Edgerton* v. *Clinton*, 311 Conn. 217, 235–36, 86 A.3d 437 (2014); *Coe* v. *Board of Education*, 301 Conn. 112, 122, 19 A.3d 640 (2011); *Grady* v. *Somers*, 294 Conn. 324, 356–57, 984 A.2d 684 (2009); *Cotto* v. *Board of Education*, 294 Conn. 265, 279–80, 984 A.2d 58 (2009); *Durrant* v. *Board of Education*, supra, 284 Conn. 108–11; *Violano* v. *Fernandez*, 280 Conn. 310, 327–28, 907 A.2d 1188 (2006); *Doe* v. *Petersen*, 279 Conn. 607, 620–21, 903 A.2d 191 (2006); *Evon* v. *Andrews*, 211 Conn. 501, 506–508, 559 A.2d 1131 (1989).

[6] See part III of this opinion.

[7] See, e.g., *Blonski* v. *Metropolitan District Commission*, 309 Conn. 282, 286, 71 A.3d 465 (2013) (defendant's negligent actions were connected to its proprietary function, and, therefore, defendant was liable under § 52-557n (a) (1) (B)); *Ugrin* v. *Cheshire*, 307 Conn. 364, 387, 54 A.3d 532 (2012) (plaintiffs were not precluded from bringing action for negligent inspection under § 52-557n (b) (8) when municipality was on notice of hazardous condition). In addition, statutory claims against municipal defendants exist outside of the scope of the municipal immunity doctrine. See, e.g., General Statutes § 13a-149 (highway defect statute).

[8] See *Northrup* v. *Witkowski*, 332 Conn. 158, 166, 189–90, 210 A.3d 29 (2019) (overruling *Spitzer* v. *Waterbury*, 113 Conn. 84, 154 A. 157 (1931)); see also id., 190–91, 201–202 (*Ecker, J.*, dissenting).

Borelli *v.* Renaldi

another recent judicial innovation changed *who* decides whether municipal immunity applies in any particular case. This latter development evolved gradually from 1988 until its consummation last year, when we expressly overruled a long line of precodification cases holding that the immunity issue ordinarily is for the jury.[9] Most of this court's other postcodification innovations have involved, in one way or another, the ever-expanding application of the so-called discretionary function doctrine to now include virtually every imaginable act or omission by virtually every municipal employee; we now have reached the point—*for the very first time in Connecticut's history*—when it is almost impossible to prevail against a municipal defendant in a negligence action for personal injuries or property damage. It has recently become as difficult to obtain tort compensation for damages caused by a municipal employee's garden-variety negligence as it is to obtain a court order granting the extraordinary writ of mandamus against a judicial officer or other public official.[10] Almost every such

---

[9] See *Ventura* v. *East Haven*, 330 Conn. 613, 634–37, 199 A.3d 1 (2019) (holding that immunity issues ordinarily present issue of law, disavowing line of earlier cases stating that issue of whether acts or omissions are discretionary or ministerial ordinarily presents issue of fact for jury).

[10] Thus, a nonsupervisory municipal employee engaged in a routine task—shoveling snow or opening a hallway door, for example—enjoys the same insulation from ordinary negligence liability as a public official enjoys from being ordered by a judge to do (or not to do) some act within the scope of the official's discretionary authority. The comparison, while startling, unfortunately is neither hyperbolic nor accidental. The strict definition of a "ministerial act" required to overcome municipal employee immunity is effectively a mandamus standard. Compare *Ventura* v. *East Haven*, 330 Conn. 613, 631, 199 A.3d 1 (2019) ("to demonstrate the existence of a ministerial duty on the part of a municipality and its agents [in a negligence action], a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion" (internal quotation marks omitted)), with *AvalonBay Communities, Inc.* v. *Sewer Commission*, 270 Conn. 409, 422, 853 A.2d 497 (2004) ("[A] writ of mandamus will lie only to direct performance of a ministerial act which requires no exercise of a public officer's judgment or discretion. . . . Furthermore, where a public

Borelli *v.* Renaldi

negligence claim under our new, judge-made doctrine
will be terminated summarily in the trial court long
before the case ever reaches a jury. Municipalities can
rest assured, moreover, that, in the highly improbable
event that a plaintiff somehow manages to avoid such
a fate and obtains a jury verdict finding that the munici-
pality is not entitled to immunity and must pay damages,
our current doctrine will see the judgment overturned
on appeal "as a matter of law."[11] Despite our declaration
that the 1986 codification erected a bar to any future
judicial modification; *Durrant* v. *Board of Education,*
supra, 284 Conn. 107; the pace of our judicial modifica-
tions over the past fifteen years has, at times, been so
rapid that we have been unable to keep up with our own
innovations.[12] A negligence claim against a municipal

officer acts within the scope of delegated authority and honestly exercises
her judgment in performing her function, mandamus is not available to
review the action or to compel a different course of action." (Internal quota-
tion marks omitted.)). Something has gone very wrong when our municipal
immunity doctrine has blindly collapsed these two legal standards from the
extreme opposite ends of the judicial remedial spectrum—one a routine
damages award used every day to compensate any person who has sustained
real and demonstrable physical harm as a result of a defendant's negligent
performance of routine tasks like shoveling snow or opening a hallway door,
the other an extraordinary writ involving the exercise of direct judicial
control to command or prohibit a government official from taking a particu-
lar action.

[11] See, e.g., *Ventura* v. *East Haven,* 330 Conn. 613, 617, 640–42, 199 A.3d
1 (2019) (reversing judgment awarding plaintiff $6 million, rendered after
jury rejected municipal immunity defense in personal injury case on basis
of negligence); *Edgerton* v. *Clinton,* 311 Conn. 217, 219–21, 86 A.3d 437
(2014) (reversing approximately $13 million judgment in plaintiff's favor,
notwithstanding jury's express finding that defendant was not entitled to
municipal immunity for its employee's negligence resulting in plaintiff's
personal injury); *Daley* v. *Kashmanian,* 193 Conn. App. 171, 173, 177, 219
A.3d 499 (2019) (upholding trial court's granting of employee's and munici-
pality's motions to set aside $312,160.50 jury verdict on personal injury claim
predicated on negligence), petition for cert. filed (Conn. October 23, 2019)
(No. SC 190245), and cross petition for cert. filed (Conn. November 1, 2019)
(No. SC 190256).

[12] I refer to the fact that a substantial number of our recent immunity
cases, sometimes before the ink is dry, have themselves been overruled by
still more recent cases. See, e.g., *Ventura* v. *East Haven,* 330 Conn. 613,

Borelli *v.* Renaldi

employee simply is not a viable theory of recovery in the overwhelming majority of cases brought in Connecticut today.

It would try the reader's patience beyond the breaking point to explicate the many sources of this erroneous turn. The remainder of part I of this opinion, therefore, will focus primarily on what I believe to be the mistake most responsible for the doctrinal expansion, which is our failure to observe and enforce the fundamental distinction between corporate (municipal entity) immunity and personal (municipal employee) immunity. The distinction is critical because the former always has been substantially broader than the latter, a well-known historical fact that this court unfortunately has forgotten in recent years. The distinction figured prominently in the common law of this state; it was very familiar to the Connecticut legislature by 1957, when widespread concern over the threat of municipal employees' exposure to personal liability for on-the-job negligence resulted in the passage of the highly controversial municipal indemnification statute, General Statutes § 7-465, and, as I discuss later in this opinion, the legislature embedded the distinction in the text and structure of § 52-557n itself. It is regrettable that this court has, since 1986, almost

634–37 and n.12, 199 A.3d 1 (2019) (holding that immunity issues ordinarily present issue of law and overruling *Strycharz* v. *Cady*, 323 Conn. 548, 148 A.3d 1011 (2016), *Coley* v. *Hartford*, 312 Conn. 150, 95 A.3d 480 (2014), *Bonington* v. *Westport*, 297 Conn. 297, 999 A.2d 700 (2010), *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 881 A.2d 194 (2005), and *Lombard* v. *Edward J. Peters*, *Jr.*, *P.C.*, 252 Conn. 623, 749 A.2d 630 (2000)); *Haynes* v. *Middletown*, 314 Conn. 303, 323–25 n.16, 101 A.3d 249 (2014) (overruling less demanding imminent harm standard used in *Purzycki* v. *Fairfield*, 244 Conn. 101, 708 A.2d 937 (1998), and *Burns* v. *Board of Education*, 228 Conn. 640, 638 A.2d 1 (1994)); *Grady* v. *Somers*, 294 Conn. 324, 348–49, 984 A.2d 684 (2009) (overruling "dicta" in *Pane* v. *Danbury*, 267 Conn. 669, 841 A.2d 684 (2004), and *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 191–92, 592 A.2d 912 (1991), that identifiable person, imminent harm exception does not apply to negligence claims brought against municipality only).

336 Conn. 1 FEBRUARY, 2021 77

Borelli *v.* Renaldi

completely removed the preexisting domain of liability, which was substantial, and it is discomforting that we have done so in the name of "construing" legislation that actually compels the opposite result.

B

Until recently, our common law very clearly distinguished between municipal entity immunity and the personal immunity of municipal employees. This historical distinction, though largely overlooked in our recent case law, was readily acknowledged by this court in the not-too-distant past. Thus, " '[i]t was once said that as a general rule governmental officers and employees were personally liable for their torts, more or less without exception, even where the governmental unit itself was protected by an immunity.' [W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 132, p. 1056]; see also G. Bermann, 'Integrating Governmental and Officer Tort Liability,' 77 Colum. L. Rev. 1175, 1178 (1977); 63A Am. Jur. 2d, Public Officers and Employees § 358 (1984)." *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 165–66, 544 A.2d 1185 (1988); see also *Spears* v. *Garcia*, 263 Conn. 22, 36, 818 A.2d 37 (2003).[13]

---

[13] In light of the theme of this opinion, it seems fitting that the municipal immunity doctrine itself originated from the careless transplantation to the New England states of an English case, *Russell* v. *Men of Devon*, 100 Eng. Rep. 359 (K.B. 1788). See E. Borchard, "Government Liability in Tort," 34 Yale L.J. 1, 41–42 (1924) (describing doctrine's history and explaining why *Russell*, which addressed liability of unincorporated and unfunded county, does not support granting immunity to municipalities). Numerous scholarly and judicial commentators have made the same observation as Professor Borchard regarding this unfortunate transplantation. See, e.g., *Muskopf* v. *Corning Hospital District*, 55 Cal. 2d 211, 216, 359 P.2d 457, 11 Cal. Rptr. 89 (1961) (Traynor, J.) (opining that cases that adopted reasoning of *Russell* "[ignored the] differences" that made *Russell* inapposite to municipalities in United States); *Spanel* v. *Mounds View School District No. 621*, 264 Minn. 279, 282, 118 N.W.2d 795 (1962) ("Every reason assigned by the court [in *Russell*] is born of expediency. The wrong to [the] plaintiff is submerged in the convenience of the public. No moral, ethical, or rational reason for the decision is advanced by the court except the practical problem of assessing

Borelli *v.* Renaldi

I will confine myself here to four observations regarding Connecticut's common law governing the personal immunity of municipal employees prior to the passage of § 52-557n in 1986. First, far from being a fixture of our law since its inception, the municipal employee immunity doctrine was not recognized in Connecticut until 1920. See *Gordon* v. *Bridgeport Housing Authority*, supra, 208 Conn. 166 ("[t]his court first adopted a version of qualified official immunity in 1920 in *Wadsworth* v. *Middletown*, 94 Conn. 435, 439, 109 A. 246 (1920), [in which] we said that since certain public officials were 'engaged upon a governmental duty . . . so long as they act in good faith, in the exercise of an honest judgment, and not in the abuse of their discretion, or maliciously or wantonly, they cannot be held liable' "). This doctrinal fact is no mere historical curiosity; it has unmistakable and unavoidable *constitutional* implications because a common-law cause of action in existence in 1818 cannot be abrogated. Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." "[A]ll rights derived by statute and the common law extant at the time of the adoption of article first, § 10, are incorporated in that provision . . . ." *Gentile* v. *Altermatt*, 169 Conn. 267, 286, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); see *Sharp* v. *Mitchell*, 209 Conn. 59, 64, 546 A.2d 846 (1988).[14] When we ignore the traditional common-law

damages against individual defendants."); E. Fuller & A. Casner, "Municipal Tort Liability in Operation," 54 Harv. L. Rev. 437, 438 n.2 (1941) ("[t]hese reasons [used in *Russell* to justify county immunity] were never applicable in America").

[14] In *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 592 A.2d 912 (1991), this court rejected a plaintiff's claim that her constitutional right to a remedy was violated when the trial court found that § 52-557n immunized municipal defendants from liability for injuries the plaintiff sustained as a result of an automobile collision allegedly caused by the defendants' negli-

Borelli *v.* Renaldi

distinction between municipal entity immunity and the municipal employee's personal immunity, we also overlook this lurking constitutional issue, which, regardless of whether it is meritorious in the final analysis, is by no means insubstantial.

Second, the citation in *Gordon* to the seminal decision in *Wadsworth* v. *Middletown*, supra, 94 Conn. 435, is telling because *Wadsworth* actually demonstrates how far we have strayed from the original doctrine. *Wadsworth*, in fact, *rejected* a personal immunity defense and *affirmed* a substantial damages judgment in favor of the plaintiff against the defendant town official for the destruction of trees located on the plaintiff's roadside property. Id., 437–38, 443. The defendant, who was the first selectman of Middletown acting on official business, had sent a man named "Atkins, whom he had occasionally hired to make repairs on the town highways, with a gang of men and with instructions 'to trim off the sides of the roads to the wall and make a good job of it,' " with no further instruction. Id., 442. By affirming the judgment against the defendant, *Wadsworth* shows that our law previously did *not* automatically equate discretion with immunity but, rather, applied an immunity doctrine for discretionary acts using a deferential version of the abuse of discretion standard: "[S]ince [the defendants] are engaged upon a governmental duty in the care and maintenance of the highways, so long as they act in good faith, in the exercise of an honest judgment, *and not in abuse of their discretion*, or maliciously or wantonly, they cannot be held liable." (Empha-

gent maintenance of a defective traffic signal. Id., 182–84, 194–95. It did so, however, on the ground that the legislature has made available an alternative form of liability as a substitute for any preexisting liabilities that may have existed prior to 1818. See id., 196–97 ("[t]he availability of redress under [General Statutes] § 13a-149 permits the legislature constitutionally to eliminate [common-law] remedies, if any, that may have existed prior to 1818 and that continued to exist prior to the Tort Reform Act of 1986, for injuries arising out of highway defects" (footnotes omitted)).

Borelli *v.* Renaldi

sis added.) Id., 439; see also id., 440 ("[The defendant's] brief concedes that the exercise of this discretion does not justify [public officials'] acting wantonly or maliciously, *or with a clear abuse of discretion.* And we think this is our own rule." (Emphasis added.)).[15]

Our current law, which holds that municipal employees enjoy complete and unrestrained freedom to act carelessly in the absence of unequivocal mandatory directives instructing their every move,[16] would have been unrecognizable to the court in *Wadsworth.* Indeed, in this important respect, the doctrine established in *Wadsworth* was the very opposite of our present day, judge-made rule equating discretion with immunity. As the court in *Wadsworth* explained: "The defendant argues that public officials caring for highways may act, in removing obstructions within the highway, within their discretion. . . . As we have pointed out, the defendant's brief practically concedes that the exercise of discretion by a public official in caring for highways

---

[15] This abuse of discretion standard is familiar in our jurisprudence. Cf. *State* v. *Ayala*, 324 Conn. 571, 588–89, 153 A.3d 588 (2017) ("[i]ndeed, the failure to exercise discretion is an abuse in and of itself"); *Sturman* v. *Socha*, 191 Conn. 1, 7, 463 A.2d 527 (1983) ("[D]iscretion imports something more than leeway in [decision making]. . . . Judicial discretion . . . is always legal discretion, exercised according to the recognized principles of equity. . . . While its exercise will not ordinarily be interfered with on appeal to this court, reversal is required where the abuse is manifest or where injustice appears to have been done. . . . In essence, the trial judge's discretion should be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Citations omitted; internal quotation marks omitted.)).

[16] "[O]ur courts consistently have held that to demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion. See *Violano* v. *Fernandez*, 280 Conn. 310, 323, 907 A.2d 1188 (2006); *Evon* v. *Andrews*, 211 Conn. 501, 506–507, 559 A.2d 1131 (1989); *DiMiceli* v. *Cheshire*, [162 Conn. App. 216, 224–25, 131 A.3d 771 (2016)]; *Grignano* v. *Milford*, 106 Conn. App. 648, 659–60, 943 A.2d 507 (2008)." (Internal quotation marks omitted.) *Ventura* v. *East Haven*, 330 Conn. 613, 631, 199 A.3d 1 (2019).

Borelli *v.* Renaldi

does not justify acting maliciously, or wantonly, *or in clear abuse of the discretion by law vested in him.* The finding shows that the defendant cut down a great number of trees which did not obstruct the public easement of travel over the highway, and were in fact distant from it. . . . [A]nd this was done by the defendant, not through mere error of judgment *but through a failure to exercise not merely reasonable discretion but any discretion.*" (Emphasis added.) Id., 441. *Wadsworth* did not hold, as we no doubt would today, that the municipal defendants were immune because the decision to cut trees abutting a public roadway was "discretionary" in nature or because the municipal actors would need to exercise judgment and discretion in deciding which particular trees posed a potential hazard to the travelling public. Nor did *Wadsworth* hold, as our recent cases do, that the municipal defendants were immune because no task-specific rules had been promulgated to make the activity ministerial. To the contrary, the court held that the first selectman was *obligated* to provide that task-specific guidance and that he was liable in negligence for the harm resulting from his *failure* to exercise the discretion required of him.[17] Id., 441–42.

---

[17] I do not suggest that the "clear abuse of discretion" rule articulated in *Wadsworth* was itself consistently followed by this court between 1920 and 1986. Our cases did not establish anything like the near-absolute immunity rule fashioned by this court after 1986, but they often followed a less nuanced approach than the court did in *Wadsworth*. See, e.g., *Fraser* v. *Henninger*, 173 Conn. 52, 60, 376 A.2d 406 (1977) (in describing distinction between ministerial and discretionary duties, noting that "[t]he word 'ministerial' 'refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion' "); *Pluhowsky* v. *New Haven*, 151 Conn. 337, 347, 197 A.2d 645 (1964) (same). Still, *Wadsworth*, more than any other case, was cited continually by this court in the common-law era as the leading precedent on "official immunity" in Connecticut, and, as of 1986, it remained unquestioned authority for the proposition that a municipal employee does not enjoy immunity from negligence liability if he fails to exercise the discretion required of him. Although there is one isolated case suggesting that *Wadsworth* does not establish any limitation on employee immunity for negligent (as opposed to wilful or wanton) conduct; see *Stiebitz*

Borelli *v.* Renaldi

This latter point warrants particular emphasis because it is exactly the claim made in the present case by the plaintiff, Angela Borelli, administratrix of the estate of Brandon Giordano. The plaintiff alleges that two of the defendant police officers—Officer Anthony Renaldi and Officer Michael Jasmin of the Seymour Police Department—engaged in a highly dangerous pursuit, at night and well beyond posted speed limits, of a Ford Mustang convertible full of teenagers for no better reason than that the car was equipped with underglow lights.[18] The plaintiff alleges that, in doing so, the officers disregarded their legal obligation to balance the seriousness of the offense with the threat to public safety caused by the pursuit. The plaintiff's claim is that this conduct does not reflect the exercise of discretion but, instead, demonstrates the *failure* to exercise the very discretion required by the governing law and the Seymour Police Department Pursuit Policy. The plaintiff, in other words, advances a *Wadsworth* claim. Like the plaintiff in *Wadsworth*, she is entitled to have a jury determine the merits of that claim.

v. *Mahoney*, 144 Conn. 443, 449, 134 A.2d 71 (1957); the assertion is demonstrably incorrect. *Stiebitz* overlooks the fact that *Wadsworth* was a *negligence* case, and *Wadsworth* held that employee immunity for *negligence* is lost if the official acts are undertaken "wantonly or maliciously, *or with a clear abuse of discretion*." (Emphasis added.) *Wadsworth* v. *Middletown*, supra, 94 Conn. 440.

[18] I do not agree with the majority's suggestion that the pursuit did not begin until the pursued vehicle began driving recklessly. A jury reasonably could conclude that the plaintiff's decedent was a passenger in a vehicle that was being operated in a safe manner until after the police vehicle observed its underglow lights, performed a U-turn, and pursued the vehicle for the apparent purpose of taking action against the driver. When a vehicle takes flight in response to the initiation of law enforcement activity of this nature, the recklessness inherent in the effort to evade the police cannot itself be used to justify the emergency pursuit. Otherwise, virtually all emergency pursuits would be justified, by definition, because a pursuit occurs only if the driver takes flight. I also strongly disagree with the majority's suggestion that the legal issue on appeal involves only the decision to initiate the pursuit, not to continue the pursuit after its initiation. To the contrary, the underlying lawsuit and the present appeal plainly include the entire pursuit from start to finish. See part II A of this opinion.

Borelli *v.* Renaldi

Third, another important aspect of the common-law, municipal employee immunity doctrine, also of direct relevance to the present case, has been overlooked by this court since 1986 in its postcodification decisions. This forgotten doctrinal nuance recognizes that the distinction between discretionary and ministerial acts is far more subtle than that drawn in this court's recent case law. Even the more restrictive of the precodification cases recognized this doctrinal subtlety: "A ministerial duty on the part of an official often follows a quasijudicial [discretionary] determination by that official as to the existence of a state of facts. Although the determination itself involves the exercise of judgment, and therefore is not a ministerial act, *the duty of giving effect, by taking appropriate action, to the determination is often ministerial.*" (Emphasis added.) *Pluhowsky* v. *New Haven*, 151 Conn. 337, 347–48, 197 A.2d 645 (1964); see *Wright* v. *Brown*, 167 Conn. 464, 472, 356 A.2d 176 (1975) (same); *Betts* v. *Dimon*, 3 Conn. 107, 108–109 (1819) (administering legal oath "to a poor imprisoned debtor" is "an act strictly ministerial," even though official administering oath must first make "[an] [i]nquiry . . . to ascertain the legality of administering the oath"). In other words, although the initial decision to undertake a course of action may be based on discretionary considerations, the implementation of that decision "by appropriate action" may still require the exercise of due care under ordinary negligence principles. This important aspect of the discretionary act analysis, necessarily incorporated as part of our immunity doctrine in § 52-557n, has been ignored by this court since 1986.

Fourth, at the time the common-law doctrine of municipal employee immunity was adopted by the legislature and codified at § 52-557n, the *jury* decided when that immunity applied. See *Tango* v. *New Haven*, 173 Conn. 203, 204–206, 377 A.2d 284 (1977) (reversing judgment in favor of defendant on demurrer in negligence action

Borelli *v.* Renaldi

arising from sledding accident at municipal golf course); *Fraser* v. *Henninger*, 173 Conn. 52, 53–54, 61, 376 A.2d 406 (1977) (rendering judgment in connection with negligence action arising out of injuries sustained in basketball game run by municipal recreational program); cf. *Sestito* v. *Groton*, 178 Conn. 520, 523, 526, 423 A.2d 165 (1979) ("the question of the defendant town's negligence . . . should have been submitted to the jury" when town police officer witnessed ongoing brawl in bar's parking lot but did not intervene until after participant shot and killed plaintiff's decedent). Even in cases involving a discretionary function, a jury ordinarily was required to perform fact-finding to determine whether the individual defendant had acted in the exercise of his or her discretion or had failed to exercise discretion that was required properly to discharge his duties, or to decide whether the negligence at issue occurred as part of the initial discretionary act or its subsequent execution by "appropriate action." Under the common law codified in 1986, a jury was responsible for sorting out these issues. This court nevertheless has seen fit to declare that this is no longer the law, largely because we have fashioned a one-size-fits-all, per se rule, under which everything from driving a car to driving a nail is discretionary. There is nothing left for the jury to decide.

To summarize, the recent, judge-made developments represent a major departure from the law as codified in 1986. Our current doctrine considers virtually anything and everything that a municipal employee does (or omits doing) as discretionary, which, therefore, renders the employee immune from negligence liability. The rule is so extreme that it covers almost every act of every municipal employee, from planning and formulating important governmental initiatives to opening a door.[19] Perhaps more incredible, the current doctrine

---

[19] See *Colon* v. *Board of Education*, 60 Conn. App. 178, 183, 758 A.2d 900 ("[T]here was no directive describing the manner in which [a teacher or an employee] was to open doors. Rather, it appears that it is [the teacher's or

now appears to confer immunity not only when the
government worker has indeed exercised his or her
considered "judgment" bearing on public safety, but
also, contra *Wadsworth*, when the employee fails to
recognize the need to exercise discretion at all because
he or she is asleep at the switch, distracted, lazy, oblivi-
ous, or otherwise neglectful. In the absence of a spe-
cific, binding directive leaving the actor absolutely no
room for judgment about how to carry out a particular
task, there is no liability for his or her negligence. None
of these alterations can be justified as a matter of pol-
icy.[20] More important, none of them was recognized,
approved, or adopted by the legislature.

employee's] poor exercise of judgment when opening the door that forms
the basis of the plaintiffs' complaint. Accordingly, we conclude that [the
teacher's or employee's] actions were discretionary in nature."), cert. denied,
255 Conn. 908, 763 A.2d 1034 (2000), and cert. denied, 255 Conn. 908, 763
A.2d 1034 (2000). I wish I were exaggerating here, but I am unable to
overstate the scope of the current doctrine; even a maintenance worker
who fails to shovel snow from a sidewalk is immune from negligence liability
under our current doctrine. See *Kusy* v. *Norwich*, 192 Conn. App. 171, 180,
217 A.3d 31 ("[t]he act of snow and ice removal, absent a directive strictly
imposing the time and manner in which it is to be done, is inherently a
discretionary act"), cert. denied, 333 Conn. 931, 218 A.3d 71 (2019).

[20] To the contrary, the public policy established by our current doctrine
is inimical to public safety. The doctrine encourages municipal managers
to avoid promulgating any rule, directive or policy that could be used in a
lawsuit to defeat an immunity defense. For anyone in municipal government
paying the least bit of attention to our cases, "there shall be no mandatory
policies regarding operations" will become the only mandatory policy regard-
ing operations. Just as the general counsel to a private enterprise will instruct
management never to publish a personnel manual that could be construed
as creating contractual rights in an employee; see *Gaudio* v. *Griffin Health
Services Corp.*, 249 Conn. 523, 535, 733 A.2d 197 (1999) ("[w]e have stated
with unambiguous clarity that employers can protect themselves against
employee contract claims based on statements made in personnel manuals
by following either (or both) of two simple procedures: (1) eschewing lan-
guage that could reasonably be construed as a basis for a contractual prom-
ise; and/or (2) including appropriate disclaimers of the intention to contract"
(internal quotation marks omitted)); so, too, budget-conscious municipal
managers will instruct supervisory employees never to characterize any
operational duties or tasks as mandatory and never to prescribe in mandatory
terms how any such task must be executed. This "no ministerial policy"
policy not only will make the workplace less safe, for both municipal employ-
ees and members of the public, but it will have the desired effect of reducing
the line item for legal liability in the annual budget.

Borelli *v.* Renaldi

C

Additional compelling evidence of the extent to which municipal employees were often exposed to personal liability for negligence under the common law, as it existed at the time of codification in 1986, is found in a series of indemnification statutes enacted by our legislature in the middle of the last century for the express purpose of obligating municipalities to indemnify policemen, and later all other municipal employees, for damages awards against the employee as a result of the negligent performance of the employee's duties.[21] If municipal employees were already protected by anything approaching the near-absolute immunity mythologized in our recent revisionist histories, these indemnification statutes would have been largely unnecessary; at most, such statutes would have been minor, interstitial, belt and suspenders measures intended to fill in any small gaps in the preexisting immunity doctrine. But it was nothing like that at all. The legislative record makes clear that the indemnification statutes—enacted between 1945 and 1971— were considered necessary precisely because police officers and other municipal workers, without such statutory protection, were exposed to the risk of personal financial ruin as a result of common-law negligence

---

[21] See General Statutes (Supp. 1945) § 89h (saving harmless municipal police officers for negligence in operating vehicle, amended in 1955; General Statutes (Supp. 1955) § 265d; to indemnify municipal police officers for all liability for damage to persons or property, and repealed in 1957 by Public Acts 1957, No. 401, § 3, with establishment of broader § 7-465 indemnification); General Statutes § 10-235 (enacted in 1949 to "protect and save harmless" any member of board of education, teacher, or other board employee from financial loss and expense arising out of accidental injury to persons or property); General Statutes § 7-465 (enacted in 1957 to indemnify municipal employees for liability for damages to persons or property); General Statutes § 7-308 (enacted in 1955 to "protect and save harmless" municipal volunteer firefighters, ambulance members, and fire police officers from financial loss and expense arising out of any negligence claim); General Statutes § 7-101a (enacted in 1971 to "protect and save harmless" municipal officers from financial loss and expense, including legal fees and costs, arising out of any negligence claim).

Borelli *v.* Renaldi

liability arising from the performance of their routine job functions. The *municipality* typically was immune, but the employee was not.

The first such indemnification statute in Connecticut, enacted in 1945, dealt specifically with liabilities for the negligent operation of a motor vehicle by a police officer. See Public Acts 1945, No. 251, codified at General Statutes (1949 Rev.) § 674.[22] As motor vehicles increasingly became essential to law enforcement activity, the looming risk of personal liability imposed on police officers for damages caused by automobile accidents was of widespread concern. Vincent Dooley, corporation counsel for the city of New Haven, explained the problem to the Judiciary Committee during hearings on the bill: "We have had considerable experience from the matter of [p]olice and [f]iremen in our [c]ity, being sued for damages due to the [negligent] operation of motor vehicles." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1945 Sess., p. 202; see also id., remarks of Edward Mugavoro, Chief of Police of the Darien Police Department ("it will give the [p]olice [o]fficer security, to know when he goes out to perform the duty . . . [that he will] not have his life savings washed away through one little accident"). The 1945 statute was enacted to "protect all our policemen who are operating vehicles in the course of business and in any accident." Id., p. 194, remarks of Senator Alfred Tweedy.[23]

---

[22] Number 251 of the 1945 Public Acts provides in relevant part: "Each municipality of this state, notwithstanding any inconsistent provision of law, general, special or local, or the limitation contained in the provisions of any city or town charter, shall, upon adopting the provisions of this act in the manner hereinafter provided, save harmless any duly appointed policeman of such municipality for the negligence of such appointee in the operation of a vehicle upon the public streets or highways in the discharge of a duty imposed by law upon such appointee or municipality, provided the appointee, at the time of the accident, injury or damages complained of, was acting in the performance of his duties and within the scope of his employment. . . ."

[23] In the absence of express statutory authority, it evidently was uncertain at the time whether municipalities lawfully could expend public funds to insure or indemnify municipal employees for negligence liability. See Conn.

Borelli *v.* Renaldi

In 1953, the legislature acted to broaden the indemnification to include liabilities incurred by a municipal police officer for money damages resulting from the negligent performance of all of the officer's duties, not only driving. See Public Acts 1953, No. 469.[24] "This bill extends this [indemnification] protection . . . to any activity of the policeman in the course of duty unless the liability comes from [the] wilful or wanton actions of the policeman." 5 H.R. Proc., Pt. 7, 1953 Sess., p. 2544, remarks of Representative Frank E. Raymond; see also 5 S. Proc., Pt. 5, 1953 Sess., p. 1605, remarks of Senator George A. Saden ("[T]his bill broadens the protection given to a policeman who is found liable [for] an act performed in the course of his duties. At the present time he is given protection only in those cases [in which] he is operating a vehicle on the public street. This extends that protection to any act he may perform."). By examining the legislation and its background, we again see the legislature responding to liability concerns that are inconceivable under our municipal immunity doctrine, as recently expanded by this court. The particular event prompting the 1955 legislation illustrates the extent of this court's recent departure from preexisting law. The 1955 statute was enacted as the result of a negligence lawsuit brought against a West Haven police officer who accidentally discharged

Joint Standing Committee Hearings, Judiciary, 1945 Sess., p. 201, remarks of Representative Edward H. Delafield.

[24] Number 469 of the 1953 Public Acts provides in relevant part: "Each municipality of this state, notwithstanding any inconsistent provision of law, general, special or local, or the limitation contained in the provisions of any city or town charter, shall, upon adopting the provisions of this section in the manner hereinafter provided, pay on behalf of any duly appointed policeman of such municipality all sums which such appointee shall become obligated to pay by reason of the liability imposed upon such appointee by law for damages to person or property, provided the appointee, at the time of the occurrence, accident, injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, in the discharge of a duty imposed by law upon such appointee or municipality and provided such occurrence, accident, injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty. . . ."

Borelli *v.* Renaldi

his firearm and killed a fleeing larceny suspect while engaged in an on-foot pursuit. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1953 Sess., pp. 514–15, remarks of Attorney John Mezzinotti (describing incident); 5 H.R. Proc., supra, pp. 2545–46, remarks of Representative John Q. Tilson, Jr. (same). The jury ultimately returned a verdict for the defendant, but the case provoked sufficient concerns that the legislature enlarged the municipality's indemnity obligation to include all liabilities arising from the performance of the officer's duties and in the course of employment, unless due to the wilful or wanton act of the employee. The municipal employee immunity doctrine that today would spell the certain doom of such a lawsuit at the earliest stages of litigation was not even mentioned as a potential bar to liability during the legislature's consideration of the law sixty years ago.

Instead, the legislative history reflects intensive focus on the same general category of common-law liabilities that were the subject of concern eight years earlier in connection with No. 251 of the 1945 Public Acts. Thus, as one proponent of the bill remarked: "I think the policeman performing the duties that are his to perform under the law finds himself subject to a suit and probably liable for damages as a result of the attempt at the performance of his duties, I think that it should fall upon the city to take care of that policeman and see that he doesn't lose his personal fortune or assets that he may have saved throughout the years through hard work." 5 H.R. Proc., supra, p. 2550, remarks of Representative John M. Scanlon; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1953 Sess., p. 514, remarks of Representative J. Marshall Baldwin ("As the statutes read today, the policeman of a municipality can be sued personally for something that was done while he was performing his duty. As you know, policemen are not the best paid people. They protect our life and family and property. I think they have gone a long

90 FEBRUARY, 2021 336 Conn. 1

Borelli *v.* Renaldi

time without protection that many of us enjoy today.''); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1953 Sess., p. 516, remarks of Lieutenant Haddon (''I am speaking for the Police Benefits Association and the need for this bill has been brought to our attention. . . . I would like to also point out that every police officer in the state is very much interested in this bill.''); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1953 Sess., p. 517, remarks of Everett W. Shaw, executive secretary of the New Haven Police Union (''[w]e would like to point out that a police officer's life-time effort can be wiped out [overnight] in the line of duty'').

All this was prelude to the enactment of § 7-465 in 1957. See Public Acts 1957, No. 401, § 1 (P.A. 57-401). The passage of § 7-465 marked a watershed event in the law of municipal liability because the statute effectively eliminated the defense of municipal entity immunity in a broad range of cases by extending to *all* municipal employees the same protection that recently had been provided, on a selective basis, only to policemen, firemen and teachers. See P.A. 57-401, § 1. After years of effort and study, and despite substantial opposition—which included two gubernatorial vetoes, the first of which successfully blocked the legislation[25]—the legislature voted to override Governor Abraham Ribicoff's veto and to require, in very broad terms, all Connecticut municipalities to indemnify all employees: ''Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages to person or property, if the

---

[25] See 7 S. Proc., Pt. 6, 1957 Sess., pp. 3228–29 (clerk reading Governor Abraham Ribicoff's veto message regarding P.A. 57-401); id., pp. 3230–32, remarks of Senator Benjamin L. Barringer (describing thorough discussion before Judiciary Committee and extensive study by Legislative Council regarding bill's merits).

Borelli *v.* Renaldi

employee, at the time of the occurrence, accident, injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty.'' P.A. 57-401, § 1.

Everyone at the time understood the stakes. They were so high because the legislation served to protect municipal employees from potential financial ruin, not by extending immunity to them but, instead, by shifting the employee's exposure to the municipality itself— that is, by rescinding the municipal entity's immunity. Both sides of the controversy explicitly recognized that passage would require the municipality to pay the damage judgments that were sure to follow. Governor Ribicoff's veto message, which proved unsuccessful, made no bones about it: ''In vetoing a substantially similar bill during the 1955 regular session of the General Assembly, I said: 'The effects of this act are widespread and complicated. For hundreds of years municipalities in Connecticut have had a governmental immunity from liability, except where eliminated in particular cases such as injuries resulting from defective roads or sidewalks. *This bill removes the defense of governmental immunity from all our cities and towns.*

'' '*Taking away this defense from our municipalities will cause them to be exposed to heavy damages.* These damages in turn will be placed upon the shoulders of the taxpayers. Every municipality will have to bear a considerable cost.

'' 'With the rising tax rates in most of our cities and towns, I am unwilling to add to their tax burdens. There is no sound reason why we should now remove a legal defense which has existed for so many years.' [This bill] is open to identical criticism, and I accordingly veto it.'' (Emphasis added.) 7 S. Proc., Pt. 6, 1957 Sess.,

Borelli *v.* Renaldi

pp. 3228–29. Those legislators supporting the veto echoed these sentiments. See id., pp. 3234–37, remarks of Senator Arthur H. Healey; 7 H.R. Proc., Pt. 4, 1957 Sess., pp. 2217–19, remarks of Representative Samuel S. Googel.

It was no minor matter to override the governor's veto,[26] and the legislative body that did so responded to the governor's criticism with a number of counterarguments. They invoked three principles based on fairness, which further demonstrate the fact that municipal employees at the time were personally liable for their negligent conduct. First was a simple desire to protect municipal employees from ruinous liability. The remarks of Representative Edward C. Krawiecki are illustrative: "[L]et me raise my voice [on] behalf of these little people, who collect your garbage and dig up your streets, and fix up the sidewalks and do the other jobs that surround your city, who drive the trucks, who do all the things which expose them to danger and liability for the injuries that might happen to others in the course of the duty they do to the municipality [and they] let us remember that these jobs which they do are not personal; they're performing those jobs in the course of their employment; and I do not want to see any of my little people lose their houses or lose their possessions, if they have any, to pay a judgment for any injury that might have happened due to negligence in the course of their employment. Certainly the time has

_____

[26] The controversy inspired strong feelings and harsh words. See, e.g., 7 S. Proc., supra, p. 3232, remarks of Senator Benjamin L. Barringer (accusing governor of "trying to usurp the legislative functions" and trying "to pervert the legislative functions into the executive functions"); id., pp. 3235–37, remarks of Senator Healey (responding in kind in support of governor); see also 7 H.R. Proc., supra, p. 2224, remarks of Representative Erving Pruyn ("I'm very sorry to learn that the [g]overnor will probably veto this bill if it reaches him, because in doing so he will be thwarting the will of the legislature, the duly elected representatives of the people of the state for the second time, and such thwarting is done after careful research and investigation and recommendation by the Legislative Council. I think it's against the public [interest] for him to veto this bill, and I hope that he will see the light.").

Borelli *v.* Renaldi

come when I think that our cities are better able to
bear a loss of such proportions [than] one of my little
people, who might lose their house or possessions [and]
I urge you to think of that when you vote on this bill.''
7 H.R. Proc., supra, p. 2226.[27]

Second, the legislators also were concerned about
parity among all municipal workers. They expressed
the view that all municipal employees should enjoy the
same statutory protections that policemen, firemen and
teachers had been granted over the past twelve years.
See 7 S. Proc., supra, p. 3241, remarks of Senator Albert
C. Snyder (After explaining the historical background
of the bill, Senator Snyder stated: ''I decided [that] . . .
if we've given this to the firemen, [if] we've given it to
the policemen, what are the other municipal employees
who work for the Street Department, the Board of Health,
[who] lug the rubbish out, and so forth, are they second-
rate citizens? Should one segment of our municipal employ-
ees be covered against liability, suits, damages, in the
performance of their work?'').[28]

---

[27] See also 7 S. Proc., supra, p. 3233, remarks of Senator Harold Borden
(''Why should a poor individual who makes [f]ifty or [s]ixty [d]ollars a week,
just because he happens to be employed by a municipality, [which] can very
well afford it, and if they can't afford it, then if there is a [t]en [t]housand
[d]ollar judgment against this individual then it's split up amongst five, ten
and twenty or thirty thousand [municipal taxpayers] instead of one individ-
ual. Why should he be different than a man working in private industry? I
say, he should not be different than private industry. This is a very good
bill. I was on the [l]egislative [c]ouncil and this bill was heard. It came
before the [l]egislative [c]ouncil. We discussed this bill. We had pros and
cons. It finally reached an impasse where we approved this bill unanimously
and had the bill drawn et cetera and sent it to the legislature. I am going
to vote to override the veto.''); id., p. 3230, remarks of Senator Benjamin L.
Barringer (''We feel, and we felt in the [Judiciary] Committee, that this was
a reasonable and proper bill. We felt that a municipal corporation should
be as subject to [a lawsuit for the negligence of its employees] as a pri-
vate corporation.'').

[28] See also 7 H.R. Proc., supra, p. 2220, remarks of Representative Louis
J. Padula (''As . . . you know there's a statute where the towns are liable
for negligent acts of firemen, and recently the bill was increased to cover
policemen, where the town has the right to assume they are liable when in
the performance of their duties. There are other employees of the town that
outnumber the firemen and policemen that are exposed to the same type

Borelli *v.* Renaldi

Third, and of equal concern to those supporting the legislation, was the manifest unfairness that inevitably resulted when the cost of a municipal employee's negligence was imposed on the victim of that negligence rather than on the municipality. The legislators expressed the opinion that basic principles of fairness required the cost of the municipality's operations (including the cost of accidents) to be spread among the taxpayers, who are the beneficiaries of those operations. The proponent of the legislation in the House of Representatives, Representative Erving Pruyn, explained: "The [legislative] [c]ouncil after studying what other states have done, very careful consideration, came to the conclusion that the old doctrine of governmental immunity based as it is on that ancient principle that the [k]ing can do no wrong was outmoded, and that with the great increase of activities now being carried on by the municipalities and the availability at reasonable cost of insurance protection, the municipalities should assume the liability for injuries caused by their employees acting in the performance of their duties, and within the scope of their employment." 7 H.R. Proc., supra, p. 2215.[29]

of risk." (Internal quotation marks omitted.)); id., p. 2224, remarks of Representative Erving Pruyn ("[at the] hearing before the [L]egislative [C]ouncil representatives of the city of Hartford appeared and stated that they insured all their municipal employees who drive automobiles or rather protected them—they do it on a self-insurance basis; that their policemen and firemen and school teachers were protected, but a similar protection was not given to the other municipalities; and they pointed out that the employees of the Public Works Department and the Park[s] Department are not protected, although many of them come in contact with members of the general public in carrying out their duties; and they further stated that the distinction between these employees of the city was harmful to the morale of the employees who are not protected").

[29] See also 7 H.R. Proc., supra, p. 2216, remarks of Representative Pruyn ("[i]t is only fair and just that losses from injuries and damages of the kind under discussion, should be spread over society in general instead of being borne by the innocent victim"); id., pp. 2222–23, remarks of Representative A. Searle Pinney ("[T]he basic underlying question . . . is simply this: Should an injured individual bear the cost of an accident, which wasn't his fault, or should it be borne by the agency which caused it and the burden spread over the public at large[?] I find nothing in [the governor's veto] message which attempts to handle that question. The [L]egislative [C]ouncil

Borelli *v.* Renaldi

With respect to the financial burden assumed by the municipalities as the result of the statutory indemnification obligation, those who supported the law pointed out that liability insurance could be purchased to cover such losses. See 7 S. Proc., supra, p. 3230, remarks of Senator Benjamin L. Barringer (''[w]e felt that [the municipalities'] liabilities in this respect could be covered by insurance if they wished, though in many cases, apparently, in the larger cities they would prefer to be self-insured''); 7 H.R. Proc., Pt. 4, 1957 Sess., p. 2223, remarks of Representative A. Searle Pinney (''[t]he public can protect itself through insurance or through one of the self-insuring systems that some of the towns in this state have already adopted''); 7 H.R. Proc., Pt. 5, 1957 Sess., p. 2763, remarks of Representative Pruyn (''The bill provides that this liability of municipal employees may be covered by insurance. I am informed that the cost of this insurance is extremely reasonable.'').

The legislative history contains overwhelming evidence that these intentions directly motivated the statute's enactment. The legislative intentions are clear because the ultimate success of the 1957 legislation depended heavily on the analysis and positive recommendation of the Legislative Council, which was charged with the task of studying the merits of the proposal after the 1955 bill was vetoed by Governor

in its study of the matter went into that in great detail, and came to the conclusion that the cost should be borne by the agency doing the harm and it should be spread over the entire public. The public can protect itself through insurance or through one of the self-insuring systems that some of the towns in this state have already adopted.''); id., p. 2225, remarks of Representative Pruyn (After describing the facts of a case in which the municipality was found by this court to be immune from liability, stating: ''Now, here you have . . . a girl badly injured, no remedy except the doubtful one of recovering against the municipal employee. Certainly the spreading of this loss over the general society [by way of the indemnification statute] is certainly much better than of allowing the poor innocent victim to bear the loss.''); 7 H.R. Proc., Pt. 5, 1957 Sess., p. 2763, remarks of Representative Pruyn (''it's only fair and just that losses from injuries and damages of this kind should be spread over society instead of being borne by the person who is injured by the act of a municipal employee—the innocent victim'').

Borelli *v.* Renaldi

Ribicoff, and the Legislative Council's report leaves no doubt about which arguments won the day.[30] After reviewing the background of the proposed legislation and describing some of the information considered by the Legislative Council, including input from Connecticut municipalities and a study of national trends prepared by the Institute for Public Service of the University of Connecticut, the council enumerated seven reasons supporting the view that municipalities should assume legal responsibility for the negligent acts of its employees:[31]

"1. The defense of governmental immunity should be eliminated, and cities should assume the same public liability for which a private individual or corporation which is exercising the same powers would be liable.

_____

[30] See 7 S. Proc., supra, p. 3231, remarks of Senator Barringer ("[w]e're always in the habit of further studying matters if they're too hot to consider, and it was referred to the [l]egislative [c]ouncil and I'm given to understand that the [l]egislative [c]ouncil again endorsed the merits of the bill unanimously and returned it to this [G]eneral [A]ssembly as a bill worthy of our consideration"); 7 H.R. Proc., Pt. 4, 1957 Sess., pp. 2215–16, remarks of Representative Pruyn ("Because of the importance of this type of legislation the 1955 session referred this bill to the [l]egislative [c]ouncil for study and recommendation. Now, the [c]ouncil gave an exhaustive study to this proposition; it held a public hearing at which representatives from several municipalities appeared and urged favorable action on this bill. The [c]ouncil after studying what other states have done, very careful consideration, came to the conclusion that the old doctrine of governmental immunity based as it is on that ancient principle that the [k]ing can do no wrong, was outmoded, and that with the great increase of activities now being carried on by the municipalities and the availability at reasonable cost of insurance protection, the municipalities should assume the liability for injuries caused by their employees acting in the performance of their duties, and within the scope of their employment. This bill . . . was therefore recommended for passage by the [l]egislative [c]ouncil.").

[31] The Report of the Legislative Council also identified the three main arguments against indemnification: "1. Citizens would become claim-conscious and the number of legal suits would rise tremendously. 2. High awards would be made because of the feeling that the government would be paying, when actually the taxpayers would be footing the bill. 3. Municipal employees would become careless in their duties to the detriment of the community, in the knowledge that the municipality is legally responsible for their acts." Report of the Legislative Council (December 7, 1956) p. 13.

Borelli *v.* Renaldi

"2. The fear that extending municipal responsibility in tort will cause the community to suffer serious losses no longer exists because insurance may be carried on its employees.

"3. If a municipality is held liable for the negligence of its agents, a more responsible type of employee would be hired and thus the rights of the public would to some extent be protected.

"4. It should be a part of public policy of the community that the party wronged should have a right of action against the principal who made the wrong possible. This should be a part of the protection furnished by the municipality to its citizens in return for taxes.

"5. The basis for the rule of governmental immunity is historical and is not a sound or logical reason for [nonliability] of a municipality.

"6. With the greater increase in the functions and powers of the municipality, the duties of the legal department would be considerably reduced rather than increased.

"7. Greater justice would result if losses from injuries were spread over society instead of being borne by individuals." Report of the Legislative Council (December 7, 1956) p. 12.

The Legislative Council recommended adoption of the proposed legislation on the following grounds: "The [c]ouncil believes that the old rule of governmental immunity is outmoded and that, with the great increase of activities being carried on by municipalities and the availability of insurance at reasonable cost, municipalities should assume liability for injury caused by their employees acting in the performance of their duties and within the scope of their employment. It believes further that [the 1955 legislation vetoed by the governor] is appropriate legislation to accomplish the desired objective." Id., p. 13.

Borelli *v.* Renaldi

The bill recommended by the Legislative Council became law, over Governor Ribicoff's veto. It was a major piece of legislation. After reviewing the statute and its legislative history in the process of adjudicating a 1974 negligence case brought against a municipal employee, Judge John F. Shea, Jr., stated: "In attempting to determine the intent of the legislature, especially in regard to expanding liability and removing common-law governmental immunity, the court has studied the legislative history of § 7-465. In particular, the [R]eport of the [J]udiciary [C]ommittee of the [L]egislative [C]ouncil has been reviewed. Although § 7-465 was not fully enacted until the 1957 session of the legislature; [P.A. 57-401, § 1]; a similar bill was passed in 1955. Public Acts 1955, No. 72. This bill was vetoed by the governor on the ground that it would remove the defense of governmental immunity and expose municipalities to costly damages. . . . The proposal was then referred to the [L]egislative [C]ouncil for further study. It recommended passage of the act to the 1957 session of the General Assembly. *A review of the [R]eport of the [L]egislative [C]ouncil and a study of the wording of the bill convince this court that it was the intention of the legislature to subject municipal employees, and hence municipalities by way of indemnification, to liability for discretionary as well as ministerial acts so long as they were performed within the scope of the employment.* Municipalities were, however, not obliged to indemnify for wilful or wanton acts."[32] (Citation omit-

---

[32] Judge Shea notes that Judge (later Justice) John P. Cotter reached the opposite conclusion in *Boucher* v. *Fuhlbruck*, 26 Conn. Supp. 79, 83, 213 A.2d 455 (1965). See *Lapierre* v. *Bristol*, 31 Conn. Supp. 442, 445–46, 333 A.2d 710 (1974). *Boucher* relies on generic canons of statutory construction and does not examine the extensive legislative history considered by Judge Shea. I include Judge Shea's views because they reflect a contemporaneous analysis of the proper construction of § 7-465 as events were unfolding. It is important to understand, however, that the conclusions contained in this opinion do not depend at all on Judge Shea having been right about the intended effect of § 7-465 on the discretionary/ministerial distinction as it applies to municipal employees. Whatever the intended status of the distinction as a general matter after the enactment of § 7-465, the historical record

Borelli *v.* Renaldi

ted; emphasis added.) *Lapierre* v. *Bristol*, 31 Conn.
Supp. 442, 446, 333 A.2d 710 (1974). No other conclusion
is possible on the basis of the historical record.

Yet another municipal indemnification statute was
enacted by our legislature in 1971. See General Statutes
§ 7-101a.[33] The details of the statute do not matter for
present purposes; nor does its close relationship to § 7-
465. What does matter is the explanation that this court
provided—in 1986—to explain the purpose of the stat-
ute, because we see this court acknowledging in frank
terms the fact that municipal employees personally
*were* subject to common-law negligence liability:
"Absent such a statute, claimants injured by the miscon-
duct of municipal officers and employees acting in the
course of their official duties would be limited to
recourse against individual tortfeasors. The legislature
might reasonably have concluded that such limited
recourse would be unfair both to the injured claimant
and to the municipal officer or employee. From the
point of view of the claimant, he would be confronted
with a defendant who might well lack the resources
to provide adequate compensation for the claimant's

makes it abundantly clear that the distinction had no application to the
employee's liability for negligent driving (routine or emergency) under the
common law. See part II of this opinion. Liability unquestionably existed as
a matter of well settled common law. Because § 7-465 was an indemnification
statute, the doctrine likewise had no application to the municipality's indem-
nity obligations with respect to municipal employee liability in such cases.

[33] "Section 7-101a, as initially adopted in 1971, mandated that municipali-
ties 'protect and save harmless any member of any board, committee or
commission of such municipality from financial loss and expense, including
legal fees and costs, if any, arising out of any claim, demand, suit or judgment
by reason of alleged negligence on the part of such member while acting
in the discharge of his duties as such member.' Public Acts 1971, No. 726.
In 1975, this statute was extended to local council members and included
protection 'for alleged infringement of any person's civil rights.' Public Acts
1975, No. 75-408. In 1977, the statute was amended further by extending
coverage to include 'any full-time municipal employee.' Public Acts 1977,
No. 77-399. This amendment became effective October 1, 1977." *Ahern* v.
*New Haven,* 190 Conn. 77, 79–80, 459 A.2d 118 (1983). The statute was
amended again in 1980; Public Acts 1980, No. 80-403, §§ 9 and 10; and in
1989. Public Acts 1989, No. 89-212, § 11; Public Acts 1989, No. 89-378.

Borelli *v.* Renaldi

injuries. From the point of view of the municipal officer or employee, he would be required to shoulder ultimate liability, as well as the costs of defense, for conduct that was solely beneficial to his municipal employer. To remedy these distortions that the law of [governmental] immunity would otherwise impose upon the fair allocation of the risks of accident and other tortious misconduct, the legislature provided for statutory indemnification by municipalities to relieve individual municipal employees and officers of personal liability for injuries they cause, or are alleged to have caused, to third parties on behalf of their municipalities. In effect, the legislature has created a statutory analogue for the [common-law] doctrine of respondeat superior.'' *Norwich* v. *Silverberg*, 200 Conn. 367, 374–75, 511 A.2d 336 (1986).

D

The foregoing historical overview demonstrates beyond any doubt that the common law of municipal employee immunity and the correlative web of municipal indemnification statutes existing as of 1986 had established a legal landscape in which the municipal *employees* themselves were understood to be personally liable for the damages negligently caused by their job-related activities, and the municipal *employers* were liable by statute for the indemnification of those liabilities. The employee's liability for *discretionary* acts was left unclear after § 7-465 was enacted in 1957,[34] but,

---

[34] I say that the continued vitality of the discretionary function doctrine was uncertain in the wake of § 7-465 because there was a difference of opinion on the question. On the one hand, there is rather compelling evidence in the legislative history supporting the conclusion reached by Judge Shea, who determined that the legislature intended to eradicate the doctrine altogether with the enactment of § 7-465: "A review of the [R]eport of the [L]egislative [C]ouncil and a study of the wording of the bill convince this court that it was the intention of the legislature to subject municipal employees, and hence municipalities by way of indemnification, to liability for discretionary as well as ministerial acts so long as they were performed within the scope of the employment." *Lapierre* v. *Bristol*, supra, 31 Conn. Supp. 446. On the other hand, this court evidently had no occasion between 1957 and 1986 to consider the question decided by Judge Shea, and we continued to apply the discretionary function doctrine (although not in its current extreme version). See footnote 18 of this opinion.

Borelli *v.* Renaldi

regardless of whether the discretionary function doctrine had survived, everyone at the time understood that, in any event, the scope of the employee's personal liability (and hence the scope of the municipality's indemnification obligation) encompassed a broad range of day-to-day operational activities, from driving police cars and fire trucks[35] to "collect[ing] your garbage and dig[ging] up your streets, and fix[ing] up the sidewalks and do[ing] the other jobs that surround your city . . . [and that] expose [municipal employees] to danger and liability for the injuries that might happen to others in the course of the duty they do to the municipality." 7 H.R. Proc., Pt. 4, 1957 Sess., p. 2226, remarks of Representative Krawiecki; see part I C of this opinion (discussing extensive legislative history reflecting similar views about broad scope of municipal indemnification statutes).

There are only two possible ways to explain the great change that has transformed the legal landscape described above into today's law of near-absolute immunity for municipalities and municipal employees. One possibility is that the operative doctrinal changes are all incorporated within the text and legislative policy of § 52-557n, the statute enacted for the purpose of codifying the law governing the liabilities and immunities of municipal entities and their employees. The other possibility is that, in the past three decades, we have gradually, and perhaps without even noticing, constructed a doctrine that has lost its foothold in the text and legislative purpose of § 52-557n, resulting in an expanded immunity doctrine that has gained momentum and mass over time, like a snowball rolling downhill. An examination of the language, structure and legislative history

_____

[35] Historically, there has never been any doubt that police officers (and firefighters) are personally liable for damages caused by negligent, on-duty driving. See part II of this opinion. Indeed, protecting police and fire workers against personal liability was why our legislature enacted the original municipal indemnification statutes in Connecticut. See part I C of this opinion (discussing legislative history of No. 251 of the 1945 Public Acts).

Borelli *v.* Renaldi

of § 52-557n, when considered alongside the doctrinal history previously set forth, confirms my belief that the latter explanation is correct.

Probably the most salient textual feature of § 52-557n is the unmistakable fact, hidden in plain view as it were, that the statute treats the liabilities and immunities of *municipalities* as separate and distinct from the liabilities and immunities of municipal *employees*. This should come as no surprise in light of the fact that the common law has always treated the entity and the employee very differently for such purposes; see part I C of this opinion; and I cannot explain why our cases have overlooked the statutory text in this regard. The statute makes it crystal clear that certain of its provisions apply to *both* the municipality *and* municipal employees, officers and agents, whereas other provisions apply *only* to the municipality itself. More specifically, § 52-557n (a) governs the liabilities and immunities of the *municipality* only. Its plain language says so, more than once, in unmistakable terms. It begins with these words: "Except as otherwise provided by law, *a political subdivision of the state* shall be liable for damages to person or property caused by . . . [t]he negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . ." (Emphasis added.) General Statutes § 52-557n (a) (1) (A). Likewise, § 52-557n (a) (2) (B), which contains the discretionary-duty exception, provides: "Except as otherwise provided by law, *a political subdivision of the state* shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." (Emphasis added.) *Nothing* in subsection (a) purports to define, delineate, or delimit the liability of municipal *employees*. Subsection (a) of the statute contains no provision immunizing

Borelli *v.* Renaldi

municipal *employees* from liability for their negligent actions or omissions, discretionary or otherwise. This is no technicality.

Nor is it an oversight. We know that the word choice is deliberate because the corresponding language in subsection (b) of the statute stands in stark contrast to the language employed by the legislature in subsection (a). Unlike subsection (a), subsection (b) includes both the municipality *and its employees* within its scope: "Notwithstanding the provisions of subsection (a) of this section, *a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties* shall not be liable for damages to person or property . . . ." (Emphasis added.) General Statutes § 52-557n (b). The difference between the two subsections could not be more obvious.

The rules of construction take over from here and lead to one inevitable conclusion: the plain and unambiguous language of § 52-557n (a) manifestly does not impose liabilities or grant immunities to municipal *employees* and, therefore, cannot serve as the basis for the court's decision with respect to the individual defendants in the present case. The rules of construction require us to give meaning to the fact that § 52-557n (a) addresses liability and immunity with respect to municipalities only, whereas § 52-557n (b) applies to both municipalities and their employees. It is "a fundamental tenet of statutory construction that [t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . ." (Internal quotation marks omitted.) *Hasselt* v. *Lufthansa German Airlines*, 262 Conn. 416, 426, 815 A.2d 94 (2003); accord *Marchesi* v. *Board of Selectmen*, 328 Conn. 615, 640–41, 181 A.3d 531 (2018); *C. R. Klewin Northeast, LLC* v. *State*, 299 Conn. 167, 177, 9 A.3d 326

Borelli *v.* Renaldi

(2010); *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008). Section 52-557n is not exempt from this basic rule of construction. Indeed, this court has found that far more subtle differences in word choices contained in this very statute reflect meaningful legislative choices that must be honored. See *Ugrin* v. *Cheshire*, 307 Conn. 364, 385, 54 A.3d 532 (2012) (holding, with respect to language of § 52-557n (b) (4), that "[the] difference in the use and meaning of 'if' and 'unless' within the same statute cannot be ignored"). If we take the rules of construction seriously, we cannot overlook this dispositive point.

The foregoing statutory analysis does not establish definitively that immunity is unavailable to the individual defendants as a matter of law in the present case. It does, however, establish without any doubt that the majority cannot be correct that the individual defendants are entitled to immunity *by virtue of § 52-557n* because the relevant language of that statute plainly and unambiguously applies only to municipalities, not to municipal employees. There is no other way to read the statutory text.[36]

The only issue left unaddressed and unclear in the relevant statutory text is whether the legislature intended to leave the employee unprotected by way of municipal indemnification, which seems very unlikely, or, instead, intended to retain indirect municipal liability for the employee's negligence under § 7-465 or other applicable indemnification statutes. Presumably, the statute's "except as otherwise provided by law" proviso answers this question by retaining the statutory indemnifica-

---

[36] To be clear, the common law also never conferred immunity on the employee for vehicular negligence, whether under routine or emergency conditions. See part II of this opinion. My immediate point, however, is simply that the individual defendants are not entitled to immunity under the plain language of § 52-557n (a).

336 Conn. 1 FEBRUARY, 2021 105

Borelli *v.* Renaldi

tion.[37] This conclusion is consistent with statements in the legislative history indicating an intention to impose liability on both the employee and the municipality. Representative Robert G. Jaekle, the proponent in the House of Representatives of the bill that became § 52-557n, expressed no uncertainty on the matter: "Many other questions were posed, statements, the teacher negligently injures a student and [the municipalities] are not going to [be] liable. *Well, of course, they are going to be liable.* And this [bill] says so. But is the town going to be liable if two students get in a fight with each other and student one hurts student two? Is the town liable under a theory that the teacher negligently supervised the activities of the children? That is [third-party] liability. *If the teacher negligently injures a student, the town is going to be liable under this language.* That is the thrust all the way through." (Emphasis added.) 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5942.

One additional point implicit in these observations warrants emphasis. The only reference to the discretion-

---

[37] See 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5939, remarks of Representative Robert G. Jaekle ("[Subs]ection (a), both the liability and the exemptions from liability are unless otherwise provided by law. Federal, state or local."). There are two responses to any criticism that this reading of § 52-557n would nullify its limitations on municipal liability because a plaintiff could recover indirectly, via indemnification pursuant to § 7-465, what the plaintiff is prohibited by the municipal entity immunity doctrine from recovering directly from the municipality. First, far from being irrational or absurd, this arrangement replicates precisely the result under Connecticut law before the enactment of § 52-557n. The municipality itself was immune, but it was obligated by statute to indemnify the employee for any personal liability resulting from that employee's negligence. This is why it is said that § 52-557n codified the then-existing common law. Second, in the same way that § 7-465 cannot be allowed to swallow up § 52-557n, we also must ensure that § 52-557n is not construed to effectively swallow up § 7-465, a statute of great importance. See part I C of this opinion. Nothing in § 52-557n or its legislative history suggests any legislative intention to repeal § 7-465 or render it nugatory. See, e.g., *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 242, 756 A.2d 1264 (2000) ("[I]t is a well established rule of statutory construction that repeal of the provisions of a statute by implication is not favored and will not be presumed where the old and the new statutes . . . can peacefully coexist. . . . If, by any fair interpretation, we can find a reasonable field of operation for both [statutes], without destroying or perverting their meaning and intent, it is our duty to reconcile them and give them concurrent effect." (Internal quotation marks omitted.)).

Borelli *v.* Renaldi

ary function doctrine anywhere in the statute appears in subsection (a), which, as I have noted, speaks only to the liabilities and immunities of the municipal entity. The statute provides that the *entity* shall not be liable for damages caused by the employee's negligent acts or omissions acting in his or her discretionary capacity. See General Statutes § 52-557n (a) (2) (B). It leaves the liability of the employee to be determined under the common law, which the statute codified without alteration. See footnote 3 of this opinion. This means that, under the statute, the employee retains the same liabilities as existed under preexisting law, subject only to the provisions of subsection (b) of the statute. Subsection (a) does not expand or modify the discretionary duty doctrine or any other aspect of employee liability, and, therefore, any changes made to that doctrine by this court since 1986, by definition, contravene the legislature's intention to codify preexisting law.

There are other lessons to be learned from reading the statute as written. Far from making immunity the near-absolute rule, as we have done since 1986 by judicial construction, § 52-557n, as written by the legislature, strongly suggests that immunity is intended to be an *exception* to a general rule of municipal liability. Subdivision (1) of § 52-557n (a) provides that "a political subdivision of the state *shall be liable* for damages to person or property caused by" conduct that falls within three basic categories of liability, two of which are very broad: negligence, in § 52-557n (a) (1) (A), and nuisance, in § 52-557n (a) (1) (C). Subdivision (2) of § 52-557n (a) then establishes two limited exceptions to the general rule of liability by providing that municipalities shall not be liable for damages to person or property caused by (1) acts or omissions "which constitute criminal conduct, fraud, actual malice or wilful misconduct"; General Statutes § 52-557n (a) (2) (A); or (2) "negligent acts or omissions which require the exercise of judgment

336 Conn. 1 FEBRUARY, 2021 107

Borelli *v.* Renaldi

or discretion as an official function of the authority expressly or impliedly granted by law.'' General Statutes § 52-557n (a) (2) (B).

Our decisions unfortunately have turned the statute upside down by construction—liability is now the rare exception to a general rule of immunity. In its current, judicially revised version, the statute now reads: ''Neither a political subdivision of the state *nor any employee, officer or agent thereof shall be liable* for damages to person or property caused by the negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties *unless such damages are caused by acts or omissions that violate the clear and express provisions of a city charter, ordinance, regulation, rule, policy or other directive requiring the employee, officer or agent to act in a prescribed manner.*'' The actual statute says no such thing, of course, and its language and structure both imply a very different meaning. Our rules of construction prohibit judicial policymaking of this kind. See, e.g., *Commissioner of Emergency Services & Public Protection* v. *Freedom of Information Commission*, 330 Conn. 372, 393, 194 A.3d 759 (2018) (''It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature.'' (Internal quotation marks omitted.)).[38]

---

[38] See also *State* v. *Josephs*, 328 Conn. 21, 27, 176 A.3d 542 (2018) (in construing statutes, ''[w]e are not permitted to supply statutory language that the legislature may have chosen to omit'' (internal quotation marks omitted)); *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 316 Conn. 790, 803–804, 114 A.3d 1181 (2015) (''[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language''); *State* v. *Rupar*, 293 Conn. 489, 511, 978 A.2d 502 (2009) (''We are not in the business of writing statutes; that is the province of the legislature. Our role is to interpret statutes as they are written. . . . [We] cannot, by [judicial] construction, read into statutes provisions [that] are not clearly stated.'' (Internal quotation marks omitted.)); *Glastonbury Co.* v. *Gillies*, 209 Conn.

Borelli *v.* Renaldi

One additional structural feature of § 52-557n is of particular relevance in the present case. Subsection (b) contains a series of express exceptions or limitations to the liability rule set forth in subsection (a). It enumerates ten specific circumstances in which neither the municipality *nor* the employee is liable, or is liable only under certain limited conditions, notwithstanding anything in subsection (a) to the contrary. See General Statutes § 52-557n (b) (1) through (10). These special cases cover a wide variety of circumstances in which the immunity had not previously been clearly established. The legislature evidently wished to make its intentions known with respect to these particular scenarios so that there would be no doubt in the future. The enumerated circumstances include, for example, the condition of unimproved municipal property; General Statutes § 52-557n (b) (1); the initiation of any judicial or administrative proceeding, unless "commenced or prosecuted without probable cause or with a malicious intent to vex or trouble"; General Statutes § 52-557n (b) (5); and the "failure to make an inspection or making an inadequate or negligent inspection of any property, other than property owned or leased by or leased to such political subdivision, to determine whether the property complies with or violates any law or contains a hazard to health or safety, unless the political subdivision had notice of such a violation of law or such a hazard or unless such failure to inspect or such inadequate or negligent inspection constitutes a reckless disregard for health or safety under all the relevant circumstances . . . ." General Statutes § 52-557n (b) (8).

Two interrelated features of this statutory enumeration leap out. First, *none* of the ten exceptions relates to the negligent operation of motor vehicles under routine or

175, 181, 550 A.2d 8 (1988) ("As we have stated in numerous other cases, 'it is not the province of a court to supply what the legislature chose to omit. The legislature is supreme in the area of legislation, and courts must apply statutory enactments according to their plain terms.' ").

Borelli *v.* Renaldi

emergency conditions. Motor vehicles are not mentioned at all, and there is not even a whisper of any intention to repeal or alter the long existing legal regime imposing liability for the negligent operation of a municipal vehicle, whether routine or emergency.[39] The majority has an obligation, in my view, not merely to explain why we should assume that the legislature intended to create immunity, sub silentio, for the negligent operation of motor vehicles, but why we should assume that it did so silently in a statute that contains a lengthy list of *express* liability exemptions for immunities not already plainly established under the law existing at the time § 52-557n was enacted.

Second, and relatedly, there is no indication that the legislature intended this particularized enumeration to be nonexhaustive or merely illustrative; to the contrary, the legislature manifestly paid very close attention to detail in fashioning subsection (b). The statutory enumeration is carefully drawn and covers many different scenarios, some rather obvious and others obscure in nature. The legislature drew fine lines and made nuanced distinctions in its treatment of the circumstances selected for inclusion. We cannot avoid application of the canon of expressio unius est exclusio alterius. See, e.g., *DeNunzio* v. *DeNunzio*, 320 Conn. 178, 194, 128 A.3d 901 (2016) (''[u]nder the doctrine of expressio unius est exclusio alterius—the expression of one thing is the exclusion of another—we presume that when the legislature expresses items as part of a group or series, an item that was not included was deliberately excluded'').[40]

_____

[39] It is indisputable that the municipal employee was personally liable for negligent, on-duty driving under our common law. It also is indisputable that the municipality, although itself immune from liability under the common law, was required by statute to indemnify this liability. See part II of this opinion.

[40] To avoid any misunderstanding, I am not suggesting that § 52-557n imposes municipal liability in all circumstances not specifically carved out by § 52-557n (b). Not at all. Just as subsection (a) contains the basic rules of municipal liability, it also contains the basic rules of municipal immunity, not the least of which is § 52-557n (a) (2) (B), which codifies the doctrine of discretionary act immunity. The point here is that, when, as in the present

Borelli *v.* Renaldi

Finally, I address the majority's suggestion that the doctrine of legislative acquiescence operates to ratify our misconstruction of § 52-557n due to the passage of time. "[S]urely," the majority states, "at some point in the . . . years that have passed since the passage of § 52-557n, the legislature would have weighed in [to correct such an error]." Footnote 12 of the majority opinion. This is an odd theory of lawmaking. It appears to distort the constitutionally prescribed order of things by relying on a *later* legislative body, the members of which may have had no role at all in the original legislation, to review judicial opinions, not for the purpose of ensuring fidelity to the original legislative intention, but to decide if the court's gloss comports with the later legislature's idea of good public policy at that time. I do not maintain that the doctrine of legislative acquiescence is rotten to its core; it may, under limited circumstances, provide a modicum of assistance when construing a statute. See *State* v. *Salamon*, 287 Conn. 509, 522, 949 A.2d 1092 (2008) (noting that "legislative inaction is not always the best of guides to legislative intent" but providing examples of when court nonetheless has done so (internal quotation marks omitted)). But legislative acquiescence should not be invoked to justify or ratify an erroneous construction of a statute, even if a new legislature later may consider that construction to be acceptable or even salutary. I thus agree with Justice Frankfurter that "we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle." *Helvering* v. *Hallock*, 309 U.S. 106, 121, 60 S. Ct. 444, 84 L. Ed. 604 (1940). There are numerous reasons to tread cautiously. Here is a good summary: "The verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible. [The United

case, then existing law did not confer immunity for negligent driving of police vehicles (or any other municipal vehicles), then any change or clarification intended by the legislature in 1986 necessarily would be found in § 52-557n (b). There is nothing in section (b) granting immunity in this case.

Borelli *v.* Renaldi

States Supreme Court] has many times reconsidered
statutory constructions that have been passively abided
by Congress. Congressional inaction frequently beto-
kens unawareness, preoccupation, or paralysis. It is at
best treacherous to find in congressional silence alone
the adoption of a controlling rule of law. . . . Where,
as in the case before [the court], there is no indication
that a subsequent Congress has addressed itself to the
particular problem, we are unpersuaded that silence is
tantamount to acquiescence . . . .'' (Citations omitted;
internal quotation marks omitted.) *Zuber* v. *Allen*, 396
U.S. 168, 185–86 n.21, 90 S. Ct. 314, 24 L. Ed. 2d 345
(1969). In any event, and regardless of one's views on
the subject generally, everyone appears in agreement
that the doctrine of legislative acquiescence should
carry no force when, as here, the legislature has not
revisited the statutory provisions at issue since the rele-
vant cases were decided.[41]

I conclude this section by explaining that my purpose
is not to cry over spilled milk. I am aware that the dam-
age in large part has been done, and I am realistic enough
to understand that this court is not soon going to reverse
course with respect to most of the doctrinal changes
that I critique in part I of this opinion. I also understand
that it is unlikely that the legislature will restore the
statute to its original meaning now that this court has
done the work that the legislature was unable or unwill-

_____

[41] See, e.g., *State* v. *Salamon*, supra, 287 Conn. 525–26 ("[i]t is significant
. . . that, with the exception of a 1993 amendment to [General Statutes]
§ 53a-94 affecting only its penalty provisions, neither that section nor the
pertinent definitional section, General Statutes § 53a-91, has been subject
to any substantive amendments since it first was enacted in 1969'' (footnote
omitted)). Section 52-557n, likewise, has been amended only twice since its
enactment, and neither amendment involved subsection (a) or involved any
issue relevant to this case. See Public Acts 1992, No. 92-198 (adding subsec-
tion (c) concerning immunity of members of local boards and commissions
who are not compensated for their membership); Public Acts 1993, No. 93-
290 (adding subdivision (10), regarding preexisting conditions on land sold
or transferred by the state, to subsection (b)).

Borelli *v.* Renaldi

ing to do—as a result of the various demands, imperatives, deal-breakers, trade-offs and other political forces at play between and among the political stakeholders and interest groups at the negotiating table—in 1986, when the provisions of § 52-557n were hammered out as part of a much larger legislative initiative known as the Tort Reform Act of 1986. See, e.g., *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 185, 592 A.2d 912 (1991) ("[a]s finally enacted, the [Tort Reform Act of 1986] represents a complex web of interdependent concessions and bargains struck by hostile interest groups and individuals of opposing philosophical positions"). Nor is my intention to scold the court for its errant construction of a statute. Section 52-557n is poorly built. It contains vague terms that reflect opaque and perhaps even contradictory intentions, and, by its terms, it incorporates wholesale a patchwork of common-law doctrines that lack any overarching internal consistency themselves because each is the product of highly particularized contextual considerations that have no currency in society today. The task of interpretation becomes still more challenging because the statute repeatedly states that its provisions apply only "[e]xcept as otherwise provided by law"; General Statutes § 52-557n (a); a phrase that we have construed to include statutory and common law alike. We are left to find our way in a swirling vortex of rules swallowed by exceptions swallowed by rules and more exceptions, and it is no wonder that we have lost our bearings.

My purpose, rather, is to issue a plea that we open ourselves to the possibility that we have taken things too far. We have issued what I consider to be a regrettable series of judicial decisions that has decimated a previously active and important realm of negligence law, and I hope that we will be more careful in the future. Real people have sustained, and will continue to sustain,

Borelli *v.* Renaldi

real harm, sometimes catastrophic in nature, because of the negligence of municipal employees whose careless job performance has created or increased the risk of harm to innocent victims in public places. Since 1986, our cases have expanded the immunity for these employees on the theory that their exercise of discretion should not be second-guessed because such oversight may "cramp" their exercise of discretion. See, e.g., *Doe* v. *Petersen*, 279 Conn. 607, 609–10, 614, 903 A.2d 191 (2006) (concerns about "cramp[ing] the exercise of official discretion" justify extending immunity to town employee's negligent mishandling of teenage girl's report that she was sexually molested by her instructor at municipal tennis program). I find this reasoning nothing short of nonsensical, at least as applied to day-to-day operational activities such as driving a car, shoveling snow from a walkway, and opening a hallway door. The fundamental public policy underlying our negligence law is that we *want* to inhibit carelessness. That is what tort liability rules do. Negligence law gives social actors (and usually their employers) a financial incentive to consider the safety of others before engaging in conduct that entails the foreseeable risk of harm. This has always been our state's general policy applicable to municipal employees, and it was extended to municipal employers in our indemnification statutes. "We cannot afford the cost of operating with due care" is not an acceptable reason, in my opinion, to fashion a doctrine exempting a large class of social actors from the legal requirements applicable to the rest of society.

II

A

I leave behind the generalized doctrinal critique set forth in part I of this opinion and now address the present case. Nothing that follows, in either part II or part III of this opinion, depends for its validity on the

Borelli *v.* Renaldi

reader's acceptance of the foregoing critique. I start part II with the same point of emphasis, however, by highlighting the particular context in which this case arose. Officers Renaldi and Jasmin were driving motor vehicles on a public roadway. That context is critical because the law imposes a *duty*—a legally enforceable obligation to drive with due regard for the safety of others—on *all* persons operating a motor vehicle on public roads.[42] This is not a mere "duty in the air"[43] or a duty that disappears when a police officer activates his lights and siren. The plain language of § 14-283 (d) says exactly the opposite: "The provisions of this section *shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property.*" (Emphasis added.) Indeed, this court reached the very same conclusion in a unanimous decision authored by former Chief Justice Peters.[44] See *Tetro* v. *Stratford*, supra, 189 Conn. 609–11 (affirming judgment against town police officers for negligent operation of vehicle during vehicular pursuit). If the plain statutory text and unmistakable import of *Tetro* were not enough to prove the point, there is additional evidence—I would say there is overwhelming legal authority—to the same effect dating back nearly one hundred years. The majority's holding today inex-

[42] I am aware of a single exception to this proposition, which is the immunity provided to the state and its political subdivisions by General Statutes § 28-13 (a) for actions taken in connection with a civil preparedness emergency declared by the governor pursuant to General Statutes § 28-9. See *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 32–33, 213 A.3d 1110 (2019).

[43] *Bottomley* v. *Bannister*, 12 K.B. 458, 476 (1932) ("It is a commonplace of the law of negligence that before you can establish liability for negligence you must first show that the law recognizes some duty towards the person who puts forward the claim. . . . English law does not recognize duty in the air, so to speak; that is, a duty to undertake that no one shall suffer from one's carelessness."); see also *Shore* v. *Stonington*, 187 Conn. 147, 151, 444 A.2d 1379 (1982) ("[t]he law does not recognize a 'duty in the air' ").

[44] I defer discussion of the alternative reading of § 14-283 proposed in the Chief Justice's concurring opinion until the end of part II B of this opinion.

Borelli *v.* Renaldi

plicably changes all of this by conferring blanket immunity on police officers who fail to exercise reasonable care while engaging in pursuits on public roads. In doing so, the majority not only engages in what I consider to be very poor policymaking, but it does so in the face of the legislature's obvious and express intention to hold operators of emergency vehicles legally responsible for the negligent operation of their vehicles at all times.

At the outset, I disagree with the efforts by the majority opinion and Chief Justice Robinson's concurring opinion to characterize this appeal as not being about driving. In my view, the plaintiff's negligence claim, and this appeal from the striking of that claim, relate directly to the acts and omissions of the defendant officers in driving their vehicles without due regard for the safety of the plaintiff's decedent. I understand that this may become an easier case to decide if the appeal "does not concern . . . whether and under what circumstances the duty to drive with due regard for the safety of others is discretionary or ministerial." Footnote 5 of the majority opinion. But that is not the situation here. The plaintiff's fundamental claim is that the plain and mandatory language of § 14-283 (d) expressly imposes a duty on operators of emergency vehicles "*to drive* with due regard for the safety of all persons and property." (Emphasis added.) General Statutes § 14-283 (d). Every substantive pleading and motion filed in this case, by either side, demonstrates that the plaintiff's claims, and the defendants' defenses, necessarily require consideration of the immunity question, as applied to the vehicular pursuit from its initiation to its tragic end.[45]

---

[45] The plaintiff's complaint alleges that the pursuing officers were negligent *both* in initiating the pursuit and in the manner in which they conducted the pursuit, and the summary judgment proceedings addressed those allegations. The trial court's memorandum of decision granting the defendants' motion for summary judgment likewise decided those issues. On appeal, the plaintiff identifies the issue presented broadly: "Did the trial court err when it concluded that . . . § 14-283 imposed a discretionary, as opposed to ministerial,

Borelli *v.* Renaldi

Although, no doubt, a *part* of the plaintiff's appellate brief (part B 1) focuses attention on the police officers' decision to initiate the pursuit, and perhaps overemphasizes the importance of that threshold issue in the overall analysis, another part (part B 2) argues that the duty of care applies during an emergency pursuit *to the act of driving itself.*[46] As one would expect in a case in which the plaintiff's legal and factual claims always have included the entire duration of the police pursuit, the appellate argument extends beyond the decision to initiate the chase. Thus, portions of the introductory part of the plaintiff's brief, portions of the statement of facts, and the entirety of part B 2 of the argument all serve the plaintiff's claim that the act of *driving*— the dangerous operation of an emergency vehicle at high speeds rather than the decision only to initiate the pursuit—is the activity that makes this case different

duty?" The defendants' appellate brief follows suit and presented the following counterstatement of the issue: "Whether the trial court correctly determined, based upon the allegations of the plaintiff's complaint, that the acts and omissions complained of with respect to Renaldi and Jasmin inherently involve discretionary acts/duties?"

[46] In part B 1 of her brief, the plaintiff seeks (unsuccessfully) to harmonize a host of conflicting Superior Court decisions on the subject by focusing on the officer's decision making when initiating a vehicular pursuit. Part B 2 of the plaintiff's brief, however, argues in the alternative by asserting (correctly, in my view) that immunity does not apply for the simple reason that §14-283 requires that even police officers operating emergency vehicles must exercise due care at all times, period. See *Borelli* v. *Renaldi*, Conn. Supreme Court Briefs and Appendices, April Term, 2019, Plaintiff's Brief pp. 14–15 ("[W]hereas typically governmental immunity is applied to those activities that are uniquely government functions, the operation of a motor vehicle on a public roadway is not unique to the government. Rather, ordinary citizens . . . use the public roadways on a daily basis. Accordingly, those courts that have found that § 14-283 imposes a ministerial duty have done so on the conclusion that it is desirable, from a public policy perspective, to mandate that officers act reasonably on the road. Any other conclusion creates the risk of chaotic and unpredictable roadways."). I need not and do not address the artificial and academic question whether immunity would attach to the isolated decision to initiate a high speed chase alone, without more, because that question is not presented here (nor do I suspect that it will ever be raised as a complete and stand-alone theory of liability).

Borelli *v.* Renaldi

from the typical immunity situation and that requires a different outcome.[47] The portions of the plaintiff's brief quoted by the majority and the Chief Justice's concurrence, which focus exclusively on the officer's decision to initiate the pursuit, do not nullify or blot out the *other* portions of the plaintiff's brief (including those quoted in footnote 47 of this opinion), which the plaintiff offers in support her alternative argument, contained in part B 2 of her brief, contending more broadly that immunity does not attach to the officer's negligent operation of his vehicle *during* the pursuit.[48]

[47] See, e.g., *Borelli* v. *Renaldi*, Conn. Supreme Court Briefs and Appendices, April Term, 2019, Plaintiff's Brief p. 2 ("[T]he correct conclusion [in the trial court] should have been that a ministerial duty existed under [the] plain language of § 14-283 (d), and that it was for the jury to decide the factual question of whether the defendants performed that duty at all—that is to say, whether the officers did give due regard for the safety of those involved in the chase in light of the seriousness of the offense. Given that the defendants engaged in an extremely dangerous chase at night over a minor infraction, a jury could conclude that the officers engaged in the chase thoughtlessly and did not give due regard to safety balanced against the nature of the minor offense conduct, as § 14-283 requires."); id., p. 5 ("Renaldi did not cease his pursuit but instead attempted to proceed to halt the minor infraction he had observed by continuing, even though he was losing ground on the Mustang throughout the chase" (footnote omitted)); id., pp. 14–15 (emphasizing that, in addition to the express directive contained in § 14-283, the requirements found in both § 14-283a-4 (b) (4) of the Regulations of Connecticut State Agencies and § 5.11.12.B of the Seymour Police Department Pursuit Policy impose mandatory duties for *driving* emergency vehicles extending beyond the threshold decision to initiate a pursuit); see also id., p. 15 (arguing that various pursuit policies demonstrate that safe operation of vehicle during police pursuit is ministerial duty because "[a] reasonable interpretation of these state and local [pursuit] policies is that the state and local agencies understood that the operation of an emergency vehicle, even one in the pursuit of a suspect, must be done with safety, because § 14-283 requires as much" (emphasis omitted); id., p. 17 (arguing that this court's other discretionary duty cases do not apply to police pursuits because there is statutorily recognized duty to drive safely during pursuit, specifically, "[§] 14-283 represents a legislative determination as to what should happen in a police pursuit").

[48] In support of its contention that the plaintiff's appeal involves solely the officer's decision to initiate the pursuit and excludes his conduct in the continuation of the pursuit, the majority observes that the Uniform Statewide Pursuit Policy likewise treats the two aspects of a pursuit separately,

Borelli *v.* Renaldi

Although, at one level, I take comfort that the majority chooses to leave for another day the core question raised on appeal—namely, whether immunity attaches to the negligent operation of a police car *during* a chase—I do not believe that this choice is fair to the plaintiff, and, therefore, I will address the issue left undecided by the majority.

We can begin on common ground. I take it that we can all agree that police officers and their municipal employers are subject to liability under existing law for personal injuries caused by the officer's negligent operation of a motor vehicle in routine (i.e., nonemergency) conditions. See, e.g., *Winn* v. *Posades*, 281 Conn. 50, 59–60, 913 A.2d 407 (2007) (holding that plaintiff must prove proximate causation in negligence case against municipal police officer based on excessive speed in nonemergency situation); *Dumas* v. *Mena*, 82 Conn. App. 61, 62, 842 A.2d 618 (2004) (affirming judgment imposing liability for personal injuries caused by negligent operation of motor vehicle by on-duty police officer); *Hunter* v. *Healey Car & Truck Leasing, Inc.*, 41 Conn. App. 347, 349–51, 675 A.2d 919 (plain error

addressing initiation under § 14-283a-4 (a) of the Regulations of Connecticut State Agencies, and the continuation of the pursuit under § 14-283a-4 (b) and (d). One flaw in this argument, among others, is that a different subsection of the same Uniform Statewide Pursuit Policy collapses the clean line drawn by the majority by requiring the pursuing officer, throughout the entire duration of the pursuit, to "continually re-evaluate and assess the pursuit situation, including all of the initiating factors, and terminate the pursuit whenever he or she reasonably believes that the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension." Regs., Conn. State Agencies § 14-283a-4 (e) (1). The bottom line is that the typical negligence claim arising from a police pursuit almost always will require factual consideration of the initiation, continuation *and* termination of the pursuit, and it serves no useful purpose to draw bright-line distinctions between those intertwined aspects of the pursuit when applying the immunity doctrine or the requirements of § 14-283, for the simple reason that the legal analysis will always turn on the same fundamental underlying claim, which is that, *at each and every stage of the pursuit*, the officer is required by positive law to exercise the same standard of due care applicable to all drivers on our public roads.

Borelli *v.* Renaldi

for trial court to direct verdict for police officer in negligence action brought on behalf of child struck by vehicle driven by officer while on-duty), appeal dismissed, Connecticut Supreme Court, Docket No. SC 15483 (December 18, 1996). The point is confirmed by the very existence of our various indemnification statutes enacted to protect municipal employees, including police officers, from the financial consequences of common-law tort liability for damages caused by their on-duty, negligent operation of motor vehicles; concerns about liability arising from negligent driving in large measure account for the enactment of our municipal indemnification statutes. See part I C of this opinion.

It is well established that police officers are situated no differently from any other municipal employee in this respect. See, e.g., *Rokus* v. *Bridgeport*, 191 Conn. 62, 63–64, 72, 463 A.2d 252 (1983) (affirming judgment against city and municipal employee for personal injuries caused by negligent operation of municipally-owned dump truck); *Muckle* v. *Pressley*, 185 Conn. App. 488, 489, 197 A.3d 437 (2018) (appeal from judgment against city and employee for property damage resulting from negligent operation of motor vehicle by municipal employee in course of employment); *Madsen* v. *Gates*, 85 Conn. App. 383, 385–86, 857 A.2d 412 (affirming judgment in favor of one plaintiff and against second plaintiff struck by town vehicle), cert. denied, 272 Conn. 902, 863 A.2d 695 (2004); cf. *Fiano* v. *Old Saybrook Fire Co. No. 1, Inc.*, 332 Conn. 93, 95–97, 209 A.3d 629 (2019) (holding that municipality was not liable for negligent operation of motor vehicle driven by volunteer firefighter while not engaged in course of employment).

Historically speaking, ordinary negligence principles so plainly apply to municipal employees who drive motor vehicles on public roadways that the rubric of municipal immunity typically is not invoked at all in this context. The clear thrust of cases such as *Winn*, *Dumas*, *Hunter*, *Rokus*, *Muckle*, and *Madsen* demon-

Borelli *v.* Renaldi

strates that the usual, day-to-day operation of motor vehicles by municipal employees on public roadways is not subject to the municipal employee immunity doctrine, period. This is true because, unlike situations in which no particularized legal duty is owed by the municipal employee to "protect" the public,[49] the municipal employee operating a motor vehicle *does* owe a duty of care to other drivers and their passengers, pedestrians, and others lawfully using the roadway. *Every* driver—public or private, on-duty or off—owes a duty of care to every other person using the roadway, whether they be a driver, passenger, or pedestrian. See, e.g., *Mahoney* v. *Beatman*, 110 Conn. 184, 188, 147 A. 762 (1929) ("[t]he defendant owed to the plaintiff and all travelers upon the highway the duty of exercising reasonable care in operating his car so that there might result from such operation no probability of harm to them"); *Heimer* v. *Salisbury*, 108 Conn. 180, 183, 142 A. 749 (1928) ("The appellant's criticism of this charge seems to be that the standard of duty for the police officer is said to be the same as for any other user of the highway. In this the court was right. The general standard of care which the law requires is the same for all using the highway—that which a reasonably prudent person would exercise under the same circumstances."); *State* v. *Carter*, 64 Conn. App. 631, 642, 781 A.2d 376 ("[a]n operator of a motor vehicle is always under a duty to exercise reasonable care"), cert. denied, 258 Conn. 914, 782 A.2d 1247 (2001); see also General Statutes § 14-300d ("each operator of a vehicle shall exercise due care to avoid colliding with any pedestrian or person propelling a human powered vehicle and shall give a reasonable warning by sounding a horn or other lawful noise emitting device to avoid a collision"); *Palombizio* v. *Murphy*, 146 Conn. 352, 357, 150 A.2d

---

[49] See, e.g., *Shore* v. *Stonington*, 187 Conn. 147, 157, 444 A.2d 1379 (1982) (police officer owes no duty to remove from road all persons who may pose potential hazard).

Borelli *v.* Renaldi

825 (1959) ("[a driver] is required to keep a reasonable lookout for any persons and traffic he is likely to encounter, and he is chargeable with notice of dangers of whose existence he could become aware by a reasonable exercise of his faculties"); Connecticut Civil Jury Instructions 3.7-17, available at http://www.jud.ct.gov/ JI/Civil/civil.pdf (last visited June 22, 2020) ("[t]he driver of an automobile has a duty to use reasonable care to avoid injury to other persons using the road").

Our legal culture, as it functions each and every day in law offices, legal departments, and courthouses across Connecticut, is attuned to the express legislative purpose underlying the various indemnification statutes discussed in part I of this opinion, which were enacted for the very purpose of indemnifying police officers, firemen, and other municipal employees for personal liability arising from motor vehicle accidents caused by their negligent driving at work. Courts and litigants involved in these cases apparently consider it self-evident that municipal employees could be found liable for the negligent operation of a motor vehicle.[50]

[50] On a few occasions, this "self-evident" proposition has been challenged by defendants in our Superior Court, almost always without success. See, e.g., *Williams* v. *New London*, Superior Court, judicial district of New London, Docket No. CV-12-6012328-S (April 7, 2014) (58 Conn. L. Rptr. 86, 89–90) (noting "sizeable majority" of Superior Court cases "that have held that routine nonemergency driving involves ministerial, rather than discretionary, duties"); *Pelletier* v. *Petruck*, Superior Court, judicial district of Hartford, Docket No. CV-07-5009064-S (September 10, 2008) (46 Conn. L. Rptr. 288, 289) ("Connecticut [case law] supports the argument that the operation of a motor vehicle is, in fact, a ministerial act to which government immunity does not attach"); *MacMillen* v. *Branford*, Superior Court, judicial district of New Haven, Docket No. 374004 (March 30, 1998) (21 Conn. L. Rptr. 561, 561) ("the operation of a motor vehicle is a ministerial act that does not confer governmental immunity"); *Hurdle* v. *Waterbury*, Docket No. 0123428, 1995 WL 781380, *2 (Conn. Super. December 12, 1995) ("the [police officer] having embarked upon . . . a plan of action, which involved the operation of a motor vehicle on the public highways . . . is duty bound to physically operate the vehicle in a reasonable manner"); *Borchetta* v. *Brown*, 41 Conn. Supp. 420, 424, 580 A.2d 1007 (1990) ("operation of a police vehicle was a ministerial function"); *Letowt* v. *Norwalk*, 41 Conn. Supp. 402, 406, 579

Borelli *v.* Renaldi

What has been said so far likely explains why it has taken until now, approximately one century after municipal employees first began using automobiles to perform their jobs, for this court even to be asked to decide whether driving is "ministerial" or "discretionary" for purposes of our municipal employee immunity doctrine.[51] It has not taken so long for the question to arise because municipal employees are exceptionally careful drivers. The real reason is that, historically, everyone has always taken it for granted that all drivers owe a duty of care to all other users of the roadway, and, at least in the absence of an express legislative exemption from this rule,[52] municipal immunity does not apply. The discretionary versus ministerial issue never has been part of the analysis. Indeed, we know with certainty that, when the personal liability of municipal employees for negligent driving became an issue of public concern in the middle of the last century, the legislature did not

A.2d 601 (1989) (police officer's act of driving to scene of accident was ministerial). But see *Gordils* v. *Hartford*, Docket No. CV-07-5012160-S, 2009 WL 1444793, *2 (Conn. Super. May 5, 2009) (sanitation worker who drove truck into trash barrel that allegedly then struck plaintiff was engaged in discretionary act, and he "made an error in judgment by driving too close to the sidewalk").

[51] The Appellate Court came close to addressing the issue in a recent decision. See *Daley* v. *Kashmanian*, 193 Conn. App. 171, 219 A.3d 499 (2019), petition for cert. filed (Conn. October 23, 2019 (No. SC 190245), and cross petition for cert. filed (Conn. November 1, 2019) (No. SC 190256). In *Daley*, the vehicle driven by the defendant police officer had collided with the plaintiff's motorcycle when the officer was conducting "surveillance" of the plaintiff. Id., 174. In affirming the Superior Court's order granting the defendants' motion for a directed verdict on the plaintiff's negligence claim, the Appellate Court focused its analysis on whether surveillance of a suspect is discretionary or ministerial. See id., 184 (noting that "[n]either [the] Supreme Court nor [the Appellate] [C]ourt has determined whether a municipal police officer conducting surveillance while driving a motor vehicle is engaged in discretionary or ministerial conduct"). The court did not decide whether the act of driving, in itself, is discretionary or ministerial or address the impact that § 14-283 would have on the analysis.

[52] See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 52, 213 A.3d 1110 (2019) (concluding that General Statutes § 28-13 (a) extends sovereign immunity to state's political subdivisions for actions taken in connection with civil preparedness emergency).

336 Conn. 1 FEBRUARY, 2021 123

Borelli *v.* Renaldi

even consider conferring immunity on those employees; it did virtually the opposite by effectively removing the municipality's immunity via the indemnification statutes.

Nor does the discretionary/ministerial distinction make any real sense in the context of driving. To force the analysis reflects a concession to the artificial demands of doctrinal pigeonholes rather than a useful exercise in legal reasoning—no one honestly would assert that driving a car requires less in the way of judgment and discretion than, for example, the "discretionary" acts of shoveling snow or wiping down wet bleachers.[53] To the contrary, anyone who drives a car knows that safe driving requires far more than rote ministerial compliance with pre-scripted directives. Safe driving depends largely on the operator's human ability to react appropriately to the amazingly complicated, multi-variant, and ever-present risk of unpredictable, unforeseen and sometimes unforeseeable roadway occurrences requiring a near-instantaneous exercise of coordinated perceptive, cognitive and muscular activity.[54] This is true of all driving in all vehicles, whether personal cars, municipal

_____

[53] *Prescott* v. *Meriden*, 273 Conn. 759, 762–63, 873 A.2d 175 (2005) (treating as "discretionary" school employee's failure to keep bleachers safe by removing rain water that had caused slipping hazard); *Kusy* v. *Norwich*, 192 Conn. App. 171, 178, 217 A.3d 31 (treating as "discretionary" school employee's failure to remove snow and ice from walkway in absence of mandatory policy directive prescribing manner in which snow and ice are to be removed), cert. denied, 333 Conn. 931, 218 A.3d 71 (2019).

[54] This may explain why our automakers are experiencing such difficulty perfecting a self-driving car; bad human judgment causes accidents, but the right kind of human judgment seems essential to good driving. See N. Oliver et al., "To Make Self-Driving Cars Safe, We Also Need Better Roads and Infrastructure," Harv. Bus. Rev., August 14, 2018, available at http://hbr.org/2018/08/to-make-self-driving-cars-safe-we-also-need-better-roads-and-infrastructure (last visited June 22, 2020) (explaining difficulty in designing autonomous vehicles that can safely navigate "edge cases" like "accidents, road work, or a fast-approaching emergency response vehicle"); National Transportation Safety Board, Department of Highway Safety, Vehicle Automation Report No. HWY18MH010 (November, 2019) (report on death of Elaine Herzberg, pedestrian struck and killed by self-driving car in Tempe, Arizona, on March 18, 2018).

Borelli *v.* Renaldi

vehicles, dump trucks, pickup trucks or garbage trucks. Safe driving, in short, requires good judgment, which is how we sometimes refer to the prudent deployment of discretionary decision making.

In point of fact, the "rules of the road" recognize and operate on the inherently discretionary nature of the activity we call driving. This is to say that many of our driving rules, whether statutory or common-law, do not eliminate the role of discretion by providing directives susceptible to mechanical and ministerial application. They do exactly the opposite. The rules *demand* the exercise of discretion and good judgment.[55] They do so in recognition of the fact that the safe operation of a motor vehicle often involves the very type of split-second decision making that, in *other* contexts, serves as the signature feature of what our immunity doctrine labels a "discretionary" act.[56] Despite this rather obvious point, our cases have never conferred immunity to municipally-employed drivers in the ordinary course; nor has the legislature ever given any indication that it intends such a result by statute.

A rule of immunity would be exceedingly difficult to justify in this context because it would mean that our municipal employees would be free to drive negligently

---

[55] See, e.g., General Statutes § 14-218a (a) ("[n]o person shall operate a motor vehicle . . . at a rate of speed greater than is reasonable, having regard to the width, traffic and use of highway, road or parking area, the intersection of streets and weather conditions"); General Statutes § 14-240 (a) ("[n]o person operating a motor vehicle shall follow another vehicle more closely than is reasonable and prudent, having regard for the speed of such vehicles, the traffic upon and the condition of the highway and weather conditions"); *McDonald* v. *Connecticut Co.*, 151 Conn. 14, 17, 193 A.2d 490 (1963) ("The plaintiff claims that the operator of the bus failed to maintain a proper lookout. An operator of a motor vehicle is chargeable with notice of dangers of whose existence he could become aware by a reasonable exercise of his faculties.").

[56] See *Edgerton* v. *Clinton*, 311 Conn. 217, 228 n.10, 86 A.3d 437 (2014) (immunity appropriately applied to situations involving "split second, discretionary decisions on the basis of limited information").

Borelli *v.* Renaldi

with impunity. See *Daley* v. *Kashmanian*, 193 Conn. App. 171, 188, 219 A.3d 499 (2019) (observing that, if ''under all circumstances a municipal police officer operating a motor vehicle is engaged in discretionary conduct,'' then this would ''immuniz[e] the officer and municipality from damages arising from all violations of motor vehicle statutes''), petition for cert. filed (Conn. October 23, 2019) (No. SC 190245), and cross petition for cert. filed (Conn. November 1, 2019) (No. SC 190256); *Williams* v. *New London*, Superior Court, judicial district of New London, Docket No. CV-12-6012328-S (April 7, 2014) (58 Conn. L. Rptr. 86, 88) (if routine driving was not ministerial, municipal drivers could ''claim that they have discretion to run stop signs, ignore pedestrians in the crosswalk, or exceed the speed limit while driving through city streets''). Among other regrettable consequences, an immunity regime in this context would (1) leave the victim uncompensated for damages sustained due to the defendant's negligence when operating a vehicle on public roads,[57] and (2) remove the deterrent effect that the tort system exercises on all other drivers and their employers (through the doctrine of respondeat superior and indemnification statutes), who otherwise would face a far lessened financial incentive to encourage safe driving and discourage carelessness. See generally *Doe* v. *Cochran*, 332 Conn. 325, 363, 210 A.3d 469 (2019) (''[t]he fundamental policy purposes of the tort compensation system [are] compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate

[57] The costs of the victim's injuries, of course, do not disappear; the costs merely get transferred to a payer other than the negligent employee or his municipal employer. The burden may be shifted to the victim him or herself, or to his or her medical insurer and/or employer, or to the various governmental programs of last resort that must pay the costs imposed on society when the responsible party is not held accountable. Meanwhile, the most efficient cost-avoiders and most effective cost-spreaders in connection with the harm—the municipal employee and the municipality—escape liability without paying a nickel.

Borelli *v.* Renaldi

entities, and deterrence of wrongful conduct'' (internal quotation marks omitted)); *Robbins* v. *Physicians for Women's Health, LLC*, 311 Conn. 707, 722–23, 90 A.3d 925 (2014) (''[b]y assigning responsibility to employers for the legal consequences of their employees' errors of judgment and other lapses, the doctrine of respondeat superior 'creates an incentive for principals to choose employees and structure work within the organization so as to reduce the incidence of tortious conduct' ''), quoting 1 Restatement (Third), Agency § 2.04, comment (b), p. 141 (2006); see also W. Keeton et al., supra, § 69, pp. 500–501 (employer liable for torts of employee because employer has control over selection, instruction, and supervision of employees, will profit from enterprise, and is better able to bear costs of doing business).

These implications have not been lost on the courts of our sister states. Even those states applying the ministerial/discretionary analysis consistently hold routine driving by municipal employees to be a ministerial function. See, e.g., *Evans* v. *Cotton*, 770 So. 2d 620, 623 (Ala. Civ. App. 2000) (correctional officer was engaged in ministerial function when driving van); *Snyder* v. *Curran Township*, 167 Ill. 2d 466, 472–73 and n.4, 657 N.E.2d 988 (1995) (overruling prior decision holding that driving snowplow is discretionary); *Jones* v. *Lathram*, 150 S.W.3d 50, 53 (Ky. 2004) (''the act of safely driving a police cruiser, even in an emergency, is not an act that typically requires any deliberation or the exercise of judgment''); *Prince George's County* v. *Brent*, 414 Md. 334, 356, 995 A.2d 672 (2010) (''ordinarily the operation of a vehicle by [anyone], including a public official, is a mere ministerial act'' (internal quotation marks omitted)); *Davis* v. *Little*, 362 So. 2d 642, 643–45 (Miss. 1978) (member of county board of supervisors was engaged in ministerial act when driving pickup truck); *Brown* v. *Tate*, 888 S.W.2d 413, 415 (Mo. App. 1994) (''a police officer, driving on the public streets and highways, in a [nonemergency] situation, has no blanket immunity

Borelli *v.* Renaldi

from liability for negligence in the operation of his car''); *Salek* v. *Burton*, Docket No. 2865, 1979 WL 207732, *1 (Ohio App. July 18, 1979) (''[t]he driving of vehicles is . . . a ministerial act and not immune''); *Kyllo* v. *Panzer*, 535 N.W.2d 896, 903 (S.D. 1995) (''[i]t is inconceivable that driving a motor vehicle is anything other than a ministerial function''); *Victory* v. *Faradineh*, 993 S.W.2d 778, 781 (Tex. App. 1999) (''an officer driving a motor vehicle while on official, [nonemergency] business is performing a ministerial act''); *Morway* v. *Trombly*, 173 Vt. 266, 273, 789 A.2d 965 (2001) (operation of snowplow was ministerial); *Heider* v. *Clemons*, 241 Va. 143, 145, 400 S.E.2d 190 (1991) (''[w]hile every person driving a car must make myriad decisions, in ordinary driving situations the duty of due care is a ministerial obligation''); *Legue* v. *Racine*, 357 Wis. 2d 250, 298, 849 N.W.2d 837 (2014) (driving is ''a paradigmatic ministerial act'').

Municipal police officers, like all other drivers, were and remain legally liable at common law for damages caused by their negligent operation of a motor vehicle during nonemergency conditions. This legal liability flows from the legal duty owed by all drivers, public and private alike, to the occupants of all other vehicles, pedestrians, and others lawfully using the roadway. Pursuant to our indemnification statute, § 7-465, a municipal employee's personal financial exposure in this context is removed by the employer's indemnification obligation.

B

The only remaining issue—the one presented by this case—is whether the foregoing analysis changes when the municipal employee operates a motor vehicle in ''response''[58] to an emergency under the aegis of § 14-

[58] I use quotation marks here because it would appear to be inaccurate, on this record, to characterize the officer as ''responding'' to an emergency. A jury easily might conclude that the officer actually *created* the emergency and, thus, created the danger resulting in the plaintiff's injuries, by initiating a high speed pursuit in response to a minor violation of the motor vehicle laws. I discuss this point at greater length later in this opinion.

Borelli *v.* Renaldi

283 rather than in the ordinary course under the ordinary rules of the road. The majority sidesteps the issue by addressing only the initiation of the pursuit, but its analysis contains dicta indicating its view that everything changes when the vehicle is being operated in an emergency capacity within the purview of § 14-283. I respectfully disagree. In my opinion, the fact that a municipal police officer activates his emergency lights and engages in vehicular pursuit does not confer immunity on the officer for his negligent operation of a motor vehicle resulting in personal injury or property damage. For the reasons that follow, I do not even view it as a close legal question under the applicable law. Indeed, the statute itself answers the question in the following clear and unambiguous language: "The provisions of this section shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property." General Statutes § 14-283 (d). Neither our common law nor any statute in Connecticut has ever conferred immunity on drivers in this context.

Our emergency vehicle statute, now codified at § 14-283, has existed in some form since 1925, and, under this statutory scheme, it *always* has been understood that the operator of an emergency vehicle remains subject to a legally enforceable duty of care, i.e., the operator enjoys no immunity from liability for the negligent operation of the emergency vehicle. The historical evidence, including this court's own precedent, demonstrates beyond any doubt that the majority's conferral of immunity in the present case is without basis in Connecticut law, as it has existed for nearly 100 years. The first version of the emergency vehicle statute, passed as chapter 79 of the Public Acts of 1925, applied to "[t]he driver or operator of an ambulance, while answering a call or taking a patient to a hospital, and the driver or operator of a fire company or fire department while on the way to a fire," and gave such emergency

Borelli *v.* Renaldi

vehicles "the right of way over all other traffic upon any public or private way." Public Acts 1925, No. 79, § 1 (P.A. 25-79). Unlike the current statute, P.A. 25-79 did not include any mention of a duty of care; it was not until 1971 that the legislature added subsection (d) to § 14-283, which expressly codified that duty. See Public Acts 1971, No. 538 (P.A. 71-538). But, from the beginning, this court always has held that drivers subject to the emergency vehicle statute owed a common-law duty of care to all other users of the roadway. The first case on this point was decided in 1932, when this court held that, under the emergency vehicle statute, the fact that an ambulance drove through a red light "did not, *of itself*, render negligent the act of its driver . . . ." (Emphasis added.) *Leete* v. *Griswold Post, No. 79, American Legion*, 114 Conn. 400, 407, 158 A. 919 (1932). The court then explained that "[i]t does not follow that [the emergency vehicle statute] confers a privilege to neglect the requirements of reasonable care, under the circumstances, in the operation of the excepted vehicles; the rate of speed or manner of operation in view of the conditions existing, or disregard of reasonably obvious hazards from or to other vehicles or to pedestrians may be such as to constitute negligence." Id. In other words, the duty of reasonable care remains during emergency operation.

The very next year, this court held that the trial court properly denied a plaintiff's request for a jury instruction that a volunteer firefighter acting in an emergency is not required to exercise the same degree of care as under ordinary circumstances. See *Tefft* v. *New York, New Haven & Hartford Railroad Co.*, 116 Conn. 127, 129, 133–34, 163 A. 762 (1933). The court reasoned that, "[w]hen an alarm of fire is sent out, it is of great importance that it be answered with celerity; but the driver of [a] fire apparatus, proceeding to a fire, is bound to exercise the care and control for his own safety and that of others which is reasonable under the circumstances."

Borelli *v.* Renaldi

Id., 134. The driver of the fire truck is "required to use the care of a reasonably prudent man under the circumstances . . . ." Id. And, one year later, this court affirmed a judgment in a negligence case brought by a volunteer firefighter against the fire association and another firefighter when he was injured responding to a fire alarm. See *Voltz* v. *Orange Volunteer Fire Assn., Inc.*, supra, 118 Conn. 308–309. The defendants argued that, "because of the emergency existing when an alarm of fire was given to which the fire apparatus must respond without delay, the driver of the apparatus was not bound to exercise reasonable care for the safety of others . . . ." Id., 311. This court rejected that argument as "without merit," quoting *Tefft* for the proposition that the driver of a firetruck " 'is bound to exercise the care and control for his own safety and that of others which is reasonable under the circumstances.' " Id.; see also *Matcheski* v. *Gutkin*, 19 Conn. Supp. 29, 32, 109 A.2d 879 (1954) ("[t]he fact that [the police officer responding to an emergency call] had the right of way did not excuse him from operating his car with reasonable care"); *Kittel* v. *Quish*, 15 Conn. Supp. 232, 232–34 (C.P. 1947) (notwithstanding provisions of emergency vehicle statute, driver of ambulance traveling at sixty miles per hour through stop sign was negligent).

On the basis of this historical review, I believe that we can conclude with near certainty that the addition of subsection (d) in 1971 to the emergency vehicle statute; P.A. 71-538; codified what was already a settled point of law in Connecticut: operators of emergency vehicles owe a legally cognizable duty of care to other persons on the roadways. It is no coincidence that the standard of care contained in § 14-283 (d) is the familiar negligence standard of care—the same standard that this court articulated in *Leete*, *Tefft*, and *Voltz*, and that applies every day in motor vehicle negligence cases in courthouses around the state. Section 14-283 (d) reflects an explicit and unequivocal statement by the

Borelli *v.* Renaldi

legislature that considerations of public safety on our roads must always remain superior and paramount. Notwithstanding the fact that operators of emergency vehicles are accorded special privileges under subsections (a) through (c) of the statute, subsection (d) reminds us that those privileges do not preempt, supersede or otherwise displace (that is, "relieve the operator from") the cardinal rule applicable to all drivers at all times, which imposes a duty to operate one's vehicle with due care for the safety of others.

The most basic rules of construction teach that subsection (d) was included in the statute for a reason; *Pereira* v. *State Board of Education*, 304 Conn. 1, 58, 37 A.3d 625 (2012) (citing "the well-founded principle that we presume that the legislature acts intentionally when it includes certain words or provisions within a statute"); and courts cannot choose to ignore such a provision, treat it as superfluous, or render it meaningless by interpretive gloss. *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008) ("[i]nterpreting a statute to render some of its language superfluous violates cardinal principles of statutory interpretation"); see also General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language"); *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 176, 162 A.3d 706 (2017) ("[w]hen a term is not defined in a statute, we begin with the assumption that the legislature intended the word to carry its ordinary meaning"). The words mean what they say.

What the words in § 14-283 (d) say is that a police officer driving an emergency vehicle has a "duty to drive with due regard for the safety of all persons and property." General Statutes § 14-283 (d). The statute also tells us that the referenced duty is the *same* legal duty owed by *all* drivers, whether public or private, to

Borelli *v.* Renaldi

operate their vehicles at all times with due regard for the safety of others.[59] See part II A of this opinion (discussing this duty of care). We know that it is the same duty that applies under routine conditions because the provision declares that the driving privileges afforded to emergency vehicle operators under the statute "*shall not relieve* the operator . . . *from the duty* to drive with due regard for the safety of all persons and property.'' (Emphasis added.) General Statutes § 14-283 (d). The statutory duty is the *same* duty that the driver had under nonemergency circumstances—the legal duty that, if breached, is enforceable in a negligence lawsuit. See part II A of this opinion. There is no "relief'' from that duty when the driver is operating under emergency conditions.

If more is needed, there is a wealth of additional evidence that immunity does not operate to shield police officers from negligence liability when engaged in vehicular pursuit. One such item is the unanimous decision of this court in 1983, authored by Justice Peters, upholding a damages award when a jury found that two police officers had negligently operated their cruiser during an emergency pursuit. See *Tetro* v. *Stratford*, supra, 189 Conn. 604. The defendants argued on

---

[59] The word "duty,'' as used here, has a definitive legal meaning as a legally enforceable obligation. See Black's Law Dictionary (11th Ed. 2019) p. 637 ("duty'' means, inter alia, "[a] legal obligation that is owed or due to another and that needs to be satisfied; that which one is bound to do, and for which somebody else has a corresponding right''). As this definition explains, the existence of a legal duty necessarily implies a corresponding legal right in one or more other persons to obtain redress for breach of that duty. Without that right of enforcement, no duty exists in the eyes of the law. See W. Hohfeld, "Some Fundamental Legal Conceptions as Applied in Judicial Reasoning,'' 23 Yale L.J. 16, 33 (1913) ("a duty is the invariable correlative of that legal relation which is most properly called a right or claim''). In § 14-283 (d), the legislature explicitly recognized the continued existence of a duty owed to other persons using the roadway. In this context, the existence of that legal duty necessarily implies a correlative right on the part of injured parties to sue for breach of that duty.

Borelli *v.* Renaldi

appeal that the usual principles of common-law tort liability "are, for emergency vehicles like police cars, superseded by the provisions of . . . § 14-283." Id., 607–608. This court rejected the argument in no uncertain terms: "[O]ur common law and our statutes do not confer upon police officers, whose conduct is negligent, blanket immunity from liability to an innocent bystander by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior." Id., 611. With respect to § 14-283 in particular, we stated: "The statute, in subsection (b), permits the operator of an emergency vehicle, in disregard of traffic laws, inter alia, to 'proceed past any red light or stop signal or stop sign . . . exceed the posted speed limits . . . and . . . disregard . . . regulations governing direction of movement or turning in specific directions.' The subsection limits even this authority, however, by providing that the operator, in passing through traffic lights, must slow down 'to the extent necessary for the safe operation of such [emergency] vehicle' and in exceeding normal speed limits, must 'not endanger life or property by so doing.' Furthermore, the statute expressly states, in subsection (d), that it 'shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property.' Read as a whole, the defendants contend, this statute limits their scope of duty to incidents involving collisions with the emergency vehicle itself.

"We see no reason to read the words 'safety of all persons and property' so restrictively. Other courts, construing similar statutory language, have explained that emergency vehicle legislation provides only limited shelter from liability for negligence. *The effect of the statute is merely to displace the conclusive presumption of negligence that ordinarily arises from the violation of traffic rules. The statute does not relieve*

Borelli *v.* Renaldi

*operators of emergency vehicles from their general duty to exercise due care for the safety of others. . . . We agree with this interpretation and conclude that § 14-283 provides no special zone of limited liability once the defendants' negligence has been established.*'' (Citations omitted; emphasis added; footnote omitted.) Id., 608–10.

Especially in light of all of the other historical and statutory evidence, I firmly believe that *Tetro* controls the outcome of the present case. It confirms in plain terms that drivers of emergency vehicles owe the same duty to abstain from negligent conduct as they have always had under our emergency vehicle statute and at common law —that is, ''their general duty to exercise due care for the safety of others.'' Id., 609. As Justice Peters explained: ''The effect of the statute is merely to displace the conclusive presumption of negligence that ordinarily arises from the violation of traffic rules.'' Id. Thus, if a plaintiff's injuries arise in connection with a police chase or another emergency covered by § 14-283, the plaintiff cannot rely on a claim of per se negligence for violation of the designated statutes but, instead, is required to prove that the officers failed to exercise ''due regard for the safety of all persons and property.'' General Statutes § 14-283 (d). Justice Peters concluded *Tetro* in the following unambiguous terms: ''[Neither] our common law [nor] our statutes . . . confer upon police officers, whose conduct is negligent, blanket immunity from liability . . . by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior.'' *Tetro* v. *Stratford*, supra, 189 Conn. 611.

*Tetro* answers the question posed at the beginning of this discussion, which asked whether the usual liability rule applied to the negligent driving by municipal employees changes when the vehicle is operated under emergency conditions, as defined by § 14-283. *Tetro*

Borelli *v.* Renaldi

explains that emergency driving is treated differently, but not because the operator is granted immunity when none previously existed. The difference, rather, is that the statute removes the availability of negligence per se under the designated motor vehicle laws and requires a plaintiff to show a violation of the ''duty to drive with due regard for the safety of all persons and property.'' General Statutes § 14-283 (d). The Office of the Attorney General understood *Tetro* precisely the same way in 1988. See Opinions, Conn. Atty. Gen. No. 88-032 (October 7, 1988) pp. 219–20 (''[A]lthough [§] 14-283 permits an officer to disregard certain traffic regulations, it does not relieve him of responsibility for causing a fatality. If the Commissioner [of Motor Vehicles] determines that the police officer was not answering an emergency call or in pursuit of fleeing law violators . . . was not using an 'audible warning signal device' . . . or was not operating with 'due regard for the safety of all persons and property' . . . then the officer is not relieved of liability for his negligence by [§] 14-283. This interpretation is supported by the court's opinion in *Tetro* . . . .'' (Citations omitted.)).

The majority attempts to distinguish *Tetro* by pointing out that the municipal defendants in that case did not plead municipal immunity. It should be clear by now why this argument cannot withstand scrutiny. Municipal immunity was off the table in *Tetro* because the defense could not have been raised in good faith, not because everyone overlooked it. By the time that *Tetro* was decided, emergency vehicle drivers had been subject to negligence liability for fifty years. Immunity law, which would be codified by the legislature three short years after *Tetro* was decided, gave police officers no protection for negligent driving, emergency or otherwise, which is why the indemnification statutes had been enacted. The majority cannot and does not cite a single Connecticut case to the contrary. If immunity

Borelli *v.* Renaldi

merely had been overlooked, but remained available in other cases to competent litigants—i.e., if the immunity question remained open even a crack, regardless of whether it had been raised by a party to the litigation— this court would not have categorically denounced the existence of any common-law or statutory "blanket immunity" in this context. *Tetro* v. *Stratford*, supra, 189 Conn. 611. I also have great difficulty believing that the defendant in *Tetro* would have overlooked the most basic and common defense in the municipal playbook had it been viable. In fact, it appears to me that everyone in *Tetro* understood the rules; the plaintiff knew that the town itself (unlike the individual defendants) enjoyed immunity and, therefore, sued the town only under the municipal indemnification statute, § 7-465.[60] See id., 602 n.1. The defendants raised their statutory and causation arguments precisely because the individual defendants had no immunity available. To summarize, the fact that municipal immunity was a nonissue in *Tetro* almost certainly was "a function of a failure to litigate the obvious [rather] than a failure to raise and decide the issue." *Paulus* v. *LaSala*, 56 Conn. App. 139, 150, 742 A.2d 379 (1999), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000).[61]

The majority also fails to consider in a proper light the timing of *Tetro* relative to the enactment of § 52-

---

[60] This was not the first time the town had defended against a negligence action based on § 7-465 indemnification. See *Bailey* v. *Stratford*, 29 Conn. Supp. 73, 74, 271 A.2d 122 (1970) (same municipality sued for negligence of employee under § 7-465).

[61] If the defendants had overlooked a viable immunity defense, the court in *Tetro* likely would have found it prudent to note that fact, neutrally and in passing, so as to leave open for another day a holding based on that defense. Judge Povodator made a slightly different point regarding *Tetro* in a police pursuit case when he observed that the holding in *Tetro* would be "superfluous (if not self-contradictory) if there were no possibility of liability of a police officer whose conduct came within the scope of § 14-283." *Torres* v. *Norwalk*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FST-CV-16-6029691-S (May 2, 2018) (66 Conn. L. Rptr. 548, 558).

Borelli *v.* Renaldi

557n just three years later. *Tetro* was the controlling case on police liability for negligent pursuit at the time that the common law of municipal immunity was codified in § 52-557n. This chronology is telling. "Since the codification of the common law under § 52-557n, this court has recognized that it is not free to expand or alter the scope of governmental immunity therein." *Durrant* v. *Board of Education*, supra, 284 Conn. 107. We are bound to assume that *Tetro* was known to the legislature in 1986. See, e.g., *State* v. *Dabkowski*, 199 Conn. 193, 201, 506 A.2d 118 (1986) ("[the legislature] is presumed to know the existing state of the case law in those areas in which it is legislating . . . to be cognizant of judicial decisions relevant to the subject matter of a statute . . . and to know the state of existing relevant law when it enacts a statute" (citations omitted; internal quotation marks omitted)); 2B N. Singer & J. Singer, Statutes and Statutory Construction (7th Ed. 2008) § 50:1, p. 160 ("[a]ll legislation must be interpreted in the light of the common law and the scheme of jurisprudence existing at the time of its enactment"). The legislature, in other words, knew from *Tetro* that this court had unanimously held in 1983 that a municipality was liable under existing law for police negligence during pursuits. If the legislature wanted to establish an immunity rule for emergency vehicles generally or police pursuits in particular, it surely would have made some reference to such a scenario in the 1986 codification. Yet there is no mention of emergency vehicles, police pursuits, or *Tetro* anywhere in the legislative history, and no exception to liability is included in the enumeration of ten specific immunities contained in § 52-557n (b). Again, I have great difficulty imagining that the 1986 legislature would have remained silent if its intention was to confer immunity on those very same individuals on whom it had imposed a duty of care under §14-283 (d), particularly after this court unani-

Borelli *v.* Renaldi

mously held in *Tetro* that neither "our common law [nor] our statutes . . . confer upon police officers, whose conduct is negligent, blanket immunity from liability . . . by virtue of their engagement in the pursuit of persons whom they believe to have engaged in criminal behavior." *Tetro* v. *Stratford*, supra, 189 Conn. 611. This was the law when our immunity doctrine was codified in 1986, and this court is therefore bound to hold that municipal immunity does not apply to negligence during police pursuits.

Nor can I make sense of the majority's observation that *Tetro* was decided in 1983, prior to the codification of the common law in § 52-557n and without the benefit of the "dozens of cases" decided by this court since 1986 interpreting and applying that statute. I would have thought that this chronology would operate in the other direction, to *strengthen* the precedential force of *Tetro* in the present context. Here, we have a unanimous precedent, decided shortly before the enactment of § 52-557n, holding that a municipality is liable for its employee's negligent operation of an emergency vehicle engaged in a police pursuit. Id. The legislature thereafter codified the then-existing common law governing municipal liability without so much as a whisper of any intention to impact, modify, or even address the law of vehicular negligence in general or the holding of *Tetro* in particular. Over the ensuing thirty-plus years, this court then decided "dozens" of cases involving § 52-557n—*none* of which even remotely has to do with municipal liability arising from a police vehicular pursuit. Yet suddenly we declare today that *Tetro* nonetheless has mysteriously met its demise, offstage and out of view.[62]

---

[62] By my count, this is the third time that our more recent immunity cases have dealt in this fashion with precodification, common-law cases that were alive and well at the time the legislature enacted § 52-557n. See *Northrup* v. *Witkowski*, 332 Conn. 158, 166, 210 A.3d 29 (2019) (overruling *Spitzer* v. *Waterbury*, 113 Conn. 84, 154 A. 157 (1931)); *Grady* v. *Somers*, 294 Conn. 324, 353, 984 A.2d 684 (2009) (observing that *Sestito* v. *Groton*, supra, 178 Conn. 520, "appears . . . to be limited to its facts"); see also *Edgerton* v.

336 Conn. 1 FEBRUARY, 2021 139

Borelli *v.* Renaldi

There is still more. The holding in *Tetro* conforms not only with our earlier case law construing Connecticut's emergency vehicle statute but also with the law in a substantial number of other states that have interpreted similar "duty" language contained in their own emergency vehicle statutes to impose negligence liability on police officers and other municipal employee drivers who fail to exercise due care in the operation of their vehicles during police pursuits. See *Robbins* v. *Wichita*, 285 Kan. 455, 466–67, 172 P.3d 1187 (2007) (citing fourteen states, including Connecticut, that apply ordinary negligence standard of care to this "duty" language). There is such plentiful statutory and case law on this issue from other states because nearly all states, including Connecticut in P.A. 71-538, modeled their emergency vehicle statutes on § 11-106 of the Uniform Vehicle Code (UVC). See National Committee on Uniform Traffic Laws and Ordinances, Traffic Laws Annotated (1972) § 11-106, statutory annotation, pp. 209–11 (explaining that forty-nine states have adopted some portion of § 11-106, with seventeen states adopting it in its entirety); Conn. Joint Standing Committee Hearings, Transportation, Pt. 3, 1971 Sess., p. 717, remarks of Lieutenant Michael Griffin of the Traffic Division of the Connecticut State Police (P.A. 71-538 "places definite responsibilities upon the operators of . . . emergency

*Clinton*, 311 Conn. 217, 240, 86 A.3d 437 (2014) (stating that "we . . . found [in *Grady*] that [*Sestito*'s] holding is limited to its facts"). Our holding that *Sestito* is "limited to its facts" is, of course, a gentle way to say it has been overruled, although I do not see the need to euphemize. In any event, our decision to bury *Sestito* is directly contrary to the intention of the legislature, which intended to codify its holding rather than overrule it. See Report of the Law Revision Commission to the Judiciary Committee Comparing Public Act 86-338, An Act Concerning Tort Reform, and Prior Connecticut Law (1987) p. 22 (citing *Sestito* as an example "of the underlying [common-law principle]" that a municipality is liable when "there is a knowing failure to act or to exercise a prescribed duty of care endangering individuals"). Likewise, any attempt by this court to marginalize the holding of *Tetro* would run contrary to the legislative intention evident from the chronology described in the text accompanying this footnote.

Borelli *v.* Renaldi

vehicles. This bill also brings the Connecticut law into conformance with the [UVC].'').

The use of a negligence standard of care in this context is even more strongly indicated in Connecticut than in many other states, because Connecticut, unlike most other jurisdictions,[63] chose to retain the "due care" negligence standard without adding language contained in the UVC that could be interpreted to adopt a recklessness standard of care.[64] Our legislature's omission of the UVC's recklessness clause is meaningful. As a general matter, courts find significance in a state's decision to

---

[63] See, e.g., Haw. Rev. Stat. § 291C-26 (d) (2007) ("[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall those provisions protect the driver from the consequences of the driver's reckless disregard for the safety of others"); Kan. Stat. Ann. § 8-1506 (d) (2001) ("[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of reckless disregard for the safety of others"); N.Y. Veh. & Traf. Law § 1104 (e) (McKinney 2011) ("[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others"); Wn. Rev. Code Ann. § 46.61.035 (4) (West 2012) ("[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his or her reckless disregard for the safety of others").

[64] Although, in 1971, Connecticut adopted almost all of the UVC as it then existed, without any substantive deviation, our legislature did *not* adopt the model version of subsection (d), which, at that time, provided that "[t]he foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, *nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others*." (Emphasis added.) National Committee on Uniform Traffic Laws and Ordinances, Uniform Vehicle Code and Model Traffic Ordinance (1968 Rev.) § 11-106 (d), p. 135. Instead, in P.A. 71-538, the legislature chose to retain the traditional negligence standard of care: "The provisions of this act shall not relieve the operator of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property." P.A. 71-538, codified as amended at General Statutes § 14-283 (d).

Borelli *v.* Renaldi

adopt a model act but deviate from a particular provi-
sion thereof. See, e.g., *Heraeus Medical GMBH* v.
*Esschem, Inc.*, 927 F.3d 727, 737 (3d Cir. 2019) ("where
the [legislature] omitted text from a borrowed statute,
[this] offers strong evidence of legislative intent");
*Springfield Teachers Assn.* v. *Springfield School Direc-
tors*, 167 Vt. 180, 188 n.3, 705 A.2d 541 (1997) ("[o]rdi-
narily, when the [l]egislature models a statute after a
uniform act, but does not adopt particular language
. . . the omission was intentional such that the policy
of the uniform act was rejected"); cf. *Viera* v. *Cohen*,
283 Conn. 412, 431, 927 A.2d 843 (2007) ("[t]ypically,
the omission of a word otherwise used in the statutes
suggests that the legislature intended a different mean-
ing for the alternate term").

This rule of construction has been applied in the
present context by those states that, like Connecticut,
chose to adopt the "due care" standard in lieu of the
UVC's recklessness standard. See *Harrison* v. *Matta-
poisett*, 78 Mass. App. 367, 372–73 and n.4, 937 N.E.2d
514 (2010) (weighing sufficiency of evidence of police
officers' negligence in personal injury case stemming
from high speed police pursuit when state emergency
vehicle statute requires police to exercise "caution and
due regard under the circumstances for the [safety] of
persons and property" and does not include reckless-
ness language (internal quotation marks omitted)); *Alli-
ance* v. *Bush*, Docket No. 2007CA00309, 2008 WL
2878321, *4 (Ohio App. July 21, 2008) ("due regard for
the safety of all persons using the street or highway"
language in emergency vehicle statute that, like Con-
necticut's, does not include recklessness language
means "the driver of an emergency vehicle should oper-
ate the vehicle in the same manner as a reasonably
prudent person under similar circumstances" (internal
quotation marks omitted)); *Lowrimore* v. *Dimmitt*, 310
Or. 291, 297 and n.3, 797 P.2d 1027 (1990) (reversing
summary judgment in favor of police officer involved in

Borelli *v.* Renaldi

vehicular pursuit in light of Oregon's emergency vehicle statute, which "[does] not relieve the driver of an emergency vehicle or ambulance from the duty to drive with due regard for the safety of all other persons," because court "[could not] say, as a matter of law, that there [was] no evidence of negligence on the part of the pursuing officer" (internal quotation marks omitted)).[65]

The majority does not respond to the foregoing analysis of the statute. I honestly do not know what it means to say, as the majority does, that § 14-283 (d) "imposes a general duty on officers to exercise their judgment and discretion in a reasonable manner." Statutes typically do not contain precatory advice for healthy living, and, to the best of my knowledge, the legislature never has done so by borrowing the language of legal duty from negligence law. The majority correctly observes the fact that every law student learns the distinct and unmistakable meaning of such phrases as "due care" and its synonyms, but then fails to acknowledge what the students are taught, which is that these words, when used in association with the word "duty," are universally understood to describe a legally enforceable *liability* rule sounding in negligence. Indeed, the possibility that the legislature intended to impose an unenforceable "general duty" in this context becomes inconceivable against a historical background long recognizing the imposition of liability for the breach of that duty.

---

[65] Even among states that have adopted the UVC's "reckless disregard" language, most nonetheless adhere to a negligence standard of liability for emergency drivers on the basis of the statutory reference to the duty of due care. See, e.g., *Rutherford* v. *State*, 605 P.2d 16, 19–20 (Alaska 1979); *Pogoso* v. *Sarae*, 138 Haw. 518, 525, 382 P.3d 330 (App. 2016), cert. dismissed, Docket No. SCWC-12-0000402, 2017 WL 679187 (Haw. February 21, 2017); *Stenberg* v. *Neel*, 188 Mont. 333, 337–38, 613 P.2d 1007 (1980); *Wright* v. *Knoxville*, 898 S.W.2d 177, 179–80 (Tenn. 1995). The courts in a minority of jurisdictions have concluded that their respective statutes' "reckless disregard" standard supplants the negligence standard for liability purposes. See, e.g., *Robbins* v. *Wichita*, supra, 285 Kan. 469–70; *Seide* v. *State*, 875 A.2d 1259, 1268 (R.I. 2005); *Rochon* v. *State*, 177 Vt. 144, 145, 862 A.2d 801 (2004).

Borelli *v.* Renaldi

Construing the statutory duty language suddenly to replace an existing liability regime with a newly fashioned immunity represents a complete inversion of the standard of care articulated in the statute, transforming subsection (d) from a traditional negligence rule into its exact opposite: blanket immunity from negligence liability.[66]

I understand the majority's desire to fit this case into the discretionary/ministerial framework of our governmental immunity law under § 52-557n. Despite that statute's proviso that its terms apply "[e]xcept as otherwise provided by law''; General Statutes § 52-557n (a); and notwithstanding our repeated pronouncement that subsection (a) codified then-existing immunity law, we continue to exhibit a compulsion to create a one-size-fits-all doctrine encompassing every aspect of municipal operations. See *Northrup* v. *Witkowski*, 332 Conn. 158, 190–203, 210 A.3d 29 (2019) (*Ecker, J.*, dissenting). This

_____

[66] The flaw in the majority opinion's analysis is well illustrated by its reliance on *Coley* v. *Hartford*, 312 Conn. 150, 95 A.3d 480 (2014), to establish that this court's interpretation of "similar statutory language'' creates a discretionary, rather than a ministerial, duty to act. First, the statutory language at issue in *Coley* is not at all "similar'' to that in § 14-283 (d). Unlike § 14-283, the statute in *Coley* (1) did not mention the word "duty'' or use an iconic legal term of art imposing a "duty [to act] with due regard for the safety of all persons,'' and (2) contained no indication that the legislature intended to retain a preexisting duty of care, as reflected in the proviso in § 14-283 (d) that the emergency provisions "shall not relieve'' the operator of that duty of care. Second, the majority ignores the vast and fundamental difference between the claim of negligence in *Coley*, which involved a plaintiff's effort to impose on a police officer an *affirmative* duty of care to protect the plaintiff from the risk of harm posed by a third person, and the traditional claim of negligence in the present case predicated on the officer's own negligent conduct that creates or increases a risk of harm. Compare *Murdock* v. *Croughwell*, 268 Conn. 559, 566, 848 A.2d 363 (2004) ("[T]here generally is no duty that obligates one party to aid or to protect another party. See 2 Restatement (Second), Torts § 314, p. 116 (1965).'' (Internal quotation marks omitted.)), with 1 Restatement (Third), Torts, Liability for Physical and Emotional Harm § 7 (a), p. 77 (2010) ("[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm'').

Borelli *v.* Renaldi

is unfortunate for numerous reasons, not the least of which is that it is inconsistent with what the legislature intended. I have already stated my view that vehicular negligence was never meant to be analyzed within the discretionary/ministerial framework. See part II A of this opinion. It simply makes no sense to try to pound that square peg into the discretionary/ministerial round hole, which likely explains why we never have attempted to do so in the past and why the legislature never indicated any intention to include vehicular negligence under the aegis of § 52-557n. Cf. *Elliott* v. *Waterbury*, 245 Conn. 385, 403, 715 A.2d 27 (1998) ("[T]his court generally presumes that the legislature, in adopting a statute, did not have the intention to effect a significant change in a fundamental common-law principle. . . . This presumption may be overcome if the legislative intent 'is clearly and plainly expressed.' . . . [H]owever, neither the text of § 52-557n (b) nor its legislative history yields a clear and plain expression of any intention to effectuate a significant change." (Citations omitted.))

The expression of public policy set forth in § 14-283 (d)—the retention of the duty of care for operators of emergency vehicles—should not be subject to judicial second-guessing. Put another way, any judicial preference for a different public policy (i.e., immunity from the negligence standard for operators of emergency vehicles), even if motivated by the laudable desire for across-the-board doctrinal uniformity, must yield in the face of the legislature's ultimate choice to value the safety of public users of the roadway over whatever additional marginal utility may result from the operation of emergency vehicles unrestrained by the negligence standard of care. See, e.g., *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 316 Conn. 790, 803–804, 114 A.3d 1181 (2015) ("[i]t is not the province of this court, under the guise of statutory interpretation, to

Borelli *v.* Renaldi

legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language'').

In his concurring opinion, the Chief Justice offers an alternative reading of the liability and immunity rules produced where § 52-557n (a) (2) (B) intersects with § 14-283 (d). I take comfort in the fact that our views share substantial common ground. The Chief Justice's concurring opinion accurately observes that § 52-557n (a) expressly embraces all exceptions to its immunity rules ''as [are] provided by law,'' and rightly concludes that § 14-283 (d), ''which imposes on the operators of emergency vehicles certain obligations, including a 'duty to drive with due regard [for the safety of all persons],' functions as an exception to governmental immunity for discretionary acts pursuant to . . . § 52-557n (a) (2) (B).'' The Chief Justice also agrees with ''the proposition that driving is subject to a standing common-law exception to discretionary act immunity under § 52-557n (a) (2) (B). This includes driving an emergency vehicle in accordance with the privileges and responsibilities set forth by § 14-283 (d), which codifies the reasonable care standard . . . .'' (Citations omitted.) I consider these views to be entirely consistent with my own.

To the extent that the Chief Justice's concurring opinion and this opinion diverge, the scope of that disagreement must remain uncertain at this time. The Chief Justice agrees with me that the discretionary act immunity does not apply to claims of negligence based on the *manner* in which the pursuit is conducted but takes the position, as does the majority, that the plaintiff has narrowed the issue in the present appeal to relate solely to the officer's threshold decision to initiate a pursuit, and nothing more. I have serious doubts, at both a conceptual and practical level, whether there is a work-

Borelli *v.* Renaldi

able distinction between an officer's decision to initiate
a pursuit and the manner in which that pursuit is con-
ducted. Because this case does not involve that distinc-
tion, however, I leave a discussion of that issue for another
day.[67]

On the basis of the plain language of the emergency
vehicle statute, our precedent holding drivers liable for
negligence under the predecessors to that statute, and
this court's unanimous holding in *Tetro*, I would reverse
the judgment of the trial court.

III

It follows from the foregoing analysis that the identifi-
able victim, imminent harm doctrine has no application
to this case because Renaldi, while driving, owed the
plaintiff's decedent a common-law and statutory duty
of care. The identifiable victim, imminent harm doctrine
is an exception to immunity; there is no need for an
exception when there is no immunity. Nonetheless, if
I were to reach the identifiable victim, imminent harm
exception, I would hold that it applies with full force
on this record and certainly cannot be ruled out as a
matter of law. Indeed, my view is that this is a para-
digmatic case for the application of the exception.

The majority concludes that the plaintiff's decedent
was not an identifiable victim for two reasons: (1) he
did not belong to a foreseeable class of identifiable
victims because he "was not legally compelled to get

_____

[67] For the same reason, I defer any discussion of the out-of-state case law
bearing on the "decision/operation" distinction until we are confronted with
a case that requires us to determine the soundness and viability of that
distinction. Although the Chief Justice's concurring opinion engages in its
own extensive discussion of some of the relevant case law, I will not respond
with my own examination of these (and other) out-of-state cases because
the discussion strikes me as unnecessary in the present case, in light of the
fact that the plaintiff's claims, as construed by my colleagues, do not purport
to involve the manner in which the pursuit was conducted, i.e., the negligent
operation of the vehicle.

Borelli *v.* Renaldi

into the [pursued vehicle] and was a voluntary passenger in the vehicle,'' and (2) he was not an identifiable individual because the officer may not have seen him in the car, and, in any event, ''in the context of a police pursuit, there will *always* be at least one person whose presence the police could or should be aware of—the driver of the pursued vehicle—[and] if we agreed with the plaintiff, the exception would swallow the rule.'' (Emphasis in original.) Neither point withstands analysis. I address each in turn.

The majority, quoting *Strycharz* v. *Cady*, 323 Conn. 548, 575–76, 148 A.3d 1011 (2016), explains that, under our cases, '' 'a paramount consideration in determining whether the plaintiff was . . . [a] member of a foreseeable class of victims' '' is '' 'whether the plaintiff was compelled to be at the location where the injury occurred . . . .' '' The majority then observes that ''[w]e have thus far found this condition to be satisfied only in the case of schoolchildren attending a public school during school hours.'' The majority accurately describes the ''compelled presence'' requirement added to the identifiable victim, imminent harm doctrine by the court in recent years; unfortunately, in my view, the majority further entrenches this additional requirement without pausing to observe that the requirement (1) makes no sense from any perspective, logical or otherwise, and (2) did not exist when, by enacting § 52-557n in 1986, the legislature codified the identifiable victim, imminent harm doctrine without leave for future judicial emendation. It makes perfect sense that a legal requirement compelling the presence of a class of individuals at a particular time and place, and within a municipal employee's control, is a *sufficient* condition to make that class of individuals ''identifiable'' for purposes of imposing a duty of care to protect that class from a foreseeable risk of imminent harm. But it is a logical error to confuse sufficiency with necessity, and

Borelli *v.* Renaldi

I entirely fail to understand why a "legally compelled presence" is a *necessary* prerequisite to qualifying as an identifiable class. Having a daughter is sufficient to make a person a parent, but it is not a necessary condition to parenthood—having a son will also count. Likewise, there are various ways that the generic duty owed by a municipal employee to the public-at-large can become a particularized duty attaching to a readily identifiable class of persons likely to sustain imminent harm if the employee is negligent. Until recently, our case law construing the identifiable victim, imminent harm doctrine took this obvious point for granted.

A brief historical review will once again demonstrate how far we have strayed in the recent past from the common-law doctrine, as approved and codified by our legislature in 1986. The identifiable victim, imminent harm doctrine was first articulated in Connecticut shortly before § 52-557n was enacted. The doctrine recognizes that an official's discretionary duty owed to the public-at-large, and therefore subject to immunity for negligent performance, can become an actionable duty unprotected by immunity. The transition occurs when the need for the employee to act becomes "clear and unequivocal" because it should be apparent to the employee that the failure to take action subjects an identifiable victim or class of victims to an imminent risk of harm. As summarized by this court in *Shore* v. *Stonington*, 187 Conn. 147, 444 A.2d 1379 (1982): "We have recognized the existence of such [a] duty in situations [in which] it would be apparent to the public officer that his failure to act would be likely to subject an identifiable person to imminent harm. See *Sestito* v. *Groton*, [supra, 178 Conn. 528]. *Sestito* involved a policeman who waited and watched a public disturbance without interfering until the plaintiff's decedent was shot. Resolving conflicting testimony on the issue of imminence of harm in favor of the plaintiff, we held

Borelli *v.* Renaldi

that the case should then have been submitted to the jury.'' *Shore* v. *Stonington*, supra, 153. As we observed in *Shore*, in order to fall within the exception, the municipal employee must ''have been aware that [the tortfeasor's] conduct threatened an identifiable victim with imminent harm,'' otherwise ''[t]he plaintiff's cause of action fails . . . for want of a ministerial or a clear and unequivocal discretionary duty.'' Id., 154. *Shore* involved a police officer who decided not to arrest a driver named Mark Cugini despite signs of inebriation. Id., 150. Cugini caused a fatal accident approximately forty-five minutes later. Id., 151. Over Justice Peters' dissent, the majority in *Shore* determined that the officer's exercise of discretion not to arrest Cugini was entitled to immunity because a jury could not reasonably find that the officer ''could have been aware that Cugini's conduct threatened an identifiable victim with imminent harm.'' Id., 154; see also id., 157–63 (*Peters, J.*, dissenting).

*Sestito* and *Shore* establish that, although a municipal employee's discretionary ''public'' duty ordinarily creates no duty of care owed to any particular person, that duty can ''[precipitate] into a special [duty] to prevent harm to an individual'' upon ''a showing of imminent harm to an identifiable victim.'' Id., 156. There was nothing provisional or contingent about the exception, and it was well-known to the legislature in 1986, when our municipal immunity doctrine was codified.[68] Neither of these cases says a single word about a requirement that, to be identifiable, a victim or class of victims must be compelled by law to be present at the location and the time of the injury. In fact, had such a requirement existed, it would have required reversal in *Sestito* and a summary affirmance in *Shore* because, in both

[68] This court previously has recognized that the legislature was well aware of the identifiable victim, imminent harm exception when it enacted § 52-557n. See *Grady* v. *Somers*, 294 Conn. 324, 344–46, 984 A.2d 684 (2009).

Borelli *v.* Renaldi

cases, the plaintiffs' decedents voluntarily were present at the locations at which they were injured. See id., 151 (plaintiff's decedent was injured in collision on public expressway); *Sestito* v. *Groton*, supra, 178 Conn. 522–23 (plaintiff's decedent was among group of men drinking, arguing, and "scuffling" in parking lot adjacent to bar). The truth is that we made the requirement up, out of thin air, years after the doctrine was codified by the legislature and notwithstanding our professed inability to "expand or alter" the doctrine once it had been codified. *Durrant* v. *Board of Education*, supra, 284 Conn. 107; see id. (stating, in context of discussing identifiable victim, imminent harm exception, that "this court has recognized that it is not free to expand or alter the scope of governmental immunity [contained in § 52-557n]").

A number of our other cases addressing the identifiable victim, imminent harm exception illustrate the same point. There is no mention of any "legally compelled presence" requirement in *Edgerton* v. *Clinton*, 311 Conn. 217, 86 A.3d 437 (2014). See id., 231 (holding that passenger in car, who was injured in vehicular chase supervised by 911 dispatcher, did not come within identifiable victim, imminent harm exception, not because passenger was in car voluntarily, but because it would not have been apparent to 911 dispatcher that her failure to act would have subjected identifiable victim to imminent harm). Nor is the concept mentioned in *Evon* v. *Andrews*, 211 Conn. 501, 559 A.2d 1131 (1989). See id., 502, 508 (holding that tenants killed in fire at multifamily dwelling as result of allegedly negligent inspection did not come within identifiable victim, imminent harm doctrine, not because they occupied building voluntarily, but because "[t]he class of possible victims of an unspecified fire that may occur at some unspecified time in the future is by no means a group of 'identifiable persons' within the meaning of *Shore*"). Indeed, this court repeatedly has stated that determining whether a

Borelli *v.* Renaldi

plaintiff is within a class of identifiable victims requires consideration of multiple factors. See *Durrant* v. *Board of Education*, supra, 284 Conn. 101 ("[i]n delineating the scope of a foreseeable class of victims exception to governmental immunity, our courts have considered numerous criteria, including the imminency of any potential harm, the likelihood that harm will result from a failure to act with reasonable care, and the identifiability of the particular victim" (internal quotation marks omitted)); *Grady* v. *Somers*, supra, 294 Conn. 351 (same); *Burns* v. *Board of Education*, 228 Conn. 640, 647, 638 A.2d 1 (1994) (same), overruled in part on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 101 A.3d 249 (2014).

It strikes me as inconceivable that *Edgerton* and *Evon*, like *Sestito* and *Shore* before them, could have been written as they were if the legal doctrine under review—the identifiable victim, imminent harm exception to the municipal immunity doctrine—had no possible application in the case, as a matter of law, for the simple reason that the plaintiff was not legally compelled to be present at the time and location of the underlying events. I understand that this court ordinarily will take up a case as presented to the trial court and as framed by the parties to the appeal, and I suppose there exists a remote possibility that the trial courts and parties in *Sestito*, *Shore*, *Evon*, *Edgerton*, and the numerous other cases that have addressed the requirements of the identifiable victim, imminent harm doctrine have entirely overlooked a plain fact of dispositive significance. It also is possible, perhaps, that this court would have engaged in an entirely unnecessary doctrinal analysis in these cases without so much as a footnote drawing attention to the pig in the parlor. It seems far more likely, however, that the putative "requirement" of a legally compelled presence was not mentioned in these cases because it is not a requirement at all.

Borelli *v.* Renaldi

In fairness to the majority, the path leading to its doctrinal error on this point has been under judicial construction since 2005, and, since then, it slowly has been broadened in a process of expansion consistent with the numerous other doctrinal innovations described and criticized in part I of this opinion. Although postcodification cases such as *Evon* and *Edgerton* quite clearly do not consider the identifiable victim, imminent harm exception to include a "legally compelled presence" requirement, there are other cases following a different course. Ironically, these cases turn the doctrine on its head, and it is unfortunate that the majority chooses to follow them rather than adhere to the doctrine as originally formulated.

The first reference to the plaintiff's involuntary presence as part of the identifiable victim analysis was made in 1994, *in support of* this court's holding that the exception applied in the case rather than as a basis for rejecting its application. See *Burns* v. *Board of Education*, supra, 228 Conn. 649 ("[t]he presence of the plaintiff child on the school premises where he was injured was not voluntary"); see also *Purzycki* v. *Fairfield*, 244 Conn. 101, 109, 708 A.2d 937 (1998) (citing *Burns* for proposition that "schoolchildren who are statutorily compelled to attend school, during school hours on school days, can be an identifiable class of victims"), overruled in part on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 101 A.3d 249 (2014).[69]

What began as a basis for finding that the plaintiff fell within a foreseeable class of identifiable victims became, ten years later, a convenient if unwarranted means to limit the doctrine. In other words, what began as a sufficient condition to qualify as an identifiable victim later became a necessary condition. This trend

___

[69] Strictly speaking, of course, no child in Connecticut is legally compelled to attend public school, so long as the child receives "equivalent instruction in the studies taught in the public schools." General Statutes § 10-184.

Borelli *v.* Renaldi

began in 2005, when the court decided as a "policy" matter to exclude parents injured on school grounds from the class of identifiable victims who could sue for negligence. See *Prescott* v. *Meriden*, 273 Conn. 759, 760–61, 764–65, 873 A.2d 175 (2005) (holding that father who slipped on wet bleachers while attending his son's high school football game was not identifiable victim because his "presence at the game was purely voluntary"); see also *Durrant* v. *Board of Education*, supra, 284 Conn. 94, 108 (holding that parent picking up her six year old daughter from after-school program was not identifiable victim because both she and her daughter were on premises "voluntarily," and, therefore, she could not recover for injuries sustained when she slipped in puddle of water on staircase on school premises). It was only a matter of time before the new requirement of a legally compelled presence was applied to plaintiffs in other contexts, as well. See, e.g., *St. Pierre* v. *Plainfield*, 326 Conn. 420, 438, 165 A.3d 148 (2017) ("[T]he plaintiff was in no way compelled to attend the aqua therapy sessions provided [at the municipal pool]. . . . Under established case law, this choice precludes us from holding that the plaintiff was an identifiable person or a member of an identifiable class of persons."); *Grady* v. *Somers*, supra, 294 Conn. 356 ("we conclude that the plaintiff is not a member of a class of foreseeable victims because, as he acknowledges, he was not legally required to dispose of his refuse by taking it to the transfer station personally and could have hired an independent contractor to do so").

No reason or justification exists for limiting an identifiable class of victims to persons who are legally compelled to be present at the time and place of the negligent act or omission. The duty at issue does not become actionable because the victim is present involuntarily.[70] It becomes actionable because it should be

_____

[70] An affirmative duty to protect a person in the defendant's custodial care does exist under the law of torts. See, e.g., *Doe* v. *Saint Francis Hospital &*

Borelli *v.* Renaldi

apparent to the municipal employee that an abstract
risk has become sufficiently particularized such that
the employee must act in order to protect the person(s)
likely to suffer harm imminently. In the language of
*Shore*, following *Sestito*, the discretionary duty owed
to the public "precipitates" into a clear and unequivo-
cal duty to a particular person or class of persons when
the harm is imminent and the likely victim is known or
knowable. *Shore* v. *Stonington*, supra, 187 Conn. 156. *One*
of the ways that the employee's generalized duty precipi-
tates into a particularized one is when the would-be vic-
tim is legally required to be present in the dangerous sit-
uation, as we have said is the case with schoolchildren
attending public schools. But a moment's reflection
demonstrates that there are many other circumstances
that will also make apparent the need to protect a partic-
ular person or persons from the risk of imminent harm.
See *Durrant* v. *Board of Education*, supra, 284 Conn.
101 ("[i]n delineating the scope of a foreseeable class of
victims exception to governmental immunity, our courts
have considered numerous criteria, including the immi-
nency of any potential harm, the likelihood that harm
will result from a failure to act with reasonable care,
and the identifiability of the particular victim" (internal
quotation marks omitted)). A police chase is a perfect
example.

There is no question that police pursuits are extremely
dangerous undertakings. In 2003 alone, there were an esti-

*Medical Center*, 309 Conn. 146, 181–82, 72 A.3d 929 (2013) ("[An] exception
to the general rule that a defendant has no obligation to aid or protect
another person arises when a special relation exists between the actor and
the other which gives to the other a right of protection. . . . Certain custo-
dial relationships fall within this exception . . . . Under this exception,
one who takes custody of another person may have a duty to protect that
person from the intentional misconduct of a third person." (Citation omitted;
footnote omitted; internal quotation marks omitted.)); 2 Restatement
(Third), Torts, Liability for Physical and Emotional Harm § 40 (b), pp. 39–40
(2012) (imposing affirmative duty of care on, among others, custodians,
including school personnel, under specified conditions). The principles ani-
mating this doctrine, however, are not the same as those underlying the
identifiable victim, imminent harm doctrine.

Borelli *v.* Renaldi

mated 35,000 police pursuits across the country, 14,000 of which resulted in crashes. P. O'Connor & W. Norse, "Police Pursuits: A Comprehensive Look at the Broad Spectrum of Police Pursuit Liability and Law," 57 Mercer L. Rev. 511, 511 (2005). From 1996 to 2015, police pursuits resulted in more than 6000 fatal crashes with more than 7000 deaths; this is an average of 355 deaths per year, or about one per day. B. Reaves, Bureau of Justice Statistics, Office of Justice Programs, United States Department of Justice, Special Report: Police Vehicle Pursuits, 2012–2013 (May, 2017) p. 6, available at http:// www.bjs.gov/content/pub/pdf/pvp1213.pdf (last visited June 22, 2020). In Connecticut over this same time period, fifty-eight people died as a result of police pursuits. Id., p. 13.

Pursuits are especially dangerous for the occupants of the pursued vehicle, like the teenager who lost his life in the pursuit giving rise to the present case. The United States Department of Justice reports that, between 1996 and 2015, 65 percent of pursuit-related fatalities involved occupants of the pursued vehicle. Id., p. 6. In Connecticut, thirty-four of the fifty-eight fatalities during that period, or over 58 percent of pursuit-related fatalities, involved occupants of the pursued vehicle. Id., p. 13. The Department of Justice also estimates that, in pursuits occurring between 2009 and 2013 that resulted in serious injuries, over three quarters of those injuries occurred to the suspect being pursued. Id., p. 7.

The legislature is well aware of the dangers inherent to police pursuits and has acted repeatedly to regulate them and reduce their frequency. In 1978, the legislature required every municipality in the state to adopt a policy for handling police pursuits. Number 78-372 of the 1978 Public Acts (P.A. 78-372), codified as amended at General Statutes § 14-283a, mandated that each policy "shall specify which driving, support and other police tactics may be employed in the case of a pursuit." P.A. 78-372,

Borelli *v.* Renaldi

§ 1. It is clear from the legislative history that concern over the danger of such pursuits—including the danger to occupants of the pursued vehicle—was a primary motivation for the act's passage. Senator Mary A. Martin, a sponsor of the 1978 act, lamented: "We frequently see in the papers articles on high speed chases and these chases are usually initiated because of minor traffic violation[s] or even a suspected violation. The drivers of these vehicles are challenged to the point where they will increase their speed. The car may have been stolen and if so, what good is a wrecked car to the owner? Or the car may have a light out or the driver may have been drinking. What justification can there possibly be for a high speed chase in these circumstances? Is it worth a life or injury to the occupants?" 21 S. Proc., Pt. 8, 1978 Sess., pp. 2945–46. Senator Betty Hudson echoed Senator Martin's concerns: "I believe [this] bill really arose because of the high speed chase and fatality that occurred in Madison . . . which is my hometown; and I agree . . . [that] there ha[s] been a lack of training for police officers throughout the state regarding the whole issue of high speed police chase[s]. . . . We have seen far, far too many accidents and deaths occur because of high speed police chase[s] involving young people, involving the police officers themselves. Many, many persons are threatened and their lives are endangered because of these kinds of pursuits.'' Id., pp. 2940–41.

The legislature expressed further concern in 1999, when it amended § 14-283a to require the creation of "a uniform, [statewide] policy for handling pursuits by police officers." Public Acts 1999, No. 99-171, § 1, codified at General Statutes § 14-283a (b). During debate in the Senate, the bill's proponent, Senator Alvin W. Penn, explained: "We're talking about a guideline for police behavior. We're talking about . . . a policy that's long overdue in the significance of saving a life, particularly

Borelli *v.* Renaldi

[that] of an innocent.'' 42 S. Proc., Pt. 8, 1999 Sess., p. 2670. Echoing the concern that arose during debate on P.A. 78-372—that the police were initiating pursuits over minor offenses—Senator Penn argued: ''[There are] too many activities where a pursuit may go through that somebody ran a stop sign or somebody ran a stop light or somebody may or may not have marijuana, somebody may have done that and put the officer's life in jeopardy and an innocent life in jeopardy. And I think that's what we're talking about, putting a safety mechanism in place.'' Id., p. 2675. Senator Eric D. Coleman shared Senator Penn's concerns: ''[T]he fact of the matter is that high speed police pursuits endanger life and limb. And it would seem to make sense to me that we ought to try to do something in order to make those kinds of situations less potentially catastrophic to innocent citizens. And it's for that matter that I would support this proposal.'' Id., p. 2693.

Debate on the statewide policy in the House of Representatives evinced similar concerns. Representative Stephen D. Dargan, the proponent of the bill in that chamber, remarked: ''There [have] been some incidents in . . . Connecticut, whereby there [have] been some tragic deaths from the pursuit of [the] law enforcement community. I stand here today to say this bill is to help protect not only the innocent that have been killed within some of these police pursuits, but to protect the law enforcement community within our [state] and our respected municipalities that serve and protect [twenty-four hours a day], 365 days a [year].'' 42 H.R. Proc., Pt. 14, 1999 Sess., p. 4880. Representative Ernest E. Newton II, encouraging passage of the bill, reminded his colleagues: ''This bill means that we might save your [child's], your [friend's], your neighbor's life.'' Id., p. 4886.

The potential danger of police pursuits remains an ongoing concern in the legislature.[71] In 2018, the legisla-

_____

[71] This concern persists for good reason. See *Torres* v. *Norwalk*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FST-CV-16-6029691-

Borelli *v.* Renaldi

ture amended § 14-283a to require the police to report every pursuit engaged in and to require annual reports from each chief of police and the Commissioner of Emergency Services and Public Protection. See Public Acts 2018, No. 18-161, § 3. And, in 2019, the legislature again amended § 14-283a, mandating updates to the statewide pursuit policy every five years and adding specific requirements concerning police conduct during chases. See Public Acts 2019, No. 19-90, § 5. In support of one aspect of the 2019 legislation, Representative Steven Stafstrom, the proponent of the bill in the House of Representatives, explained: "I know that a lot of [police] departments in the [s]tate have issued policies with respect to police pursuits, the exact reason being that . . . the data [have] shown that in fact police pursuits are more likely to cause death or serious injury or to result in undesirable outcomes then they are to achieve by engaging in the pursuit. . . . [T]here [have] been at least six deaths in Connecticut after police vehicle pursuits in 2017 alone . . . ." 62 H.R. Proc., Pt. 11, 2019 Sess., p. 9197.

The fatal accident that led to the present case is precisely the type of tragedy the legislature was concerned with preventing when it promulgated and amended § 14-283a. The plaintiff should have been allowed to present her claim to the jury because her decedent, as a passenger in the pursued vehicle, unquestionably was a member of an identifiable class of foreseeable victims. If the young occupants of the Mustang convertible being pursued at a high rate of speed do not qualify as members of an identifiable class of likely victims, then the doctrine has become an absurdity. The likely harm—a fatal automobile accident—is obvious and imminent, and the likely victims—the occupants of the pursued vehicle—consist of a number small enough to be counted on one hand. This is precisely a "[situation in which]

S (May 2, 2018) (66 Conn. L. Rptr. 548, 562 n.16) (providing six examples of police pursuits in Connecticut that ended in crashes between 2016 and 2018).

Borelli *v.* Renaldi

it would be apparent to the public officer that his [negligent acts or omissions] would be likely to subject an identifiable person to imminent harm.'' *Shore* v. *Stonington*, supra, 187 Conn. 153.

This brings me to the other reason given by the majority for concluding that the plaintiff's decedent was not identifiable. The majority observes that it is possible that Renaldi did not know that there was a backseat passenger in the Mustang convertible; he testified during his deposition that he was focused on other things. But this point stalls quickly, probably because the majority realizes that we must draw all reasonable inferences in favor of the plaintiff at this stage of the litigation, and a jury could easily conclude on this record that Renaldi was aware that there were passengers in the vehicle who plainly would qualify as identifiable victims. The majority therefore turns to an alternative point, which is that ''public policy'' requires us to hold against the plaintiff because, otherwise, every police chase will involve identifiable victims and ''the exception would swallow the rule.''

I am at a loss to understand why the putative public policy favoring an officer's exercise of discretion to engage in a high speed chase should trump the legislature's expressed public policy preference favoring public safety over the apprehension of the occupants of a pursued vehicle. The majority's conclusion is not supported by case law, common sense, or any legislative enactment of which I am aware. It appears to assume a nonexistent ''rule'' favoring the exercise of unlimited discretion in police pursuits and then decrees that the identifiable victim, imminent harm ''exception'' will swallow that rule ''because in the context of a police pursuit, there will *always* be at least one person whose presence the police could or should be aware of—the driver of the pursued vehicle . . . .'' (Emphasis in original.) The argument assumes the point it purports to demonstrate.

Borelli *v.* Renaldi

The Chief Justice's concurring opinion takes a different tack but, in my view, ultimately suffers from the same fundamental flaw as the majority opinion by substituting its own policy preferences for those policies established by the legislature. The Chief Justice's concurring opinion acknowledges that, as a matter of logic alone, no one would be more of an identifiable person subject to imminent harm than the occupant of a car being pursued by the police. But the Chief Justice's concurring opinion then carves out an exception to the doctrine[72] in the form of an irrebuttable presumption deeming all voluntary (i.e., nonkidnapped) passengers in a fleeing vehicle to be "in cahoots with" the driver of that vehicle and concludes that passengers are therefore barred as a matter of policy from invoking the imminent harm, identifiable victim doctrine. The Chief Justice's concurring opinion reaches this conclusion as a matter of what it considers to be good public policy. The problem with this approach is that the policy declaration made in the concurring opinion has no basis in Connecticut law and bears no connection to the facts of this case. Although presented as a policy informed by restraint and fashioned in deference to legislative prerogative, I believe that the Chief Justice's concurring opinion actually imposes its own policy preference in lieu of the legislative policies set forth in §§ 14-283 and 14-283a.

The Chief Justice's concurring opinion begins with the proposition that "whether a particular plaintiff comes within a cognizable class of foreseeable victims for pur-

_____

[72] The identifiable victim, imminent harm doctrine is an exception to the immunity rule for municipal employees performing discretionary functions, which itself is an exception to the common-law (now codified) liability rule historically applicable to municipal employees. In other words, the Chief Justice's concurring opinion proposes an exception to the exception to the exception. Although this proposed arrangement is not definitive proof that the doctrine has run amuck, it is a strong indication that our immunity rules have been overtaken by an impractical degree of complexity and confusion.

Borelli *v.* Renaldi

poses of [the identifiable victim, imminent harm] exception . . . is ultimately a question of policy for the courts, in that *it is in effect a question of duty* . . . [that] involves a mixture of policy considerations and evolving expectations of a maturing society . . . .'' (Emphasis added; internal quotation marks omitted.) Part II of Chief Justice Robinson's concurring opinion, quoting *Prescott* v. *Meriden*, 273 Conn. 759, 763–64, 873 A.2d 175 (2005). But the Chief Justice's concurring opinion then overlooks the single most important indicator of our state's public policy on this precise issue—the explicit text of § 14-283 (d), which provides in relevant part that a police officer pursuing a fleeing suspect has "the duty to drive with due regard for the safety of *all persons* and property." (Emphasis added.) "[A]ll persons" means everyone; the legislature did not qualify or limit the class of individuals to whom the duty is owed, and, in my view, it is not for the judiciary to devise exceptions to this legislative policy choice. Cf. *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 316 Conn. 803–804 ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language'').

In light of the legislature's powerful statement of public policy in § 14-283 to protect *all* potential victims from the inherent dangers posed by high speed police pursuits, it is clear that the legislature has chosen to adopt a public policy establishing the priority of roadway safety with respect to *all* foreseeable victims of that activity, including the passengers in the pursued vehicle. Rather than confronting the clear legislative intent expressed in § 14-283, the Chief Justice's concurring opinion retreats, ironically, to generic concerns about respecting the legislative prerogative. In my view, the legislature need not "amend our governmental

Borelli *v.* Renaldi

immunity and motor vehicle statutes to waive immunity and to allow a private right of action,'' as the Chief Justice suggests, because a private right of action already exists. Indeed, the premise of our policy inquiry in this context is that the legislature has *not* taken definitive action—this is why the question comes to us at all. There is no need for the legislature to create a ''private right of action'' against individual defendants because that right, sounding in negligence, has existed in the common law since emergency vehicles first began using the roads, and the corresponding cause of action against the municipality itself exists under the various municipal indemnification statutes, including § 7-465. Stated simply, the Chief Justice's concurring opinion, which carves out an exception to the duty of care for the occupants of the vehicle pursued by the municipal defendants, finds no support in Connecticut law.

The ''in cahoots'' policy proposed by the Chief Justice's concurring opinion conflicts in yet another way with existing Connecticut public policy, this time a policy embedded in legal doctrine established by this court. In *Greenwald* v. *Van Handel*, 311 Conn. 370, 88 A.3d 467 (2014), this court adopted the ''wrongful conduct'' rule, which prohibits a plaintiff from tort recovery if his or her injuries arose ''from the legal consequences of the plaintiff's volitional criminal conduct . . . .''[73] Id., 385. Thus, a passenger in the pursued vehicle is prohibited from recovering damages in tort for his or her injuries if, but only if, he or she intentionally engaged in felonious activity in connection with the police pursuit. See id., 378–80 (explaining that rule applies only to preclude claims by persons guilty of intentional felonious conduct). The wrongful conduct rule plainly would not apply on this record because the plaintiff's

_____

[73] Under the wrongful conduct rule, the *driver* of the pursued vehicle may be prohibited from tort recovery by virtue of his unlawful flight from the police. See *Greenwald* v. *Van Handel*, supra, 311 Conn. 385.

Borelli *v.* Renaldi

decedent, a backseat passenger in the pursued vehicle, is not even alleged to have committed any crimes, much less a serious felony; nor is there any allegation that he had any role whatsoever in aiding or encouraging the driver's decision to engage in the pursuit. I am troubled that we would find the need to fashion a brand new doctrinal innovation, the "in cahoots" doctrine, as a custom-tailored public policy declaring that a plaintiff's mere status as a passenger somehow operates to defeat his ability to seek tort compensation from the persons whose carelessness proximately caused his injuries. I am unaware of any rule of law or public policy that would support such a conclusion. To the contrary, our law— common-law and statutory alike—supports the opposite conclusion.

The Chief Justice's concurrence cites numerous out-of-state cases in support of its "in cahoots" policy concerning police liability for injuries to passengers in fleeing vehicles. None of the cases is helpful in connection with the subject at hand, however, because none of them involves Connecticut public policy on this issue; nor do they involve the application of Connecticut's rather idiosyncratic identifiable victim, imminent harm exception. The out-of-state cases are also factually distinguishable in one or more vitally important ways. For example, the Chief Justice's concurring opinion relies on *Sellers* v. *Abington*, 630 Pa. 330, 347–48, 106 A.3d 679 (2014), for the proposition that the law must not impose a duty on officers to unknown passengers in a fleeing vehicle for reasons of public policy. Even if that highly dubious proposition were true in Connecticut—even if an officer has no duty to learn whether his or her decision to give chase may put the lives of passengers at risk—the facts in the present case do not fit that hypothetical fact pattern because, in the present case, the parties hotly dispute whether the pursuing officers were aware that the

Borelli *v.* Renaldi

Mustang convertible contained passengers.[74] *Sellers* is distinguishable on this ground. See id., 355 (Todd, J., concurring) ("[t]he majority expressly conditions its assessment of [the] factor [regarding the relationship between the parties] on the fact that 'the officer was unaware of the presence of a passenger,' but does not indicate whether it would reach the same conclusion if the presence of a passenger was known, but the relationship of the passenger to the driver was not known").

Likewise, *Robinson* v. *Detroit*, 462 Mich. 439, 613 N.W.2d 307 (2000), is plainly distinguishable on numerous fronts, and the only relevant aspect of the case actually supports reversal here. In no uncertain terms, *Robinson* states that the pursuing officers owe a duty of care to passengers who are not themselves wrongdoers: "[W]e hold that the police owe a duty to innocent passengers, but owe no duty to passengers who are themselves wrongdoers whether they help bring about the pursuit or encourage flight." Id., 444.[75] *Robinson* also expressly states that, to the extent that a question of fact exists regarding whether a passenger is "innocent," summary judgment is inappropriate. See id., 452–53 ("the issue of the passengers' status has not been sufficiently developed, thereby making summary disposition on the basis of duty inappropriate at this time").[76] *Rob-*

---

[74] It seems doubtful that the officers were unaware of the passengers in the open convertible, which Officer Renaldi watched as it drove past him. In any event, his state of knowledge was for the jury to decide.

[75] For policy reasons, the Michigan court "place[d] on the plaintiff the burden of proving that a passenger was an innocent person and that the police therefore owed the passenger a duty." *Robinson* v. *Detroit*, supra, 462 Mich. 452.

[76] *Robinson* upheld the trial court's order rendering summary judgment in favor the individual officers on causation grounds—an issue not before us in the present case. The relevant statutes and case law in Michigan, moreover, demonstrate why we must be cautious before using out-of-state cases to derive the public policy in Connecticut. In contrast to our law, Michigan law waives municipal immunity in this context only when the officers' conduct amounts to *gross negligence* that operates as the *sole proximate cause* of a plaintiff's injuries. See *Robinson* v. *Detroit*, supra, 462 Mich. 460–63.

*inson* therefore supports my conclusion that the trial court improperly rendered summary judgment in favor of the defendants. The other cases briefly cited by the Chief Justice's concurring opinion similarly provide no useful guidance here.[77]

The Chief Justice's concurring opinion also echoes the concern, articulated in some of the out-of-state cases, that it would be unworkable and unduly burdensome to require police officers to first determine whether there are passengers in a vehicle before giving chase. Even assuming for the sake of argument that this concern should predominate over roadway safety, Connecticut law already accounts for it, because a plaintiff seeking to invoke the identifiable victim, imminent harm exception must demonstrate that the danger to the plaintiff arising from the alleged negligence *should have been apparent* to the defendant. See *Edgerton* v. *Clinton*, supra, 311 Conn. 231 ("In order to meet the apparentness requirement, the plaintiff must show that the circumstances would have made the government agent aware that his or her acts or omissions would likely have subjected the victim to imminent harm. . . . This is an objective test pursuant to which we consider the

---

[77] *Fawcett* v. *Adreon*, Docket No. M2000-00940-COA-R3-CV, 2001 WL 950159 (Tenn. App. August 21, 2001), relies on a provision in Tennessee's emergency vehicle statute, conspicuously absent from General Statutes § 14-283, that expressly forecloses liability for "any injury proximately or indirectly caused to an actual or *suspected violator of a law or ordinance* who is fleeing pursuit by law enforcement personnel." (Emphasis added; internal quotation marks omitted.) Id., *3. The two other cases cited by the Chief Justice rest on what appears to me to be overblown rhetoric, devoid of empirical basis, expressing the view that, because police officers are "our thin blue line protecting society," it would be unfair and impractical to impose the burden on those officers to ascertain whether their vehicular pursuit would endanger innocent passengers. *Fisher* v. *Miami-Dade County*, 883 So. 2d 335, 337 (Fla. App. 2004), review denied, 901 So. 2d 873 (Fla. 2005); see also *Ombres* v. *Palm Beach Gardens*, 788 Fed. Appx. 665, 668–69 (11th Cir. 2019) (following *Fisher* under Florida law). As previously discussed, the Connecticut legislature has arrived at the opposite public policy determination when it comes to emergency police pursuits.

Borelli *v.* Renaldi

information available to the government agent at the time of her discretionary act or omission." (Citation omitted.)). Once again, there is no need for the innovation proposed by the Chief Justice because existing law already provides the necessary policy-based limitations.

Second, and more concretely, the Chief Justice's concurring opinion addresses a hypothetical policy concern that may arise in some other case but that is not present in the case before us. If a case arises in which there is either (1) insufficient evidence to prove that the pursuing officer was aware of any passengers in the pursued vehicle, or (2) evidence that the plaintiff-passenger himself may be a wrongdoer, then we might wish to consider a policy-based rule barring recovery. In the present case, the officers were pursuing the driver of an open convertible for a minor traffic violation. On this record, it makes no sense to consider, much less adopt, the counterfactual legal presumption proposed by the Chief Justice. At the very least, the question of whether the officer was aware of the passengers and whether the passengers were "in cahoots" with the driver's act of flight should be left to the trier of fact.

The real "rule" at issue in the identifiable victim, imminent harm analysis is the one set forth in the plain language of § 52-557n, which is that a municipality is liable for the negligent acts or omissions of its employees. There is an exception to that rule for "negligent acts or omissions which require the exercise of judgment or discretion . . . ." General Statutes § 52-557 (a) (2) (B). But then there is an exception to the exception, which applies when an employee's discretionary acts expose a foreseeable victim to an imminent risk of harm. The majority agrees that the exception applies here because "there will *always* be at least one person whose presence the police could or should be aware of—the driver of the pursued vehicle"; (emphasis in original); but refuses to accept the consequences of that point.

Borelli *v.* Renaldi

There can be no question that the individuals in the pursued vehicle constitute a narrow class of readily foreseeable victims, and, therefore, the officer's duty to exercise reasonable care is "owe[d] . . . to the individual plaintiff, not just to the public in general." *Sestito* v. *Groton*, supra, 178 Conn. 527. The harm posed by a nighttime, high speed chase on rural roads is imminent, the potential injuries are catastrophic, the likelihood that the harm will eventuate is high, and the victims in the pursued vehicle are readily identifiable. See *Durrant* v. *Board of Education*, supra, 284 Conn. 101 (listing criteria used to delineate "the scope of a foreseeable class of victims exception to governmental immunity" (internal quotation marks omitted)). Indeed, the application of the exception particularly is appropriate in a case such as the present one, in which the officer's affirmative conduct (i.e., initiating the high speed chase), as opposed to his or her failure to act, caused the imminent risk of harm to eventuate, resulting in bodily injury and death. But cf. *Evon* v. *Andrews*, supra, 211 Conn. 507–508 (identifiable victim, imminent harm exception was inapplicable when city officials failed to enforce fire safety laws); *Shore* v. *Stonington*, supra, 187 Conn. 157 (identifiable victim, imminent harm exception was inapplicable when officer failed to arrest drunk driver); *Sestito* v. *Groton*, supra, 528 (identifiable victim, imminent harm exception was applicable when officer failed to interrupt public disturbance).

This state has a strong public policy in favor of encouraging the safe operation of motor vehicles and discouraging police officers from initiating high speed chases for minor vehicular infractions. Nothing is to be gained and more lives will be lost if we grant immunity to officers who engage in such chases in a negligent manner contrary to the spirit and purpose of §§ 52-557n, 14-283, 14-283a, and our common-law history.

I respectfully dissent.